UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

GEM FINANCIAL SERVICE, INC., *doing
business as* GEM PAWNBROKERS, and
MITCHELL KAMINSKY (*a majority shareholder
of GEM FINANCIAL SERVICE, INC.*),

                             Plaintiffs,

             v.

CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT and POLICE
OFFICERS JOHN DOE #1–10,

                        Defendants.

**<u>MEMORANDUM & ORDER</u>**
13-CV-1686 (MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Gem Financial Service, Inc., doing business as Gem Pawnbrokers, and Mitchell

Kaminsky brought the above-captioned action against Defendants the City of New York

("City"), the New York City Police Department ("NYPD") and Police Officers John Doe #1–10,

alleging unlawful search and seizure, malicious prosecution, arbitrary treatment as a class of one

in violation of the Fourth and Fourteenth Amendments, and municipal liability. Plaintiffs also

allege claims under the New York State Constitution, the New York Civil Rights Law

("NYCRL") and New York State common law for malicious prosecution and tortious

interference. Plaintiffs seek damages, a declaratory judgment, injunctive relief and attorneys'

fees. Defendants moved to dismiss the Complaint for failure to state a claim. At oral argument

on March 6, 2014, the Court dismissed Plaintiff Mitchel Kaminsky from this action and

dismissed all claims against the NYPD. For the reasons discussed below, Defendants' motion to

dismiss is granted in part and denied in part. The Court grants Defendants' motion to dismiss

Gem Financial Services, Inc.'s ("Gem" or "Plaintiff") class of one Equal Protection claim, federal malicious prosecution claim, NYCRL claim, and tortious interference claim. The Court denies Defendants' motion to dismiss Plaintiff's Fourth Amendment claim, state law malicious prosecution claim, municipal liability claim, and request for equitable relief. Plaintiff is granted leave to file an amended complaint.

## I.  Background

### a.  Facts

Plaintiff Gem is a collateral loan broker and secondhand dealer, duly licensed by the New York City Department of Consumer Affairs.[1]  (Compl. ¶ 11.)  Mitchell Kaminsky is the majority shareholder of Gem.  (*Id.* ¶ 7.)  Gem operates more than 20 separate retail stores in New York City.  (*Id.* ¶ 12.)  Beginning in the summer of 2011, the NYPD began visiting Gem's regional stores and making "obtrusive demands and threats" in an effort to convince Gem to use "Leads Online," a reporting system that automatically posts all transactions undertaken by a particular business on a national database viewable by law enforcement.  (*Id.* ¶¶ 13–14.)  The City and the NYPD have adopted a practice to single out pawnbrokers who choose not to utilize Leads Online, (*id.* ¶ 23), and the NYPD has subjected Gem to "threats, intimidation and disruptive actions" due to its refusal to use of Leads Online, (*id.* ¶ 24).

On March 11, 2011, NYPD officers entered a Gem store located at 1724 Pitkin Avenue, Brooklyn, New York ("Pitkin Store") without a warrant and issued four summonses to Pitkin

---

[1]  In reviewing Plaintiff's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepts all of the factual allegations in the Complaint as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Village of Willowbrook v. Oleck*, 529 U.S. 562 (2000); *see also Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011).

Store Manager Keith Watts citing violations of state and local law, all of which were eventually dismissed after numerous court appearances and argument on the merits.[2] (*Id.* ¶¶ 37–40.)

On or about March 14, 2012, NYPD officers entered a Gem regional store located at 216-15 Jamaica Avenue, Queens Village, New York ("Queens Village Store"), and questioned why the Queens Village Store was not using Leads Online. (*Id.* ¶ 25.) The NYPD urged Gem to consider using Leads Online or endure constant visits resulting in business disruption and possibly the issuance of criminal violations and arrest. (*Id.* ¶ 27.) The NYPD made it clear that if Gem registered with Leads Online, these disruptive visits would end. (*Id.* ¶ 28.)

On or about April 4, 2012, the NYPD entered the Pitkin Store and again stated that because Gem had not registered with Leads Online, Gem would be subjected to constant visits. (*Id.* ¶¶ 29, 31.)

On or about May 2, 2012, an NYPD officer told Gem's Vice-President Harold Dambrot that police visits would continue unless Gem signed up with Leads Online. (*Id.* ¶ 40.) The officer informed Dambrot that Leads Online would allow the NYPD to identify all of Gem's customers and transactions. (*Id.* ¶ 42.) During this conversation, the NYPD reiterated that if Gem did not sign up with Leads Online, more visits, arrests and possibly the closure of stores would follow. (*Id.* ¶ 43.)

On May 21, 2012, NYPD officers entered the Queens Village Store and asked questions about various transactions. (*Id.* ¶ 46.) Although the officers told Gem's management that they were performing an administrative inspection, they did not perform a "regulatory review of

---

[2] Keith Watts was served with summonses for violations of Section 5-43, 5-45 and 5-46 of the New York State General Business Law and Section 5-266(b) of the Rules of the City of New York. (Summonses Nos. 433099630-3, 433099632-7, 433099633-9 and 433099631-5, annexed to Compl. as Ex. A.)

Gem's books and records to seek to confirm transactional regularities." (*Id.* ¶¶ 48–49.) Gem was again threatened with continued business disruption if it refused to use Leads Online. (*Id.* ¶ 50.) During this incident, Dambrot told the officers via telephone that Leads Online violates the privacy rights of Gem customers and several federal laws. (*Id.* ¶¶ 53–54, 56.) After speaking with Dambrot, the officers threatened the Queens Village Store manager John Somer with arrest and store closure if Gem did not comply. (*Id.* ¶ 56.) Although no arrests were made, the NYPD did issue a misdemeanor summons to Gem for a violation of New York City Administrative Code 20–273. (*Id.* ¶¶ 58–59; Summons No. 433775608-5 annexed to Compl. as Ex. B.) This charge was eventually dismissed after the presentation of evidence and argument on the merits. (Compl. ¶ 61.)

On June 13, 2012, NYPD officers again entered the Queens Village Store and threatened further business disruption and arrests if Gem did not use Leads Online. (*Id.* ¶¶ 62, 64.) The officers issued another criminal misdemeanor summons to Gem for a violation of New York City Administrative Code 20–273 that was dismissed after the presentation of evidence and argument on the merits. (*Id.* ¶¶ 65–67; Summons No. 433775619-0, annexed to Compl. as Ex. D.)

On September 19, 2012, the NYPD issued another misdemeanor summons to Gem for a violation of Section 2-101(a) of the Rules of the City of New York. The summons was dismissed after presentation of evidence and argument on the merits. (*Id.* ¶¶ 68, 70–71, 73; Summons No. 433769774-3, annexed to Compl. as Ex. F.)

On a number of other occasions between the fall of 2011 through 2012, the NYPD maintained a constant presence at Gem's various stores and investigated random transactions. (Compl. ¶ 32.) On many of these occasions, the NYPD demanded collateral jewelry without a warrant or any other legal right. (*Id.* ¶ 33.) In addition, the NYPD would demand that Gem

place "criminal holds" on certain collateral jewelry, without any legal basis, thereby preventing Gem from utilizing said jewelry during the ordinary course of business. (*Id.* ¶¶ 34–35.) On many of these visits the NYPD would remind Gem that if it were to register with Leads Online, these activities would "cool." (*Id.* ¶ 36.)

### b. The Regulatory Scheme Governing Warrantless Searches

#### i. The Statutory Framework

Collateral loan brokers and secondhand dealers in New York City operate under a regulatory framework that includes several provisions of the New York State General Business Law, the New York City Charter, the New York City Code and the Rules and Regulations of the City of New York. At the State level, Chapter 20, Article 5 of the General Business Law regulates collateral loan brokers. *See* N.Y. Gen. Bus. Law Ch. 20, Art. 5. Section 43 of the General Business Law requires collateral loan brokers to keep a book with specific information concerning loans and collateral. N.Y. Gen. Bus. Law Ch. 20, Art. 5 § 43. Section 45 of the same law discusses inspection and states in pertinent part:

> The said book and any and all other books and records regularly kept by such collateral loan broker shall at all reasonable times be open to the inspection of the attorney general, the state comptroller, the mayor or local licensing authority, all judges of the criminal courts, the superintendent of police, police inspectors, captains of police and police justices of such cities, or any or either of them, or of any person who shall be duly authorized in writing for that purpose by any or either of them, and who shall exhibit such written authority to such collateral loan broker.

N.Y. Gen. Bus. Law Ch. 20, Art. 5 § 45.

New York City law also affords the NYPD Police Commissioner ("Commissioner") the power to conduct administrative searches of certain trades including pawnbrokers and

secondhand dealers.  Section 436 of the New York City Charter discusses the Commissioner's search power and states in pertinent part:

> The commissioner shall possess powers of general supervision and inspection over all licensed or unlicensed pawnbrokers . . . dealers in second-hand merchandise . . . and in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession.  A refusal or neglect to comply in any respect with the provisions of this section on the part of any pawnbroker . . . dealer in second-hand merchandise . . . or any clerk or employee of any thereof shall be triable by a judge of the criminal court and punishable by not more than thirty days' imprisonment, or by a fine of not more than fifty dollars, or both.

N.Y. City Charter § 436.  Several sections of the New York City code expressly govern the operations of secondhand dealers and pawnbrokers.  Section 20-277 discusses the reporting requirements of pawnbrokers and states in pertinent part:

> The police commissioner, at such times as he or she may prescribe in a written notice served upon any pawnbroker by a member of the police department, may require such pawnbroker to report to such commissioner, upon blank forms to be furnished by the police department, a description of all goods, articles or things, or any part thereof, pawned or pledged in the course of business of such pawnbroker during the days specified in such notice, stating the numbers of the pawn tickets issued therefor, the amounts loaned thereon, and such identifying marks as may be on the goods pawned.  If such notice from the police commissioner so prescribes, such pawnbroker, until he or she is notified to discontinue so doing, shall keep and furnish on such forms, a general description as to sex, color and apparent age of every person depositing such pledges.

N.Y. City Code § 20-277.  Section 20-267 is an analogous provision directed at secondhand dealers.  *See* N.Y. City Code § 20-267.  Section 20-272(b) addresses lost or stolen goods and states in pertinent part:

> Every dealer in second-hand articles who shall have or receive any goods, or articles lost or stolen, or alleged or supposed to have

> been lost or stolen, shall exhibit the same, on demand, to the
> commissioner or departmental inspector . . . to any police officer,
> or to any person, duly authorized in writing by the commissioner
> . . . who shall exhibit such written authority to the dealer.

N.Y. City Code § 20-272. Section 20-273 discusses the information secondhand dealers and

pawnbrokers must keep in a "book in which shall be legibly written in English . . . ." *See* N.Y.

City Code § 20-273(a)–(b). Subsection (d) discusses police inspection of said books and states

in pertinent part:

> Such book, at all reasonable times, shall be open to the inspection
> of any police officer, to the commissioner or departmental
> inspector . . . or any person duly authorized in writing for such
> purposes by the commissioner . . . who shall exhibit such written
> authority to the dealer.

N.Y. City Code § 20-273(d). A violation of "any of the provisions of this subchapter or

any rule or regulation issued thereunder" is a class A misdemeanor. *See* N.Y. City Code

§ 20-275. In addition, several provisions of the Rules and Regulations of the City of New

York specifically address secondhand dealers and collateral loan brokers although none

speak to administrative searches. *See* R.C.N.Y. Tit. 6, §§ 2-101–04, 5-221–37.

### ii. The Grasso Memo

All parties rely on a memorandum entitled "Guidelines for the Inspection of Pawnbroker

and Second-hand Dealers Businesses," issued in 1998 by then NYPD Deputy Commissioner for

Legal Matters George A. Grasso ("Grasso Memo"). (Annexed to the Declaration of Diane M.

Murray ("Murray Decl.") as Ex. H.) Although the Grasso Memo is not referenced in or attached

to the Complaint, the Court recognizes the Grasso Memo as integral to the Complaint.[3] The

---

[3] A document is "integral" to a complaint if it is "either in plaintiffs' possession or of
which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner., Inc.*,
282 F.3d 147, 153 (2d Cir. 2002); *see also Global Network Commc'ns, Inc. v. City of New York.*,

Grasso Memo discusses the various laws governing pawnbrokers and secondhand dealers and establishes guidelines "in order to insure that the administrative searches . . . conducted by this Department survive constitutional challenge . . . ." (*Id.* at 2.) The Grasso Memo advises officers, *inter alia*, to visit stores during regular business hours and request to inspect required books and records. (*Id.* at 5.) The Grasso Memo further advises that if an officer develops probable cause to believe that criminal activity is afoot during an inspection, the premises "should be secured and a search warrant obtained before a search of the premises is commenced." (*Id.*) Finally, the Grasso Memo reiterates that an officer may seize property only if "its evidentiary or contraband nature" is apparent and the property is in plain view. (*Id.*)

## II. Discussion

### a. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must take all of the factual allegations in the complaint as true." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir.2009)); *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320

---

458 F.3d 150, 156 (2d Cir. 2006) ("a court may consider extrinsic documents where the complaint relies heavily upon [their] terms and effect" (citation and internal quotation marks omitted)). Although neither party briefed the issue, it is apparent that Gem was in possession or at least had knowledge of the Grasso Memo as Gem referenced it several times in its opposition brief. Moreover, Plaintiff's claims involve, *inter alia*, the NYPD's allegedly unconstitutional execution of its administrative searches and the parties appear to agree that the Grasso Memo provides guidelines intended to conform the NYPD's administrative search program to New York's constitutional requirements. Therefore, Gem's claim, in part, relies on the Defendants' disregard of operative guidelines.

(2d Cir. 2009)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Iqbal*, 556 U.S. at 678); *see also Pension Ben. Guar. Corp.*, 712 F.3d at 717–18. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

When deciding a motion to dismiss, a court's review is limited to the four corners of the complaint but a court may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) any documents deemed integral to the complaint, and (4) public records. *See Nielsen v. Rabin*, --- F.3d ---, ---, 2014 WL 552805, at *4 (2d Cir. Feb. 13, 2014) (documents attached to the complaint and those incorporated by reference); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (public records).

### b. 42 U.S.C. § 1983 Claims

In order to sustain a claim for relief under § 1983, a plaintiff must allege (1) that the challenged conduct was committed by a person "acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of a right secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d

545, 547 (2d Cir. 1994)); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49 (1999) (same). Plaintiff has alleged sufficient facts to show that Defendants, acting under color of state law, plausibly violated its Fourth Amendment rights.

### i. Fourth Amendment

### 1. Unlawful Search and Seizure — Gem Stores

Plaintiff alleges that Defendants' intrusions were not legitimate administrative inspections and thus violated the Fourth Amendment.[4] Defendants argue that Plaintiff fails to state a claim because administrative inspections of pervasively regulated industries do not violate the Fourth Amendment where the inspection is in furtherance of a regulatory scheme that defines the scope of the search and limits the discretion of the inspecting officers. (Defs. Mem. 7.)

It is well-accepted that although the owner or operator of a business has a reasonable expectation of privacy in commercial property, this expectation is different from, and less than, a similar expectation in an individual's home. *New York v. Burger*, 482 U.S. 691, 699–700 (1987). "This expectation is particularly attenuated in commercial property employed in 'closely regulated' industries." *Id.* at 700. Given the diminished expectation of privacy of closely-regulated businesses, "a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *Id.* at 702; *see also In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 168 (2d Cir. 2008) ("Administrative searches, particularly those involving heavily regulated industries, may also be exempt from the warrant

---

[4] Plaintiff's first cause of action is a general claim that the NYPD unconstitutionally deprived it of its civil rights. (Compl. ¶¶ 75–83.) Plaintiff does not state which provision of the Constitution gives rise to its § 1983 claim. (*Id.* ¶ 3.) Defendants read this cause of action to be grounded in a violation of the Fourth Amendment, (Defs. Mem. 6), and Plaintiff did not dispute this characterization, (Pl. Opp'n. Mem. 10). At oral argument on March 6, 2014, Plaintiff confirmed that its first cause of action related to the Fourth Amendment only.

requirement under certain circumstances.").  In *Burger*, a case involving the constitutionality of a New York Vehicle and Traffic Law permitting warrantless searches of junkyards, the Supreme Court established a three-part test to determine whether a warrantless search of a closely-regulated industry is reasonable: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "warrantless inspections must be necessary to further the regulatory scheme"; and (3) the administrative scheme at issue "must provide a constitutionally adequate substitute for a warrant."  *Burger*, 482 U.S. at 702–03; *Anobile v. Pelligrino*, 303 F.3d 107, 117 (2d Cir. 2002) (identifying the three criteria established by the *Burger* court); *see also LeSueur-Richmond Slate Corp. v. Fehrer*, 666 F.3d 261, 264 (4th Cir. 2012) ("A statute permitting government agents to conduct warrantless searches in the context of a heavily regulated industry is constitutional so long as it satisfies the three-pronged test laid out by the U.S. Supreme Court . . . ." (citing *Burger*, 482 U.S. at 702)). The third factor is satisfied if the regulatory statute advises "the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it . . . limit[s] the discretion of the inspecting officers."  *Burger*, 482 U.S. at 703.

Defendants argue that the visits at issue did not violate the Fourth Amendment because they were permitted under § 436 of the New York City Charter which addresses the NYPD's search authority with respect to pawnbrokers and secondhand dealers such as Plaintiff.  (Defs. Mem. 10.)  This assumes that § 436 is a constitutionally adequate regulatory scheme.  But, the *Burger* Court expressly declined to address the constitutionality of § 436, *Burger*, 482 U.S. at 703 n.13 ("we have no reason to reach the question of the constitutionality of § 436"), and the

constitutionality of § 436 has not been addressed directly by any court post-*Burger*.[5]  However,

it is unclear whether Plaintiff challenges the constitutionality of § 436 under the U.S.

Constitution.[6]  For the purposes of this motion, the Court assumes the constitutionality of § 436.

According to Plaintiff,  "the NYPD consistently sought to bully Gem in part by

maintaining a constant presence at Gem's various stores and 'investigating' random transactions

— despite not performing any regimented inspection of the books and records," (Compl. ¶¶ 32,

49), and instead "on many of these occasions . . . demanded to confiscate collateral jewelry

despite having no warrant or legal right otherwise," (*id.* ¶ 33).  Plaintiff further alleges that on

---

[5]  Defendants cite to *People v. Scott*, 79 N.Y.2d 474 (1992) and *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 287 (S.D.N.Y. 2009) to support their assertion that § 436 is constitutional under the New York State and U.S. Constitutions.  In *Scott*, the Court of Appeals expressly identified the question presented as "whether an inspection conducted pursuant to Vehicle and Traffic Law § 415-a(5)(a) violates the privacy rights encompassed within article I, § 12 of the New York State Constitution."  *Scott*, 79 N.Y.2d at 514.  Contrary to Defendant's claim, the Court of Appeals did not address the constitutionality of § 436 in *Scott*.  In *5 Borough Pawn*, the district court held that "it was no violation of federal constitutional law for [Sergeant] Marti to perform repeated administrative inspections pursuant to Section 436.  *Burger* effectively settled that as a matter of federal constitutional law."  *5 Borough Pawn*, 640 F. Supp. at 291.  The Court reads this holding in *5 Borough Pawn* as an as-applied assessment of Sergeant Marti's actions.  Furthermore, the court in *5 Borough Pawn* made this observation while assessing the defendant's qualified immunity.  Thus, even recognizing the persuasive effect of sister court decisions, the court in *5 Borough Pawn* did not directly address the facial constitutionality of § 436.

[6]  Plaintiff's sixth cause of action requests a declaratory judgment that, in part, "§ 436 be deemed unconstitutional and that the New York Court of Appeals decision of *People v. Keta* - be upheld wherein said statute is deemed violative of the rights and liberties of pawn brokers and secondhand dealers operating in the State of New York."  (Compl. ¶ 133(d).)  Reasonably reading the Complaint, it appears that Plaintiff argues that § 436 is unconstitutional under the New York State Constitution as opposed to the U.S. Constitution.  This distinction is important as the New York State Constitution provides greater protection from warrantless searches than does the U.S. Constitution.  *See 5 Borough Pawn*, 640 F. Supp. at 288 (recognizing that the New York State Constitution provides New Yorkers with broader protections than does the Fourth Amendment to the United States Constitution).  Plaintiff needs to clarify his pleading to clearly state whether he is challenging the constitutionality of § 436 and, if so, under which constitution.

many occasions the NYPD "demanded that Gem place criminal holds on certain collateral jewelry" thereby preventing Gem from using such collateral jewelry for ordinary business. (*Id.* ¶ 34.) Most of Plaintiff's allegations fall within the expansive scope of the NYPD's authority under § 436. *See* N.Y. City Charter § 436 ("[I]n connection with the performance of any police duties" the Commissioner "shall have power to examine . . . clerks and employees and their books, business premises, and *any articles of merchandise* in their possession." (emphasis added)). However, § 436 does not authorize the NYPD to search, seize or place holds on any collateral jewelry absent a warrant and / or probable cause.[7] Neither does the Grasso Memo. Accepting the allegations in the Complaint as true, as the Court must, Plaintiff has stated a plausible violation of Gem's Fourth Amendment rights.

Plaintiff also alleges that Defendants operated with an improper motive, specifically, that Defendants sought to coerce Plaintiff by continuing their disruptive actions as long as Gem failed to use Leads Online. (Compl. ¶ 78.) However, an officer's subjective motive is irrelevant if any actual search that took place otherwise comports with the Fourth Amendment. *See Spinelli*, 579 F.3d at 167 ("The relevant inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent

---

[7] On March 10, 2014, Defendants wrote to the Court to correct a "misstatement" made on the record during the oral argument on March 6, 2014. (Docket Entry No. 19.) Defendants purport to remind the Court that a police officer may seize stolen property in plain view without a warrant. (*Id.*) The Court is well aware of the "plain view" exception to the warrant requirement but the fact that police officers can seize stolen property in plain view is irrelevant to the analysis of the issue of whether Plaintiff has stated a plausible Fourth Amendment deprivation. The Complaint alleges that all seizures were made without a warrant *and* without any other legal right. (Compl. ¶ 33.) Defendants further argue that the Complaint does not allege "*actual* placement of a hold." (Docket Entry No. 19 (emphasis added).) The Court disagrees. The Complaint states that the NYPD demanded that Gem place criminal holds on certain collateral jewelry, "thereby preventing Gem from utilizing [the collateral] during the ordinary course of business." (Compl. ¶ 34.)

or motivation."); *Simms v. Vill. of Albion, N.Y.*, 115 F.3d 1098, 1110 (2d Cir. 1997) ("Because the Second Circuit utilizes a wholly objective test in determining whether a Fourth Amendment violation occurred, the subjective intent of the officers effecting the entries was irrelevant."); *Blue v. Koren*, 72 F.3d 1075, 1081 (2d Cir. 1995) ("An improper motive does not create an expectation of privacy where none exists. The claim is better framed as one for government harassment in retaliation for the exercise of a constitutional right and thus sounds in due process."). Furthermore, to the extent that Plaintiff seeks to bring a § 1983 claim based on these threats, (Compl. ¶ 75), such an action fails as only actual constitutional violations may form the basis of a § 1983 claim. *See Justice v. McGovern*, No. 11-CV-5076, 2012 WL 2155275, at *3 (E.D.N.Y. Jun. 12, 2012) (dismissing an excessive force claim and noting that "[c]ourts in the Second Circuit have consistently held that [m]ere threats, verbal harassment or profanity, without any injury or damage, are not actionable under Section 1983" (second alteration in original) (internal quotation marks omitted) (citing *Mateo v. O'Connor*, No. 10-CV-8426, 2012 WL 1075830, at *4 (S.D.N.Y. Mar. 29, 2012))); *5 Borough Pawn*, *LLC v. City of New York*, 640 F. Supp. 2d 287 (S.D.N.Y. 2009) ("threatening to violate a person's constitutional rights cannot be the basis for a claim under § 1983" (citing *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 362 (S.D.N.Y. 2007))). Therefore, to the extent Plaintiff alleges Fourth Amendment violations based on the subjective intent or threats of NYPD officers, such claims are dismissed.

Plaintiff has satisfactorily pleaded factual allegations to state a claim that Gem stores were searched outside the "specific inspections . . . for specific purposes" of § 436. *See Burger*, 482 U.S. at 703. Defendants' motion to dismiss Plaintiff's § 1983 action as to the warrantless search and seizure of collateral jewelry is denied.

## 2. Unlawful Seizure — Summonses

Liberally construing the Complaint, Plaintiff alleges that the summonses issued to Gem and Watts, the manager at the Pitkin Store, resulted in unlawful seizures under the Fourth Amendment. Plaintiff argues that the issuance of "merit-less criminal summonses" resulted in a violation of their constitutional rights. (Compl. ¶¶ 77, 81–82.) Defendants argue that the summonses were not seizures within the scope of the Fourth Amendment.

"Section 1983 claims of deprivations of liberty related to criminal prosecutions implicate the Fourth Amendment right to be free of unreasonable seizure of the person." *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010). The Second Circuit has made clear that "the issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." *Burg*, 591 F.3d at 98. But in *Burg*, the Second Circuit acknowledged that the number of appearances *may* bear upon whether a summons could be considered a seizure. *Id.* However, the Court added, in dictum, that "it is hard to see how multiple appearances required by a court, or for the convenience of the person answering the summons, can be attributed to the conduct of the officer who issues it." *Id.* More recently, the Second Circuit stated that "*Burg*'s dictum is questionable unless the multiple appearances were for the arrestee's convenience." *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013).

Plaintiff alleges that the NYPD issued a total of four criminal summonses to Watts, and three summonses to Gem, all meritless. (Compl. ¶¶ 39, 58, 65, 70.) The charges against Watts were dismissed "after numerous court appearances and argument on the merits**.**" (*Id.* ¶ 40.) With respect to the other summonses, Plaintiff only alleges that they appeared in court and after the presentation of evidence and argument, the charges were dismissed. (*Id.* ¶¶ 61, 67, 73.) All

of these summonses were, indisputably, pre-arraignment, non-felony summonses requiring a later court appearance and without further restrictions. The important distinction between Plaintiff's allegations concerning the summonses issued to Watts and those issued to Gem is multiple court appearances. *Burgh* and *Swartz*, read together, suggest that a pre-arraignment, non-felony summons that results in multiple court appearances — for reasons other than the arrestee's convenience — *may* constitute a Fourth Amendment seizure. Accepting the factual allegations in the Complaint as true, Plaintiff has plausibly alleged that Watts may have suffered a deprivation of his Fourth Amendment rights. However, Plaintiff cannot bring an action based on Watts' possible Fourth Amendment deprivation.[8] With respect to the summonses issued to

---

[8] Plaintiff appears to concede that the liberty deprivation was suffered by Watts alone. (*See* Pl. Opp'n Mem. 12 ("As a consequence [of the criminal summonses], *Mr. Watts was compelled to surrender his liberty* and appear at the New York City criminal court on three separate occasions." (emphasis added)).) In *Nnebe v. Daus*, the Second Circuit stated that "it is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983 . . . ." 644 F.3d 147, 156 (2d Cir. 2011) (quoting *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984))); *see also Schachter v. U.S. Life Ins. Co. in City of New York*, 77 F. App'x 41, 42 (2d Cir. 2003) (noting that "standing to pursue a claim under 42 U.S.C. § 1983" requires personal injury). The Second Circuit went on to state in *Nnebe* that an organization may bring a § 1983 suit on its own behalf so long as it can independently satisfy the requirements of standing. *Nnebe*, 644 F.3d at 156. The Second Circuit found that the lower court incorrectly determined that New York Taxi Workers Alliance ("NYTWA") lacked standing to sue, *id.*, holding that NYTWA had shown an (1) injury in fact that is distinct and palpable (2) fairly traceable to the challenged action, and (3) likely redressable by a favorable decision, *id.* (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)). *Nnebe* involved, in part, a procedural due process challenge to the City's policy of automatically suspending the licenses of drivers arrested on criminal charges. *Nnebe*, 644 F.3d at 150. In finding that NYTWA had standing to sue, the Second Circuit recognized that the NYTWA sought to expend its resources protecting its drivers on hearings that would represent "bona fide process," and, therefore, NYTWA had a specific interest, "independent of the interest of individual drivers in their licenses." *Id.* at 158. Here, Gem has not alleged any independent interest that is distinct and palpable from that of Watts.

Tangentially, the Second Circuit did not determine that NYTWA had presented its own constitutional violation. *Nnebe* recognized NYTWA's standing to bring a § 1983 claim based on the underlying procedural due process claims of named plaintiffs and others similarly situated.

Gem, Plaintiff does not allege that their dispositions required anything beyond single respective court appearances. Plaintiff's opposition papers appear to confirm this.[9] (Pl. Opp'n. Mem. 2 n.2 ("All criminal citations were later dismissed at the respective N.Y.S. criminal court hearings.")). As such, applying *Burg*, the summonses issued to Gem, as currently pled, do not state plausible Fourth Amendment seizures. Any § 1983 claims based on these summonses are dismissed without prejudice. If Plaintiff can allege a plausible unlawful seizure claim based on multiple court appearances, and support such an allegation with credible evidence, it should be included in an amended complaint.

---

Here, Gem brings its § 1983 claims on behalf of Gem only. As such, in addition to — or, as part of — the standing inquiry, Gem must plausibly allege that it has been deprived of rights, privileges or immunities secured by the U.S. Constitution. *See Aguayo v. Richardson*, 473 F.2d 1090, 1099 (2d Cir. 1973) ("Section 1983 confers a cause of action on any citizen of the United States or other person within the jurisdiction thereof who has been deprived under color of state law of any rights, privileges, or immunities secured by the Constitution and laws." (citation and internal quotation marks omitted)); *Johnakin v. NYC Dep't of Corr.*, No. 11-CV-4807, 2013 WL 5519998, at *9 (E.D.N.Y. Sept. 30, 2013) ("Thus, to have standing to bring a claim under 42 U.S.C. § 1983, plaintiffs must demonstrate that they personally suffer from a violation of their civil rights." (citation and internal quotation marks omitted)); *Kshel Realty Corp. v. City of New York*, No. 01-CV-9039, 2003 WL 21146650, at *8 (S.D.N.Y. May 16, 2003) ("An agent of a principal does not have standing to assert a claim pursuant to Section 1983 on behalf of the principal."). Although "[t]he same conduct may result in injury to both the corporation and the individual," *Robinson v. Davis*, No. 07-CV-00265, 2010 WL 4062863, at *2 (D. Vt. Oct. 15, 2010), it does not follow that Plaintiff can bring a § 1983 action on its own behalf based on Watts' potentially unconstitutional seizure-via-summons.

[9] The Court recognizes that Plaintiff's counsel stated on the record during Plaintiff's November 21, 2012 hearing before the Queens County Criminal Court that "we have appeared three different times prior to this. . . . Or twice at least, Your Honor." (Transcript of Nov. 21, 2012 Queens County Criminal Court hearing at 4:10–13, annexed to Murray Decl. as Ex. K.) However, it is unclear whether Plaintiff's counsel was referring to multiple appearances concerning the summons at issue on that date or to the prior appearances by Plaintiff's counsel concerning the prior summonses issued to Watts and / or Gem. At oral argument before this Court, Plaintiff's counsel also represented that Plaintiff made multiple court appearances in criminal court. Notwithstanding this ambiguity, Plaintiff still fails to allege in the Complaint that the issuance of the pre-arraignment, non-felony summonses to Gem resulted in multiple appearances or any other restriction sufficient to deem them seizures within the meaning of the Fourth Amendment.

### ii. Malicious Prosecution

Plaintiff asserts a malicious prosecution claim based on the issuance of seven misdemeanor summonses. (Compl. ¶¶ 103–10.) Under New York law, the elements of a malicious prosecution are "(1) commencement of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause, and (4) institution of the proceedings with actual malice." *Swartz*, 704 F.3d at 111–12 (citing *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003)); *see also Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (stating the elements of a malicious prosecution claim under New York law); *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (same); *Adams v. City of New York*, --- F. Supp. 2d. ---, 2014 WL 309640, at *14 (E.D.N.Y. Jan. 29, 2014) (same). In addition, a plaintiff must show a "sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rutigliano v. City of New York*, 326 F. App'x 5, 8–9 (2d Cir. 2009) (quoting *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)). The Court dismisses Plaintiff's § 1983 claim based on malicious prosecution for failure to allege a plausible liberty deprivation.

### 1. Liberty Deprivation

As discussed above, *supra* Part II.b.i.2, Plaintiff does not allege that it appeared in court more than once for any given summons. As such, Plaintiff's claim falls "squarely into the line of cases . . . holding that a single court appearance, as an alleged deprivation of liberty, is insufficient to support a Section 1983 malicious prosecution claim." *Porat v. Lincoln Towers Cmty. Ass'n*, No. 04-CV-3199, 2005 WL 646093, at *3 (S.D.N.Y. Mar. 21, 2005), *aff'd*, 464 F.3d 274 (2d Cir. 2006). Plaintiff's citations to *Murphy v. Lynn* and *Swartz v. Insogna*, suggesting the contrary are distinguishable. (Pl. Opp'n Mem. 13.) In *Murphy*, the court prohibited Plaintiff from leaving the State of New York until the resolution of the charges

against him.  *Murphy*, 118 F.3d at 946.  Plaintiff has alleged no similar restriction on a constitutionally protected right such as the freedom to travel.  Plaintiff also cites to *Swartz*, 704 F.3d at 112, where the Second Circuit reversed a dismissal of a malicious prosecution claim.  In *Swartz*, the Plaintiff was subject to a criminal complaint for disorderly conduct which remained pending for several years and required three court appearances.  *Id.* at 108.  Here, in contrast, Gem's summonses were dismissed within months of being issued and required, according to the Complaint, only single court appearances.  *See Sherwyn Toppin Mktg. Consultants, Inc. v. City of New York*, No. 08-CV-1340, 2013 WL 685382, at *10 (E.D.N.Y. Feb. 25, 2013) (dismissing plaintiff's malicious prosecution claim for failing to "allege that more than one appearance or any other restrictions resulted from the summons issued"); *Gilliard v. City of New York*, No. 10-CV-5187, 2013 WL 521529, at *14 (E.D.N.Y. Feb. 11, 2013) ("Plaintiff cannot show that he suffered a 'seizure' as contemplated by the Fourth Amendment because it is undisputed that Plaintiff was issued a non-felony summons that was dismissed for legal insufficiency less than two months after it was issued.").  In addition, as already discussed, *see supra* Part II.b.i.2, Plaintiff cannot adopt any potentially plausible constitutional violation suffered by Watts. Accepting the factual allegations pleaded in the Complaint as true, and drawing all reasonable inference in Plaintiff's favor, the Court finds that Plaintiff fails to plead a plausible liberty deprivation.  The Court therefore dismisses Plaintiff's § 1983 claim based on malicious prosecution but grants Plaintiff leave to amend the Complaint if it can allege and support a plausible liberty deprivation.

### 2.  Termination in Plaintiff's Favor

Defendants also argue that Plaintiff's malicious prosecutions claim must be dismissed because the actions did not terminate in Plaintiff's favor.  (Defs. Mem. 16.)  Plaintiff only alleges

that all actions were dismissed, providing no information as to the nature of the dismissals.

(Compl. ¶¶ 61, 67, 73.)  The disposition certificates attached to the Complaint are similarly

unilluminating.  (*See* Disposition Certificates annexed to Compl. as Exs. C, E, and G.)

"An acquittal is the most obvious example of a favorable termination."  *Russell v. Smith*,

68 F.3d 33, 36 (2d Cir. 1995).  Absent an acquittal, a plaintiff must "demonstrate a final

termination of the criminal proceeding in her favor, or at least 'not inconsistent with [her]

innocence.'"  *Okoi v. El Al Israel Airlines*, 378 F. App'x 9, 11 (2d Cir. 2010) (alteration in

original) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 196 (2000)).[10]  Dismissals based on

---

[10]  The Court recognizes an apparent fissure amongst Second Circuit opinions with respect to the proper standard for assessing a favorable termination.  *Compare Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) ("[T]he plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence."); *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 229 (E.D.N.Y. 2010) ("New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence.  Instead, the plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence." (citing *Cantalino v. Danner*, 96 N.Y.2d 391, 408 (2001)), *on reconsideration in part*, 814 F. Supp. 2d 242 (E.D.N.Y. 2011), *with Gonzalez v. City of Schenectady*, 728 F.3d 149, 162 (2d Cir. 2013) ("Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused." (quoting *Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997))); *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002) ("Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." (citing *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995))).

"Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law-in this case, New York state law — for such rules."  *Negron v. Wesolowski*, 536 F. App'x 151 (2d Cir. 2013) (quoting *Conway v. Village of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984)).  Pursuant to this Second Circuit edict to follow state law, it appears that the New York Court of Appeals has adopted the "inconsistent with innocence" standard and, therefore, this Court does the same.  *See Cantalino*, 96 N.Y.2d at 410 ("[W]e reject defendant's argument that the "inconsistent with innocence" standard is limited to speedy trial dismissals, like the one at issue in *Smith–Hunter*.  The rule announced in *Smith–Hunter* is one of general application, and we see no reason to deviate from it here."); *see also Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 200 (2000) (Rosenblatt, J., concurring) (stating that the Court of Appeals "resolv[ed] a conundrum

legal insufficiency do not satisfy the favorable termination element.  *See Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("The charge subsequently was dismissed for facial insufficiency pursuant to section 170.30 of New York's Criminal Procedure Law.  Because this was not a decision on the merits, an essential element of a cause of action for malicious prosecution, the district court did not err in dismissing Breen's claim of malicious prosecution."); *McCluskey v. Town of Southampton*, No. 12-CV-2394, 2013 WL 4049525, at *6 (E.D.N.Y. Aug. 9, 2013) (holding that a dismissal based on legal insufficiency "does not constitute a decision on the merits" and therefore the dismissal did not constitute a favorable termination); *Sherwyn Toppin Mktg. Consultants, Inc. v. City of New York*, No. 08-CV-1340, 2013 WL 685382, at *9 (E.D.N.Y. Feb. 25, 2013) (holding that nineteen summonses dismissed for legal insufficiency were not favorable terminations); *Gilliard v. City of New York*, No. 10-CV-5187, 2013 WL 521529, at *13 (E.D.N.Y. Feb. 11, 2013) ("Since Plaintiff's summons was unquestionably dismissed for legal insufficiency . . . his malicious prosecution claims fail as a matter of law." (citations omitted)); *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 230 (E.D.N.Y. 2010) ("A dismissal for facial insufficiency is inadequate to constitute a favorable termination for the purposes of plaintiffs' malicious prosecution claim."); *Bender v. Alvarez*, No. 06-CV-3378, 2009 WL 112716, at *9 (E.D.N.Y. Jan. 16, 2009) ("However, dismissal for facial insufficiency is insufficient to establish a favorable termination." (citation and internal quotation marks omitted)); *De Cicco v. Madison Cnty.*, 750 N.Y.S.2d 371, 373 (App. Div. 2002) ("A

---

that has beset the law of malicious prosecution: the appropriate test for determining what is a 'favorable termination.'").  Furthermore, in *Smith-Hunter* the New York Court of Appeals expressly limited three of its decisions using the "indicative of innocence" standard in stating, "Our holdings in *Ward* [*v. Silverberg*, 652 N.E.2d 914 (1995)], *Hollender* [*v. Trump Village Co-op., Inc.*, 448 N.E.2d 432 (1983)] and *MacFawn* [*v. Kresler*, 666 N.E.2d 1359 (1996)] stand only for the proposition that dispositions inconsistent with innocence, like the ones in those cases, cannot be viewed as favorable to the accused."  *Id.* at 755.

dismissal based upon the legal insufficiency of a charging instrument is not a termination in favor of plaintiff within the context of a malicious prosecution claim." (citation omitted)); *Ellsworth v. City of Gloversville*, 703 N.Y.S.2d 294, 296 (App. Div. 2000) ("It is well established that a criminal proceeding is not considered to be terminated in a party's favor for malicious prosecution purposes where the dismissal results from the facial insufficiency of the criminal information since the dismissal is not based upon the merits of the case." (citations omitted)). This is so because a dismissal based on legal insufficiency lacks the requisite finality. *See Smith-Hunter*, 95 N.Y.2d at 197 ("[A] plaintiff in a malicious prosecution action must show, as a threshold matter, that the criminal proceeding was *finally* terminated. Indeed, it is well settled that any disposition of the criminal action which does not terminate it but permits it to be renewed . . . cannot serve as a foundation for the [malicious prosecution] action." (alteration in original) (citation and internal quotation marks omitted)).

Transcripts from the Queens County Criminal Court show that the court dismissed one summons for legal insufficiency while the court dismissed the other two, ostensibly, on the merits.[11] (*See* Transcript of Aug. 29, 2012 Queens County Criminal Court hearing 6:11–25,

---

[11] Because the viability of Plaintiff's malicious prosecution claims requires a favorable termination of the criminal summonses, the Court recognizes the criminal court hearing transcripts as documents integral to the Complaint. *See Chambers*, 282 F.3d at 153 (discussing this exception); *see also Simpson v. Melton-Simpson*, No. 10-CV-6347, 2011 WL 4056915, at *2 (S.D.N.Y. Aug. 29, 2011) ("Here, where defendant's *res judicata* argument depends on the New Jersey state court's judgment, we take judicial notice of plaintiff's complaint filed in New Jersey state court and the transcript of the state court's decision, without converting the motion into to one for summary judgment."). The Court may look to the substance of the criminal court hearings because Plaintiff's Complaint relies on the disposition of the criminal proceedings and their terms determine whether Plaintiff has a viable malicious prosecution claim. *See Global Network Commc'ns*, 458 F.3d at 156 ("a court may consider extrinsic documents where the complaint relies heavily upon [their] terms and effect" (citation and internal quotation marks omitted); *see also Campos v. City of New York*, No. 10-CV-493, 2010 WL 3912493, at *3 (S.D.N.Y. Sept. 13, 2010) (recognizing a plea transcript on a motion to dismiss the plaintiff's

annexed to Murray Decl. as Ex. J; Transcript of Nov. 21, 2012 Queens County Criminal Court

hearing 3:17–18, annexed to Murray Decl. as Ex. K; Transcript of Dec. 21,2012 Queens County

Criminal Court hearing 5:11–17, 6:4–5, annexed to Murray Decl. as Ex. L.)  Therefore, Plaintiff

fails to state a malicious prosecution claim based on its June 13, 2013 summons which was

dismissed for legal insufficiency on November 21, 2012.  However, the transcripts from hearings

dated Aug. 29, 2012 and Dec. 21, 2012, reflect that the merits were argued and that the court

dismissed the summonses because Gem had actually complied with the law.  (Transcript of

Aug.29, 2012 Queens County Criminal Court hearing 6:11–25; Transcript of Dec. 21, 2012

Queens County Criminal Court hearing 5:11–17, 6:4–5.)  With respect to the May 21, 2012 and

September 19, 2012 summonses, the actions did terminate in Gem's favor.

Defendants do not dispute that Plaintiff has plausibly alleged the remaining elements of a

malicious prosecution claim.  However, the Court notes that Plaintiff failed to allege that it filed

a timely notice of claim with respect to its May 21, 2012 summons.[12]  Therefore, although

---

malicious prosecution claim "because the proceedings themselves are expressly referenced in the
. . . Complaint, the plaintiff[ ] ha[s] actual notice of the transcript's contents (having personally
participated in the proceedings transcribed), and the transcript is a public document integral to
the case, and also, alternatively, because it is a document from a related litigation of which the
Court may take judicial notice"  (alterations in original) (citation and internal quotation marks
omitted)).  Moreover, not recognizing the transcripts would make Plaintiff's Complaint
invulnerable to a 12(b)(6) challenge "simply by clever drafting."  *See Global Network
Commc'ns*, 458 F.3d at 156 (noting that integral to the complaint exception usually includes
"transcripts or other legal documents containing obligations upon which the plaintiff's complaint
stands or falls" but for some reason were not attached to the complaint).

[12]  New York State courts strictly construe notice of claim requirements which federal
courts must apply in exercising supplemental jurisdiction over state law claims.  *See Matthews v.
City of New York*, 889 F. Supp. 2d 418, 448 (E.D.N.Y. 2012); *Excell v. City of New York*,
No. 12-CV-2874, 2012 WL 2675013, at *4 (E.D.N.Y. July 5, 2012) (citing *Promisel v. First Am.
Artificial Flowers*, 943 F.2d 251, 257 (2d Cir. 1991)).  "Under New York law, a plaintiff
asserting state law tort claims against New York municipal entities or their employees acting
within the scope of their employment must file a notice of claim within ninety days of the

Plaintiff cannot proceed with its malicious prosecution claim pursuant to § 1983 — for failure to show a plausible liberty deprivation — Gem has stated a plausible claim under New York state law based on its September 19, 2012 summons which was dismissed after a favorable termination on its merits and the subject of a timely notice of claim. To the extent Plaintiff did file a timely notice of claim concerning the May 21, 2012 summons, Plaintiff may reassert this claim in an amended complaint.

### iii. Equal Protection

Plaintiff alleges that Defendants violated Gem's right to Equal Protection by singling out "pawnbrokers and second hand dealers from other similarly situated businesses such as jewelry stores, consignment shops[,] banks and other retail businesses." (Compl. ¶ 90.) Plaintiff further alleges "[t]hat by Defendants actions, Gem was singled out . . . as a 'class of one.'" (*Id.* ¶ 91.) Defendants argue that Plaintiff fails to state a claim by failing to show that Gem is similarly situated to any identified comparator. (Defs. Mem. 12.) The Court agrees and dismisses Plaintiff's Equal Protection claim.

"To state a 'class-of-one' equal protection claim 'the plaintiff [must] allege[ ] that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, --- F. App'x ---, ---, 2014 WL 321943, at *2 (2d Cir. Jan. 30, 2014) (alterations in original) (quoting

---

incident giving rise to the claim." *Grantley v. City of New York*, No. 12-CV-8294, 2013 WL 6139688, at *3 (S.D.N.Y. Nov. 21, 2013) (citing N.Y. Gen. Mun. L. §§ 50–e, 50–i). Plaintiff filed a notice of claim on January 9, 2013, and a supplemental notice of claim on February 8, 2013. (Compl. ¶ 5.) Plaintiff's malicious prosecution claims accrued on the date of favorable termination. Therefore, any claim based on the May 21, 2012 summons accrued on August 29, 2012. Plaintiff then had until November 27, 2012 to serve its notice of claim. Plaintiff fails to allege that it served its notice of claim in a timely manner. Dismissal with respect to Plaintiff's malicious prosecution claim based on its May 21, 2012 summons is without prejudice. Plaintiff may reassert this claim if it did indeed comply with the notice of claim requirement.

*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)); *see also Fortress*

*Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012) ("The Supreme Court recognized an

Equal Protection claim 'where the plaintiff alleges that she has been intentionally treated

differently from others similarly situated and that there is no rational basis for the difference in

treatment.'" (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000))).  "[A] class-

of-one claim requires a plaintiff to show an extremely high degree of similarity between itself

and its comparators." *Fortress Bible Church*, 694 F.3d at 222 (quoting *Ruston v. Town Bd. for*

*Skaneateles*, 610 F.3d 55, 59–60 (2d Cir. 2010)); *see also JWJ Indus., Inc. v. Oswego Cnty.*, 538

F. App'x 11, 14 (2d Cir. 2013) (same) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d

Cir. 2006)).  A plaintiff must show that "(i) no rational person could regard the circumstances of

the plaintiff to differ from those of a comparator to a degree that would justify the differential

treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances

and difference in treatment are sufficient to exclude the possibility that the defendants acted on

the basis of a mistake." *Id.* at 222 (quoting *Ruston*, 610 F.3d at 60).

Plaintiff alleges that it was treated differently than jewelry stores, consignment shops,

banks and other retail businesses.  None of the businesses cited by Plaintiff are similar to it, "let

alone so similar that no rational person could see them as different." *Ruston*, 610 F.3d at 60

(finding that a 14-home development could not be compared to a country club, a luxury spa,

homes and other properties lacking the required similarity); *see also Quick Cash of Westchester*

*Ave. LLC v. Vill. of Port Chester*, No. 11-CV-5608, 2013 WL 135216, at *10 (S.D.N.Y. Jan. 10,

2013) ("Plaintiff's selection of single attributes of its shops for comparison purposes, while

ignoring the unique combination of attributes they possess, does not render it plausible that a jury

could determine that pawn shops were so similar to banks, retail stores, second hand gold

dealers, and consignment stores that any alleged selective treatment of pawn shops was unjustified.").[13]  Gem operates under a unique regulatory scheme as a pawn broker and cannot be considered so similar to jewelry stores, consignment shops, banks and other businesses that no rational person could see them as different.

In an effort to salvage its claim, Plaintiff argues that other similarly situated pawn brokers are not mistreated so long as they use Leads Online.  (Pl. Opp'n Mem. 5.)  Plaintiff submits an Affidavit by EZ Pawn Corp. President David Kaminsky in support of that argument.  (Affidavit of David Kaminsky, annexed to Paul J. Solda Declaration as Ex. A.)  This affidavit falls outside the four corners of the Complaint and the Court declines to recognize it, as it must, at the motion to dismiss stage.  *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). In addition, Plaintiff argues that the comparison to other pawnbrokers was alleged sufficiently in the Complaint.  (Pls. Opp'n Mem. 7.)  Plaintiff points to paragraphs 23 and 24 of the Complaint. (*Id.*)  Paragraph 23 states that the City and the NYPD "have adopted a practice in which [pawnbrokers] not utilizing Leads Online — are singled out and treated as suspect and with prejudice."  (Compl. ¶ 23.)  Paragraph 24 states that "such businesses including the Plaintiff — not utilizing Leads Online have been effectively prejudiced and discriminated by the NYPD and have been, as a consequence, subjected to constant threats, intimidation and disruptive actions . . . ."  (*Id.* at 24.)  These allegations fail to identify a comparatorwith the requisite

---

[13]  Plaintiff argues that this case is inapplicable because the court held that the equal protection claim at issue was not ripe for review.  (Pls. Opp'n Mem. 8.)  However, the court expressly stated that, "[e]ven if Plaintiff's equal protection claim were ripe for review, I would dismiss it for failure to state a claim."  *Quick Cash of Westchester Ave. LLC v. Vill. of Port Chester*, No. 11-CV-5608, 2013 WL 135216, at *9 (S.D.N.Y. Jan. 10, 2013).  In any event, the Court only cites to this case as supporting, not dispositive, authority.

extremely high degree of similarity and, consequently, Plaintiff fails to state a class of one claim.[14]

In opposition to the motion to dismiss, Plaintiff cites to a variety of inapposite case law. First, Plaintiff cites to *DeMuria v. Hawkes*, 328 F.3d 704 (2d Cir. 2003), to support the argument that "general allegations of disparate treatment are sufficient to survive a motion to dismiss." (Pl. Opp'n Mem. 9.) The Second Circuit has since overruled *DeMuria*. *See Ruston*, 610 F.3d at 59 ("We hold that the pleading standard set out in *Iqbal* supersedes the 'general allegation' deemed sufficient in *DeMuria*, 328 F.3d at 707."). Second, Plaintiff claims that a jury is best suited to decide "whether or not comparators were treated differently" and cites to *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011) for support. (Pl. Opp'n Mem. 9.) The court in *Mosdos* noted that "class of one" claims require "that the comparators's circumstances must be 'prima facie identical'" whereas "selective

---

[14] Defendants also argue that Plaintiff's class of one claim fails because it results from a discretionary government action. (*See* Defs. Reply Mem. 6 (citing *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008)).) The Second Circuit has "since held that *Engquist* does not bar all class-of-one claims involving discretionary state action." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012); *see also Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010) ("We join the Seventh Circuit in holding that Engquist does not bar all class-of-one claims involving discretionary state action."). Here, *Engquist* is distinguishable for two primary reasons. First, the City, in executing administrative searches of Gem stores, is acting in its regulatory capacity as a sovereign rather than a proprietor. *See Analytical Diagnostic Labs*, 626 F.3d at 142 ("There is a[] crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operations." (quoting *Engquist*, 553 U.S. at 598)). Second, the City, as argued by Defendants, conducted its administrative searches pursuant to the power (and limitations) of § 436 of the New York City Charter. (Defs. Mem. 9–10.) The regulatory framework governing the Defendants' search powers provides a "clear standard from which departures can be easily assessed." *See Fortress Bible Church*, 694 F.3d at 222 (allowing a class of one claim, in part, because the defendants did "not have complete discretion" as "it operated within a regulatory framework"). The Court finds that Plaintiff's class of one claim is not barred by *Engquist* and instead falls within the class of one claims expressly approved by the Second Circuit.

enforcement" or "selective treatment" claims involve "a slightly less stringent similarly situated standard." *Id.* at 693–66. Plaintiff's citation to *Kirschner v. Zoning Bd. of Appeals of Inc. Vill. of Valley Stream*, 924 F. Supp. 385, 391 (E.D.N.Y. 1996), is unhelpful as that case also involved a selective treatment claim.

Finally, in its opposition brief Plaintiff argues that the goal of Defendants' actions was to inhibit the exercise of Gem's "right to free establishment and commerce." (Pls. Opp'n Mem. 6–7.) Plaintiff does not reference any such constitutional rights anywhere in the Complaint. Accusations of malice and bad faith also appear for the first time in Plaintiff's opposition brief. (*Id.* at 7.) These new allegations suggest that Plaintiff wishes to pursue a claim of selective enforcement. *See Martine's Serv. Ctr.*, --- F. App'x at ---, 2014 WL 321943, at *2 ("An equal protection claim premised on selective enforcement requires a showing that '(1) . . . compared with others similarly situated, [he] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [him].'" (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). The Court grants Plaintiff leave to amend the Complaint in order to properly assert such a claim. [15] *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (recognizing that

---

[15] Although the Court grants Plaintiff leave to amend the Complaint, the likelihood that Plaintiff can assert a valid selective treatment claim based on the constitutional rights of "free establishment and commerce" is doubtful. Plaintiff's use of "free establishment" invokes the Establishment Clause which concerns the government's obligation to neither advance nor prohibit religion. *See Kiryas Joel Alliance v. Vill. of Kiryas Joel*, 495 F. App'x 183, 190 (2d Cir. 2012). It is unlikely that said clause will provide any basis for Plaintiff's selective enforcement claim. Similarly, Plaintiff's use of "commerce" references the Commerce Clause which is "a power-allocating provision" and a "substantive restriction on permissible state regulation of interstate commerce." *Dennis v. Higgins*, 498 U.S. 439, 447 (1991) (citation and internal quotation marks omitted). It is unclear how the Commerce Clause can serve as a basis for

a party may not amend its complaint through a brief (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998))).  Defendants' motion to dismiss Plaintiff's Equal Protection class of one claim is granted.

### iv.   Municipal Liability

Plaintiff argues that Defendants have adopted "a secret, unexpressed policy" that targets businesses not using Leads Online and treats those businesses as "suspect and with prejudice." (Compl. ¶ 23.)  Presumably, it is this secret, unexpressed policy that forms the basis of Gem's municipal liability allegations.[16]  (*Id.* ¶¶ 84, 92.)

In order to sustain a claim for relief under § 1983 against a municipal defendant, such as the City, a plaintiff must show the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978); *see also Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) ("[T]o hold a city liable

───────────────

Plaintiffs' claim.

[16]  Plaintiff, although seeming to request that the Court deem § 436 unconstitutional, does not appear to rest its municipal liability claim on § 436 — alone or in combination with the Grasso Memo.  (Pls. Opp'n Mem. 11 ("Defendants also claimed that Gem hasn't pled existence of a violative municipal policy or practice and cannot, therefore, carry its § 1983 claim . . . .  It is submitted, however, that by its unscrupulous nature, this obviously would exist only as a secret, unexpressed policy (although discovery may nonetheless drive this out)".)  However, Plaintiff goes on to argue that "statutes authorizing 'administrative searches' are 'the 20th century equivalent of colonial writs of assistance.'"  (*Id.* at 12 (quoting *Illinois v. Krull*, 480 US 340, 364 (O'Connor, J., dissenting))).  This suggests that Plaintiff is in fact arguing that § 436 is the operative policy at issue, not the "secret, unexpressed policy" it also mentions.   If so, the first element of a *Monell* claim would be satisfied as "alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself."  *Vives v. City of New York*, 524 F.3d 346, 357 (2d Cir. 2008) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) (Sotomayor, J.)).

under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." (alteration in original)); *Pierre v. City of New York*, No. 12-CV-9462, 2014 WL 56923, at *10 (S.D.N.Y. Jan. 7, 2014) ("[A] plaintiff must establish both a violation of his or her constitutional rights and that the violation was caused by a municipal policy or custom; that is, that the policy or custom was the actual 'moving force' behind the alleged wrongs."). Such policies need not be formal or even recognized by official decision making channels. *See Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992) ("discriminatory practices of city officials are persistent and widespread" may "be so permanent and well settled as to constitute a 'custom or usage' with the force of law" (quoting *Monell*, 436 U.S. at 691)).

Plaintiff alleges that the City and the NYPD "have encouraged and permitted such unconstitutional policies and customs to be carried out and have thereby demonstrated a deliberate indifference to those constitutional values belonging to Gem." (Compl. ¶ 89.) Plaintiff has alleged enough factual allegations to state a plausible claim that Defendants' actions of maintaining a near-constant presence at Gem stores were so persistent and widespread as to constitute the force of law. *See Connick v. Thompson*, 563 U.S. ---, ---, 131 S. Ct. 1350, 1354 (2011) ("action pursuant to official municipal policy . . . includes . . . practices so persistent and widespread as to practically have the force of law." (citation and internal quotation marks omitted)). Plaintiff identifies, and discusses in detail, seven visits by the NYPD. (Compl. ¶¶ 40, 42–43, 46, 48–50, 53–54, 56, 58–59, 62, 64, 68, 70–71, 73.) Plaintiff also alleges, which the Court must accept as true, that these are only examples of Defendants' "constant threats, intimidation and disruptive actions" "between the fall of 2011 through 2012." (*Id.* ¶ 24.) Such

allegations are sufficient to survive a motion to dismiss challenge. *See Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011) ("Three instances (including Plaintiff's own claim) might not suffice to overcome summary judgment[,] [b]ut at this stage, they do permit a plausible inference of a widespread practice or informal custom within Suffolk County."); *Michael v. Cnty. of Nassau*, No. 09-CV-5200, 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010) (finding a *Monell* claim adequately pleaded based on "multiple incidents" over a period of "several hours" including actions by various police officers); *cf. Layou v. Crews*, No. 11-CV-0114, 2013 WL 5494062, at *16 (N.D.N.Y. Sept. 30, 2013) (dismissing a *Monell* claim based on plaintiff's failure "to [identify] any other example from which it could plausibly be concluded that such incidences are either widespread or persistent throughout the County of Oswego"); *Dellutri v. Village of Elmsford*, 895 F. Supp. 2d 555, 565 (S.D.N.Y. 2012) ("Normally, 'a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct . . . .'" (quoting *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008))). As discussed above, *see supra* Part II.b.i.1, Plaintiff has alleged a plausible Fourth Amendment violation with respect to the warrantless search and seizure of collateral jewelry. Plaintiff has also successfully pleaded factual allegations sufficient to establish a plausible municipal custom which caused its constitutional violation.[17] Therefore, the motion to dismiss Plaintiff's *Monell* claim is denied.

### c. Equitable Relief

Plaintiff seeks a declaratory judgment finding that: (1) the use of Leads Online violates the Fourth Amendment rights of "all citizens who have an expectation to privacy," (2)

---

[17] The Court also recognizes that Plaintiff submitted an Affidavit by EZ Pawn Corp. President David Kaminsky alleging that his pawn shops experienced similar "police threats and harassment." (Affidavit of David Kaminsky ¶ 2, annexed to Paul J. Solda Declaration as Ex. A.) Such allegations, if included in the amended complaint, further support the existence of the municipal custom alleged by Plaintiff.

administrative inspections must be limited to "records review in premises and carried out on a systemic and regulated basis in which all pawnbrokers and secondhand dealers are reviewed orderly by law enforcement," and (3) § 436 is unconstitutional. (Compl. ¶ 133.) Plaintiff also requests injunctive relief prohibiting Defendants from coercing Plaintiff or similarly situated tradesmen into using Leads Online. (*Id.*) Defendants, assuming that Plaintiff's substantive claims would be dismissed, argue that Plaintiff's declaratory and injunctive requests cannot be recognized as independent causes of action and therefore must be dismissed. (Defs. Mem. 19.) As discussed above, Plaintiff has pleaded a plausible § 1983 claim, as such, there exists a viable substantive claim from which the Court may issue equitable relief. *See In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) ("[A] court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief."); *Springfield Hosp. v. Hofmann*, No. 09-CV-254, 2011 WL 3421528, at *4 (D. Vt. Aug. 4, 2011) (finding that "[t]he same rationale applies to injunctions"), *aff'd*, 488 F. App'x 534 (2d Cir. 2012). Defendants' motion to dismiss Plaintiff's demand for equitable relief is denied.

### d. Remaining State Law Claims

Plaintiff also brings state law actions under the NYCRL and New York common law for tortious interference. Defendants urge the Court to decline to exercise supplemental jurisdiction over all state law claims, assuming the dismissal of all federal claims. (Defs. Mem. 21–22.) Because the Court has not dismissed all of Plaintiff's federal actions, that argument fails. However, Defendants also argue that Plaintiff's state law claims fail as a matter of law.

### i. New York Civil Rights Law

Plaintiff alleges that Defendants violated Gem's right to privacy and equal protection under the New York Constitution and "Article 1 and Article 3 of the Civil Rights Law of N.Y.S."

(Compl. ¶ 95.)  Article 1 of the NYCRL is the short title for the law and confers no rights.  N.Y. Civ. Rights Law § 1.  Article 3 concerns the privilege from arrest.  *See* N.Y. Civ. Rights Law. § 1.  None of these are applicable to Plaintiff's allegations.  At oral argument on March 6, 2013, counsel for Plaintiff conceded that the NYCRL claim was not well pleaded and may not even fit within the facts of this case.  Because there is no stated NYCRL claim, the claim is dismissed without prejudice.

### ii. Tortious Interference

Plaintiff alleges that Defendants tortuously interfered with its business.  "To state a claim for tortious interference with business relations, a plaintiff must adequately allege that: '(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'"  *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 105 (2d Cir. 2012) (citing *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).  Defendants argue that Plaintiff has failed to satisfy the first and third elements of a tortious interference claim.  (Defs. Mem. 22.)  The Court agrees that Plaintiff does not satisfy the first element and therefore dismisses Plaintiff's tortious interference claim.

Plaintiff fails to identify any third party relationship damaged by Defendants' conduct. Plaintiff only alleges that "there was damage suffered by the Plaintiff as a result of the actions of Defendants and their interference with said business."  (Compl. ¶ 123.)  This is a conclusory and insufficient allegation.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 115 (2d Cir. 2010) (dismissing a tortious interference with prospective business claim due to the omission of "any third party with whom DiFolco had prospective business relations to be interfered with");

*Britestarr Homes, Inc. v. Piper Rudnick LLP*, 256 F. App'x 413, 415 (2d Cir. 2007) ("Britestarr's

claim for tortious interference with business relations fails to identify any business relationship

that was damaged by Piper's alleged errors."); *see also Combina Inc. v. Iconic Wireless Inc.*, 936

N.Y.S.2d 58 (Sup. Ct. 2011) (dismissing a tortious interference claim based on a failure "to

identify any of plaintiff's current or prospective business relations that were damaged").

Because of Plaintiff's failure to identify "a continuing business or other customary relationship,"

*Scutti Enterprises, LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003),

Plaintiff's tortious interference claim is dismissed.[18]

### III. Conclusion

The Court grants in part and denies in part Defendants' motion to dismiss. At oral

argument on March 6, 2013, the Court dismissed all claims brought by Plaintiff Kaminsky on his

own behalf and all claims against the NYPD. The Court grants Defendants' motion to dismiss

Plaintiff's class of one Equal Protection claim, federal malicious prosecution claim, NYCRL

claim, and tortious interference claim. The Court denies Defendants' motion to dismiss

Plaintiff's Fourth Amendment claim, state law malicious prosecution claim, municipal liability

---

[18] Defendants also argue that Plaintiff fails to satisfy the third element of a tortious interference claim. Defendants' argument lacks merit. "'[A]s a general rule,' in order to satisfy the third element of tortious interference with business relations, 'the defendant's conduct must amount to a crime or an independent tort.'" *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 106 (2d Cir. 2012) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1100 (2004)). If the actions in question are not independently criminal or tortious then a plaintiff must show that the "defendant engage[d] in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* (citation and internal quotation marks omitted). Defendants argue that Plaintiff cannot satisfy this element because the administrative inspections and issuance of summonses were authorized under law. (Defs. Mem. 22.) But, contrary to Defendants' argument, Plaintiff alleges that the inspections and summonses were issued in disregard of the law and have therefore satisfied this element of a tortious interference claim. However, because of Plaintiff's failure to allege any actual interference with its business relations, Plaintiff cannot maintain a claim for tortious interference with business relations.

claim, and request for equitable relief. Plaintiff is granted thirty days to file an amended

complaint to correct any of the identified deficiencies discussed above.

SO ORDERED:


_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 17, 2014
      Brooklyn, New York