UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

GEM FINANCIAL SERVICE, INC. d/b/a
GEM PAWNBROKERS,

                Plaintiff,

        v.

CITY OF NEW YORK, and POLICE OFFICERS
JOHN DOE # 1–10,

                Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-01686 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Gem Financial Service, Inc. ("Gem"), doing business as Gem Pawnbrokers,

commenced the above-captioned action on March 28, 2013 against, among others, Defendants

City of New York (the "City" or "Defendant") and Police Officers John Doe # 1–10, (Compl.,

Docket Entry No. 1), and filed an Amended Complaint on May 2, 2014, alleging, *inter alia*,

unlawful searches and seizures in violation of the Fourth Amendment, selective enforcement

under the Equal Protection Clause of the Fourteenth Amendment, and malicious prosecution

under New York state law, (Am. Compl., Docket Entry No. 25).  Currently before the Court are

the parties' cross-motions for summary judgment.[1]  Defendant moves for summary judgment as

to Plaintiff's (1) Fourth Amendment as-applied claim for search and seizure of collateral

property, (2) Equal Protection claim for selective enforcement, (3) municipal liability claim,[2] and

---

     [1]  Neither party has addressed the claims as to the John Does # 1–10.  For purposes of this
Memorandum and Order, the Court construes the cross-motions as being between the City and
Gem.

     [2]  Plaintiff's municipal liability claim is based on the alleged violations of the Fourth and
Fourteenth Amendments.

(4) state malicious prosecution claim.  (Def. Mot. for Summ. J. ("Def. Mot."), Docket Entry No.

86; Def. Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 86-9.)  Plaintiff cross-

moves for declaratory relief holding New York City Charter § 436 ("section 436") and New York

City Local Law No. 149 ("Local Law 149") facially unconstitutional under both the United

States and New York State Constitutions.  (Pl. Mot. for Summ. J. ("Pl. Mot."), Docket Entry No.

87; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 87-2.)  For the reasons

discussed below, the Court grants in part and denies in part both motions for summary judgment.

## I.  Background

### a.  Factual background

Plaintiff Gem is a licensed collateral loan broker, also known as a pawnbroker, and

second-hand dealer.  (Def. Statement of Material Facts Pursuant to Local R. 56.1 ("Def. 56.1") ¶

9, Docket Entry No. 86-1.)  As of April of 2014, Gem had twenty separate retail stores

throughout New York City.  (*Id.* ¶ 10.)

In New York City, pawnbrokers and second-hand dealers have been subject to a variety of

state and local regulations that require the recording and reporting of certain transactional

information.  (*Id.* ¶¶ 1, 5–8.)  Pursuant to statute, including section 436, Defendant has broad

supervisory authority over pawnbrokers and second-hand dealers, including the authority to

question employees, examine premises and the records and merchandise thereon, and may issue

summons for failures to comply with the various requirements.  (*Id.* ¶ 3.)

Beginning in 2010, the New York City Police Department ("NYPD") instituted a policy

designed to "encourage" the use of LeadsOnline, a "web-based electronic data transfer" database

which serves as a repository for information that pawnbrokers and second-hand dealers are

required to record and store pursuant to statute.  (*Id.* ¶ 22.)  LeadsOnline allows police officers to

download and view every uploaded transaction.  (Memo re: Increase Voluntary Use of "LeadsOnline" Electronic Pawnshop Database ("Increase Use Memo"), annexed to Def. Mot. as Ex. R, Docket Entry No. 86-7.)  The NYPD believed LeadsOnline would "allow for the gathering of information on crimes, criminals, and possibly the recovery of property."  (*Id.*)  At the time, only sixteen out of approximately 145 pawnshops in New York City used LeadsOnline.  (*Id.*)

Gem was an early adopter of LeadsOnline.  In 2007, Gem approached the NYPD about the potential use of LeadsOnline as "an effort to extend an olive branch and [desire to] develop a mutually beneficial relationship."  (Affidavit of Harold Dambrot in Supp. of Pl. Mot. ("Dambrot Aff.") ¶ 2, annexed to Pl. Mot. as Ex. A, Docket Entry No. 87-4.)  Accordingly, Gem used LeadsOnline in 2010.  (Def. 56.1 ¶ 26.)  However, Gem discontinued its use in February of 2011.  (*Id.* ¶ 27.)  Harold Dambrot, Gem's Senior Vice President for Legal Matters, explained that Gem discontinued the use of LeadsOnline because of the "constant" police holds, i.e., requests to hold onto property, and requests for photographs of collateral.  (*Id.* ¶¶ 15, 29–30.)

The NYPD encouraged officers to "actively recruit[]" pawnshops, second-hand dealers, and other businesses to use LeadsOnline.  (March 30, 2011 Leads Online Recruitment and Survey ("March 30, 2011 Memo"), annexed to Def. Mot. as Ex. R, Docket Entry No. 86-7.)  Officers were also instructed to "approach [pawnbrokers] . . . to explain the benefits and operation" of LeadsOnline.  (May 12, 2010 Expansion of Voluntary Participation of Pawnbrokers in the "LeadsOnline" Database ("May 12, 2010 Memo"), annexed to Def. Mot. as Ex. R, Docket Entry No. 86-7.)

According to Gem, after it discontinued use of LeadsOnline, there was a noticeable increase in the police presence at its stores, beginning in the summer of 2011.  (*See* Dambrot Aff.

¶ 3.)  Joseph Taranto, a manager at one Gem store, testified that the number of police visits at his particular location increased from one to two times per day in 2010, to four to five times per day in the following years, pursuant to the efforts to increase the number of stores using LeadsOnline.  (Joseph Taranto Dep. ("Taranto Dep.") 18:25–19:1, annexed to Pl. Mot. as Ex. II, Docket Entry No. 87-38.)  Dambrot, Taranto, and other Gem employees also testified at their depositions that such interactions were often hostile, accompanied by threats of arrest, and business disruption.[3]  (*See, e.g.*, Karan Ragoo Dep. in Supp. of Pl. Mot. ("Ragoo Dep.") 53:14–19, annexed to Pl. Mot. as Ex. JJ, Docket Entry No. 87-39 ("The nature of the threat was as soon as he came in he says you are not using LeadsOnline and he could shut me down.").)  The NYPD also issued Gem seven criminal summonses for various violations during this time.  (Gem Summons, annexed to Def. Mot. as Ex. S, Docket Entry No. 86-7.)  One summons, issued on September 19, 2012, was dismissed on December 21, 2012 after Gem appeared in court before Judge Raciti at the Criminal Court of the City of New York in Kew Gardens, New York.  (*See* December 21, 2012 Hr'g Tr. 5:18–22, annexed to Def. Mot. as Ex. GG, Docket Entry No. 86-8.)

Other pawnshops have testified to similar experiences.  Joseph Buoninfante, the senior manager of Quick Cash USA, LLC, a pawnbroker chain with nearly twenty stores in New York City, explained that their stores experienced a sharp increase in the number of police visits beginning in 2012.  (Joseph Buoninfante Aff. in Supp. of Pl. Mot. ("Buoninfante Aff.") ¶ 2, annexed to Pl. Mot. as Ex. J, Docket Entry No. 87-13.)  According to Buoninfante, these visits were accompanied by threats and orders to hold jewelry.  (*Id.*)  As a result, Quick Cash USA

---

[3]  Joseph J. Esposito, the former Chief of Department for the NYPD, acknowledged that even lawful inspections could often be disruptive to businesses.  (Joseph J. Esposito Dep. ("Esposito Dep.") 40:7–13 ("[I]t required us to go into the stores, disrupt their business . . . So it sort of disrupted their daily operations to some degree."), annexed to Pl. Mot. as Ex. O, Docket Entry No. 87-18).)

gave in to the NYPD's demands to use LeadsOnline. (*Id.* ¶ 3.) Upon doing so, the alleged

harassment ceased. (*Id.*) Likewise, David Kaminsky, the president of EZ Pawn Corp., a

pawnbroker chain with fourteen different stores in New York City, explained their stores were

subject to an increased police presence, threats, harassment, and bullying, upon cancellation of

their service with LeadsOnline on two separate occasions, in 2012 and May of 2015. (David

Kaminsky Aff. in Supp. of Pl. Mot. ("Kaminsky Aff.") ¶¶ 2, 5, annexed to Pl. Mot. as Ex. I,

Docket Entry No. 87-12.)

   In addition to the asserted hostile nature of the police visits, Gem also complains more

generally about officers' seizure and holds of pledged items. Gem has specifically identified

eight seizures and holds as examples of problematic police conduct. (Def. 56.1 ¶¶ 31, 52.) Gem

contends that the specifically identified seizures and holds are only examples of a much larger

number of such actions. (Dambrot Aff. ¶¶ 2–3, 6–10; Sandra Lopez Dep. ("Lopez Dep.") 32:13–

19, annexed to Pl. Mot. as Ex. KK, Docket Entry No. 87-40; Ragoo Dep. 26:24–27:5; Khariton

Popilevsky Dep. ("Popilevsky Dep.") 30:19–25, annexed to Pl. Mot. as Ex. GG, Docket Entry

No. 87-36.)

   Defendant contends that officers had probable cause to believe the seized items were

stolen, except for one pledged item for which it could not verify NYPD involvement. (Def. 56.1

¶¶ 31–45; Def. Mem. 8 n.5.) The NYPD acknowledges that where an item is not in plain view,

and they do not obtain consent to search, the premises must be secured and a warrant obtained

before any search and seizure beyond that of an ordinary administrative inspection can be

effectuated. (Joseph J. Esposito Dep. ("Esposito Dep.") 34:5–13, annexed to Pl. Mot. as Ex. O,

Docket Entry No. 87-16.) Similarly, holds of collateral are to be temporary in nature, designed

to "freeze the location" so that a search warrant may be obtained. (Patrick Timlin Dep. ("Timlin

Dep.") 65:2–7 (describing an order requiring a store owner to hold collateral "indefinitely" as "inappropriate"), annexed to Pl. Mot. as Ex. P, Docket Entry No. 87-19;[4] Esposito Dep. 34:14–21 ("[I]f we feel that we want to apply for a search warrant to seize that property, part of the process would be to freeze the location so that the property could not be disposed of while we were applying for a warrant.").) The NYPD concedes that it has never secured a warrant to seize any item from Gem between 2010 and June 21, 2016, and has never obtained a warrant to search Gem's premises. (June 21, 2016 Letter re: Supplemental Demands ("Supplemental Demands") 2, 4, annexed to Pl. Mot. as Ex. W, Docket Entry No. 87-26.) The NYPD also does not maintain records of hold requests for collateral in the possession of pawnbrokers. (Def. Resp. to Pl. First Set of Interrogs. ("Def. Resp. to Interrogs.") 5, annexed to Pl. Mot. as Ex. V, Docket Entry No. 87-25.)

Defendant contends that Dambrot, as Gem's authorized employee, consented to every hold and seizure. (Def. Mem. 3.) Dambrot testified that he never voluntarily consented to any seizure or hold request, only relenting after being given "the typical warning [that he could] be arrested for possession of stolen property, or interference with governmental administration." (Dambrot Aff. ¶ 7.) Dambrot explained that he consistently requested a warrant when the NYPD sought to seize collateral, and generally requested a warrant or further information when the NYPD sought to place holds on property.[5] (*Id.*) Despite his initial protests, Dambrot testified

---

[4] Patrick Timlin formerly served as the Deputy Commissioner of Operations for the NYPD from January of 2010 to January of 2010. (Patrick Timlin Dep. ("Timlin Dep.") 5:13–16, annexed to Pl. Mot. Ex. P, Docket Entry No. 87-19.)

[5] Dambrot acknowledged that he would at times "suggest a hold" to officers. (Harold Dambrot Dep. ("Dambrot Dep.") 92:2–3, annexed to Def. Mot. as Ex. D, Docket Entry No. 86-4.) However, Dambrot testified that this was in response to officers who demand to seize collateral and threaten to "arrest everybody." (*Id.* at 92:1–3.)

that his resolve was eventually overcome by threats of arrest, harassment of customers, and disruption of business more generally. (*Id.*; Harold Dambrot Dep. ("Dambrot Dep.") 92:1–3, annexed to Def. Mot. as Ex. D, Docket Entry No. 86-4.) Gem also explains it was under no legal obligation to keep such records of NYPD's hold and seizure requests, and visits by officers. (Dambrot Aff. ¶ 4.)

**b. The regulatory scheme governing warrantless searches**

**i. The statutory framework**

Collateral loan brokers and second-hand dealers in New York City operate under a regulatory framework that includes several provisions of the New York State General Business Law, the New York City Charter, the New York City Administrative Code, and the Rules of the City of New York ("RCNY"). At the state level, Chapter 20, Article 5 of the General Business Law regulates collateral loan brokers. *See* N.Y. Gen. Bus. Law Ch. 20, Art. 5. Section 43 of the General Business Law requires collateral loan brokers to keep a book with specific information concerning loans and collateral. N.Y. Gen. Bus. Law Ch. 20, Art. 5 § 43. Section 45 of the same law discusses inspection of such records and states in pertinent part:

> The said book and any and all other books and records regularly kept by such collateral loan broker shall at all reasonable times be open to the inspection of the attorney general, the state comptroller, the mayor or local licensing authority, all judges of the criminal courts, the superintendent of police, police inspectors, captains of police and police justices of such cities, or any or either of them, or of any person who shall be duly authorized in writing for that purpose by any or either of them, and who shall exhibit such written authority to such collateral loan broker.

N.Y. Gen. Bus. Law Ch. 20, Art. 5 § 45.

New York City law also affords the NYPD Police Commissioner (the "Commissioner") the authority to conduct administrative searches of certain trades, including pawnbrokers and second-hand dealers. Section 436 of the New York City Charter discusses the Commissioner's

search power and states in pertinent part:

> The commissioner shall possess powers of general supervision and inspection over all licensed or unlicensed pawnbrokers . . . dealers in second-hand merchandise . . . and in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession. A refusal or neglect to comply in any respect with the provisions of this section on the part of any pawnbroker . . . dealer in second-hand merchandise . . . or any clerk or employee of any thereof shall be triable by a judge of the criminal court and punishable by not more than thirty days' imprisonment, or by a fine of not more than fifty dollars, or both.

N.Y. City Charter § 436. Several sections of the New York City Administrative Code expressly govern the operations of second-hand dealers and pawnbrokers. Section 20-277 discusses the reporting requirements of pawnbrokers which has changed since the commencement of this litigation. At the commencement of this litigation, Section 20-277 stated:

> The police commissioner, at such times as he or she may prescribe in a written notice served upon any pawnbroker by a member of the police department, may require such pawnbroker to report to such commissioner, upon blank forms to be furnished by the police department, a description of all goods, articles or things, or any part thereof, pawned or pledged in the course of business of such pawnbroker during the days specified in such notice, stating the numbers of the pawn tickets issued therefor, the amounts loaned thereon, and such identifying marks as may be on the goods pawned. If such notice from the police commissioner so prescribes, such pawnbroker, until he or she is notified to discontinue so doing, shall keep and furnish on such forms, a general description as to sex, color and apparent age of every person depositing such pledges.

N.Y. City Code § 20-277.[6] Section 20-267 is an analogous provision directed at second-hand dealers. *See* N.Y. City Code § 20-267. Section 20-272(b) addresses lost or stolen goods and

---

[6] The current version now states that the blank forms may be required "in addition to the electronic record" required. N.Y. City Code § 20-277(b). The new version also requires more details as to the pledgors including name, address, telephone number, and address. *Id.*

stated in pertinent part:

> Every dealer in second-hand articles who shall have or receive any goods, or articles lost or stolen, or alleged or supposed to have been lost or stolen, shall exhibit the same, on demand, to the commissioner or departmental inspector . . . to any police officer, or to any person, duly authorized in writing by the commissioner . . . who shall exhibit such written authority to the dealer.

N.Y. City Code § 20-272.  Section 20-273 discusses the information second-hand dealers are required to keep and stated that pawnbrokers must keep a "book in which [that information] shall be legibly written in English . . . ."[7]  *See* N.Y. City Code § 20-273(a)–(b).  Subsection (d) discusses police inspection of said books and stated in pertinent part:

> Such book, at all reasonable times, shall be open to the inspection of any police officer, to the commissioner or departmental inspector . . . or any person duly authorized in writing for such purposes by the commissioner . . . who shall exhibit such written authority to the dealer.

N.Y. City Code § 20-273(d).[8]  A violation of "any of the provisions of this subchapter or any rule or regulation issued thereunder" is a class A misdemeanor.  *See* N.Y. City Code § 20-275.  In addition, 6 RCNY § 1-16 authorizes the Department of Consumer Affairs ("DCA") to conduct inspections of on-site books and records required to be maintained by licensees under the New York City Administrative Codes.  The DCA inspections are to be "conducted at least once in every two-year period" and the licensees must make records available "during business hours." 6 RCNY § 1-16.

In 2013, after the commencement of this action, the New York City Council enacted

---

[7]  The current version now requires a "written record of transactions" rather than a "book."  N.Y. City Code § 20-273(a).

[8]  The current version has eliminated the "reasonable times" language and now allows for review of electronic records, in addition to traditional records.  N.Y. City Code § 20-273(e).

Local Law 149, requiring pawnbrokers and second-hand dealers to report transactions electronically, amending sections 20-267, 20-273, and 20-277. (*See* Local Law No. 149, annexed to Def. Reply in Supp. of Def. Mot. ("Def. Reply"), Docket Entry No. 88, as Ex. LL, Docket Entry No. 88-3.) On June 3, 2015, a New York State Supreme Court enjoined the various statutes including section 436 and Local Law 149, granting a preliminary injunction while finding the statutes likely to be facially unconstitutional under Article 1 § 12 of the New York State Constitution. *Collateral Loanbrokers Ass'n of New York, Inc. v. City of New York*, 18 N.Y.S.3d 578 (Sup. Ct. 2015), *rev'd*, 46 N.Y.S.3d 600 (App. Div. 2017). After granting a stay of the Supreme Court's ruling pending appeal, the New York Appellate Division, First Department, reversed, finding the plaintiffs unlikely to succeed on the merits. *Collateral Loanbrokers Ass'n of New York, Inc. v. City of New York*, 46 N.Y.S.3d 600, 605 (App. Div. 2017), *appeal dismissed*, 29 N.Y.3d 974 (2017). In its analysis, the Appellate Division distinguished between Local Law 149 and its transactional reporting requirements and other statutes that oversee physical inspections of commercial premises. *Id.* at 604.

### ii. NYPD guidance

In 1998, George A. Grasso, then-Deputy Commissioner of Legal Matters of the NYPD, promulgated a memorandum entitled "Guidelines for the Inspection of Pawnbroker and Second-hand Dealers Businesses," ("Grasso Memo," annexed to Pl. Mot. as Ex. C, Docket Entry No. 87-6). The Grasso Memo, addressed to "Chief of Detectives," discusses the various laws governing pawnbrokers and second-hand dealers and establishes guidelines "in order to insure that the administrative searches . . . conducted by this Department survive constitutional challenge . . . ." (*Id.* at 2.) The Grasso Memo advises officers, *inter alia,* to visit stores during regular business hours and request to inspect required books and records. (*Id.* at 5.) The Grasso Memo further

advises that if an officer develops probable cause to believe that criminal activity is afoot during an inspection, the premises "should be secured and a search warrant obtained before a search of the premises is commenced." (*Id.*) Finally, the Grasso Memo reiterates that an officer may seize property only if "its evidentiary or contraband nature" is apparent and the property is in plain view. (*Id.*)

More recently, on August 1, 2013, the NYPD promulgated Patrol Guide Procedure No. 214-38, ("Patrol Guide," annexed to Pl. Mot. as Ex. D, Docket Entry No. 87-7). The Patrol Guide's purpose is "[t]o establish a systemic inspection of pawnbrokers and second-hand dealers by patrol precincts." (*Id.*) The Patrol Guide reiterates aspects of the Grasso Memo concerning the warrantless inspection of pawnbrokers and second-hand dealers. (*Id.*) In addition, the Patrol Guide provides guidelines to officers on the retention and review of electronic records uploaded by pawnbrokers and second-hand dealers to an online database. (*Id.*) Pursuant to the Patrol Guide, officers are directed to inspect on-site records at least once every ten days if those records are not maintained electronically. (*Id.*) Electronic records, however, are to be reviewed weekly. (*Id.*)

On August 5, 2016, certain aspects of the Grasso Memo and the Patrol Guide were codified in 38 RCNY § 21-11. Under 38 RCNY § 21-11(a), officers are to examine the "last twenty articles purchased or received in pledge . . . that are still in inventory," "[c]ompare the articles to the description . . . listed in the" store records, and review the entries for "completeness, accuracy, and legibility." These inspections "must occur regularly, and in no event less often than once per quarter during the calendar year." 38 RCNY § 21-11(a).

### c. Procedural background

Gem and former Plaintiff Mitchell Kaminsky filed the original Complaint on March 28,

2013 against Defendants the City, Police Officers John Doe # 1–10, and former Defendant the NYPD, alleging unlawful search and seizure, malicious prosecution, differential treatment (under a class one theory) in violation of the Fourth and Fourteenth Amendments, and municipal liability. (Compl.) Gem and Kaminsky also alleged claims under the New York State Constitution, the New York Civil Rights Law ("NYCRL") and New York state common law for malicious prosecution and tortious interference.

Defendants moved to dismiss the Complaint on July 12, 2013. At oral argument on March 6, 2014, the Court dismissed Kaminsky from the action and dismissed all claims against the NYPD. (Minute Entry dated March 6, 2014.) By Memorandum and Order dated March 17, 2014 (the "March 17, 2014 Decision"), the Court granted in part and denied in part Defendants' motion to dismiss. *Gem Fin. Serv., Inc. v. City of New York*, No. 13-CV-1686, 2014 WL 1010408, at \*16 (E.D.N.Y. Mar. 17, 2014) ("*Gem I*"). The Court granted Defendants' motion to dismiss Gem's class of one Equal Protection claim, federal malicious prosecution claim, NYCRL claim, and tortious interference claim. (*Id.*) The Court denied Defendants' motion to dismiss Gem's Fourth Amendment claim, state law malicious prosecution claim, municipal liability claim, and request for equitable relief. (*Id.*) In denying the motion to dismiss as to the Fourth Amendment claim, the Court assumed, for purposes of the motion to dismiss, that section 436 was constitutional and held that the seizures and holds fell outside even the expansive scope of that statute. *See Gem I*, 2014 WL 1010408, at \*6. Rather than dismiss Gem's as-applied challenge against the warrantless inspections of its stores, the Court reasoned that the NYPD's alleged actions went even *beyond* the broad authorization in section 436. *See id.* at \*7–8. The

Court did not limit or dismiss any portion of Gem's Fourth Amendment claim.[9]

Gem filed an Amended Complaint on May 2, 2014, adding Keith Watts[10] as a Plaintiff. In addition to its Fourth Amendment,[11] state malicious prosecution, and municipal liability claims, Gem also alleged a selective enforcement claim in violation of the Equal Protection Clause. (*See generally* Am. Compl.)

Defendant moved for reconsideration of the March 17, 2014 Decision as to the Fourth Amendment and state malicious prosecution claims and moved to dismiss the selective treatment Equal Protection claim. (Def. Mot. for Reconsideration and to Dismiss ("Def. Reconsideration")

---

[9] In moving for summary judgment, Defendant appears to have misconstrued the Court's prior orders regarding Plaintiff's remaining claim under the Fourth Amendment. In its moving papers, Defendant argues that the only remaining *as-applied* Fourth Amendment claim relates to the seizures and holds of collateral items. (*See* Def. Mem. in Supp. of Def. Mot. ("Def. Mem.") 1 n.1, Docket Entry No. 86-9; *id.* at 3 n.3 (reciting standard for constitutional warrantless searches for closely-regulated industries).) In its reply, Defendant discussed the validity of its current warrantless administrative inspection program in response to Plaintiff's request for this Court to declare section 436 and Local Law 149 *facially* unconstitutional. Indeed, as part of its explanation as to why section 436 and Local Law 149 were facially constitutional, Defendant states in one conclusory paragraph that the NYPD had faithfully followed various guidance limiting police discretion. (*See* Def. Reply in Supp. of Def. Mot. ("Def. Reply") 25, Docket Entry No. 88.) However, the Court did not dismiss Plaintiff's as-applied challenge as to whether the warrantless inspections of the premises satisfied the requirements set forth in *New York v. Burger*, 482 U.S. 691 (1987), for closely regulated businesses. To avoid any confusion as to the issues addressed in the prior decisions and this Memorandum and Order, the Court bifurcates Plaintiff's as-applied Fourth Amendment challenge into claims for (1) seizure and holds of collateral property and (2) warrantless search and seizure of the premises. While searches and seizures of property may form a part of the broader claim regarding the warrantless search and seizure of the premises, the Court only considers Defendant's challenge to seizures and holds of property because that is the only challenge Defendant has raised in its motion for summary judgment.

[10] Although the Amended Complaint added Keith Watts as a Plaintiff, the Court dismissed all of his claims as withdrawn following his death. *Gem Fin. Serv., Inc. v. City of New York*, No. 13-CV-1686, 2015 WL 1475853, at *1 n.1 (E.D.N.Y. Mar. 31, 2015).

[11] As discussed *infra*, for purposes of this motion, the Court construes Plaintiff to be asserting two separate, yet connected, Fourth Amendment claims.

1, Docket Entry 37.)  By Memorandum and Order date March 31, 2015 ("March 31, 2015

Decision"), the Court denied Defendants' motions in their entirety.  *Gem Fin. Serv., Inc. v. City*

*of New York*, No. 13-CV-1686, 2015 WL 1475853, at *10 (E.D.N.Y. Mar. 31, 2015) ("*Gem II*").

## II. Discussion

### a.  Standard of review

Summary judgment is proper only when, construing the evidence in the light most

favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v.*

*Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230

(2d Cir. 2015).  The role of the court "is not to resolve disputed questions of fact but only to

determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz v. City of*

*Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d

537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50

(1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could

reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla

of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide

"whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving

party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394,

398 (2d Cir. 2000).

### b.  Section 1983 claims

Plaintiff asserts the following claims against Defendant under section 1983: (1) as-

applied and facial challenges under the Fourth Amendment for unlawful searches and seizures,

(2) selective enforcement action under the Equal Protection Clause, and (3) municipal liability.

Defendant moves for summary judgment as to all claims.

Under section 1983, individuals may bring a private cause of action against persons "acting under color of state law" to recover money damages for deprivations of their federal or constitutional rights. *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014) (quoting 42 U.S.C. § 1983). To establish a viable section 1983 claim, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States" and that "the alleged deprivation was committed by a person acting under color of state law." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015) (citations and internal quotation marks omitted).

### i. As-applied Fourth Amendment claim

Plaintiff brings an as-applied claim under the Fourth Amendment for unlawful searches and seizures for warrantless administrative inspections of its commercial premises. In addition, Plaintiff asserts a claim for seizures and holds of collateral property, both independent and as part of its overall claim regarding the inspections.[12] Defendant specifically challenges the claim for seizure and holds of collateral property on four bases: (1) Plaintiff has no reasonable expectation of privacy in the pledged items, records, and the information therein; (2) the pledged items were seized pursuant to voluntary consent; and/or (3) the plain view doctrine; and (4) there was no practice or policy to form the basis of municipal liability. The Court separately discusses each challenge below.

---

[12] As noted *infra*, the Court only addresses Plaintiff's as-applied Fourth Amendment claim for the seizure and holds of collateral property as Defendant only moved for summary judgment as to this claim. The Court does not address Plaintiff's as-applied warrantless inspection claims.

### 1. Reasonable expectation of privacy

Defendant argues that Plaintiff does not have a reasonable expectation of privacy in the records or the pledged items because they are subject to inspection under the administrative scheme applicable to pawnbrokers and second-hand dealers.  (Def. Mem. 7; Def. Reply 25–26.) With respect to the content of the records, Defendant argues that Plaintiff has no reasonable expectation of privacy because the information therein is provided by customers, and is required and subject to review by statute.  (Def. Mem. 7.)  While unclear, Plaintiff appears to assume a reasonable expectation of privacy in the records, the information therein, and the pledged items based on language from *New York v. Burger*, 482 U.S. 691 (1987) ("*Burger*").[13]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV. "A search occurs when the Government acquires information by either 'physically intruding on persons, houses, papers, or effects,' or otherwise invading an area in which the individual has a reasonable expectation of privacy."  *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014)

---

[13]  Plaintiff relies in part on alleged Fourth Amendment violations of its customers' reasonable expectations of privacy.  (*See* Pl. Mem. 3, 4, 18, 19, 23.)  However, "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted."  *Plumhoff v. Rickard*, 572 U.S. ---, ---, 134 S. Ct. 2012, 2022 (May 27, 2014); *United States v. Payner*, 447 U.S. 727, 731 (1980) ("[T]he defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party."); *see also Motor City Pawn Brokers, Inc. v. City of Warren*, No. 322459, 2015 WL 9258083, at *1 (Mich. Ct. App. Dec. 17, 2015) (holding ordinance requiring the use of LeadsOnline did not violate various federal and state statutes including the Gramm–Leach–Bliley Financial Services Modernization Act of 1999 ("FSMA")).  In addition, customers have no reasonable expectation of privacy for information they voluntarily convey to third parties. *See Smith v. Maryland*, 442 U.S. 735, 743–44 (1979); *United States v. Ulbricht*, 858 F.3d 71, 96 (2d Cir. 2017); *but see Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 625 n.4 (2d Cir. 2015) ("The government invokes the third-party doctrine . . . to assert that Appellants have no privacy rights in the records . . . we need not decide today the relationship between changing expectations of privacy and third-party providers.").

(citations omitted). "A seizure occurs when the Government interferes in some meaningful way with the individual's possession of property." *Id.* (citations omitted).

Generally, as a threshold matter, there must be a reasonable expectation of privacy in the places or items for there to be a search or seizure within the meaning of the Fourth Amendment. *See California v. Ciraolo*, 476 U.S. 207, 211 (1986) ("The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" (citation omitted)); *United States v. Simmonds*, 641 F. App'x 99, 104 (2d Cir. 2016) ("It is well established that the Fourth Amendment applies only to spaces in which an individual has a reasonable expectation of privacy."); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 184 (2d Cir. 2004) (finding no search or seizure claim because plaintiff had no reasonable expectation of privacy in personal property maintained in classroom after being suspended); *United States v. Moran*, 349 F. Supp. 2d 425, 467 (N.D.N.Y. 2005) ("Where there is no legitimate expectation of privacy, there is no search or seizure within the ambit of the Fourth Amendment." (citation omitted)); *see also Fla. v. Jardines*, 569 U.S. 1, 11 (2013) ("The *Katz* [*v. United States*, 389 U.S. 347 (1967),] reasonable-expectations test 'has been *added to,* not *substituted for*,' the traditional property-based understanding of the Fourth Amendment." (citation omitted)). In assessing the legitimacy of an expectation of privacy, courts employ a "two-part" inquiry from *Katz*: "first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Ciraolo*, 476 U.S. at 211.

"One who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of th[e] right to exclude." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978). Under *Katz*, this property-based expectation of privacy extends to

"private" business records containing "the kind of commercially sensitive information" that society does not "ordinarily . . . expect[] to [be] disclose[d]." *Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013), *aff'd sub nom. City of Los Angeles, Calif. v. Patel*, 576 U.S. ---, ---, 135 S. Ct. 2443 (June 22, 2015); *United States v. AJS Merch., Inc.*, 90-CR-121, 1993 U.S. Dist. LEXIS 21320, at *24–26 (W.D.N.Y. May 24, 1993); *see also United States v. Torres*, 949 F.2d 606, 608 (2d Cir. 1991) ("Neither possession nor ownership of property establishes a legitimate expectation of privacy unless the party vigilantly protects the right to exclude others.").

Despite the expectation of privacy in certain private, commercially sensitive business records, the Second Circuit has held that "records required to be kept pursuant to valid regulatory programs have a 'public aspect' for purposes of constitutional analysis, and thus are not private papers entitled to the protection of the [F]ourth or [F]ifth amendments." *Donovan v. Mehlenbacher*, 652 F.2d 228, 231 (2d Cir. 1981) (applying the "required records" doctrine to documents required to be kept by labor regulations); *Sec. & Exch. Comm'n v. Olsen*, 243 F. Supp. 338, 339 (S.D.N.Y. 1965) (holding production of SEC required documents to be "quasi-public records" and did not constitute an unreasonable search and seizure under the Fourth Amendment); *Glenwood TV, Inc. v. Ratner*, 480 N.Y.S.2d 98, 102–03 (App. Div. 1984) ("It is clear that 'the modern businessman has little or no expectation of privacy in his business records, especially those documents prepared in compliance with regulatory requirements'"), *aff'd*, 65 N.Y.2d 642 (1985); *but see Patel*, 738 F.3d at 1062 (holding hotel "retain[ed] [an] expectation of privacy notwithstanding the fact that the records [were] required to be kept by law").

Courts apply a "three-factor test to determine whether documents are 'required records.'" *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d 339, 345 (2d Cir. 2013) (quoting

*Grosso v. United States*, 390 U.S. 62, 67–68 (1968)) (internal quotation marks omitted). "[F]irst, the purposes of the [government's] inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents." *Id.*[14]

Furthermore, the United States Supreme Court has held that the recordkeeping and reporting of certain transactional information do not implicate the Fourth Amendment. *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 54 (1974). In upholding the Bank Secrecy Act

---

[14] The Court is mindful of the concern that a reasonable expectation of privacy may be "stripped away merely by the adoption of a regulation authorizing searches of an item or location." *Patel v. City of Los Angeles*, 686 F.3d 1085, 1088 (9th Cir. 2012), *on reh'g en banc*, 738 F.3d 1058 (9th Cir. 2013). This rationale may "allow the government to conduct warrantless searches just by announcing that it can." *Id.* Indeed, the "public aspects" element of the required records doctrine is often satisfied by the existence of a statutory reporting requirement. *See In re Doe*, 711 F.2d 1187, 1192 (2d Cir. 1983) ("The public aspect of the prescription is demonstrated by the requirement that a copy of it must be forwarded to the New York State Department of Health."); *United States v. Bohonnon*, 628 F. Supp. 1026, 1029 (D. Conn. 1985) ("The public aspect requirement is also satisfied by the requirement that income tax forms must be filed with the I.R.S."), *aff'd*, 795 F.2d 79 (2d Cir. 1985). Furthermore, as in *Donovan v. Mehlenbacher*, 652 F.2d 228 (2d Cir. 1981), courts often appear to assume the "public aspects" element based on the satisfaction of the other elements of the required records doctrine. *See, e.g., Donovan*, 652 F.2d at 231; *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d 339, 351 (2d Cir. 2013) ("The rule distilled from *Donovan* and [*Marchetti v. United States*, 390 U.S. 39 (1968),] is that records required to be created under an *otherwise valid* regulatory regime necessarily have 'public aspects' for purposes of the required records exception."); *In re Kenny*, 715 F.2d 51, 53 (2d Cir. 1983) ("Finally, the subpoenaed documents possess 'public aspects' by virtue of New Jersey's comprehensive regulatory scheme."); *United States v. Silverman*, 449 F.2d 1341, 1345 (2d Cir. 1971) ("Records required to be kept pursuant to a reasonable regulatory scheme have 'public aspects' and may be examined for evidence of criminal conduct."); *In re Doe*, 97 F.R.D. 640, 642–43 (S.D.N.Y. 1982) ("Language in recent opinions in this circuit suggests that if records are maintained pursuant to a valid regulatory program, they then have a 'public aspect' for purposes of constitutional analysis." (citations omitted)); *United States v. LaPage*, 441 F. Supp. 824, 827 (N.D.N.Y. 1977) ("Moreover, they are of the nature of those records generally maintained by cattlemen, and possess certain public aspects by virtue of the foregoing regulations and the policies behind them."); *United States v. Cubeta*, 369 F. Supp. 242, 244 (D. Conn. 1974) ("There is little question that section 923 is essentially regulatory in nature with definite 'public aspects' features.").

("BSA"), the Supreme Court explained that "banks [were] not . . . mere stranger[s] or bystanders[s] with respect to the transactions which [they were] required to record or report." *Id.* at 66. Instead, the banks themselves were "part[ies] to each of the[] transactions, earn[ing] portions of [their] income from conducting such transactions, and in the past may have kept records of similar transactions on a voluntary basis for [their] own purposes." *Id.* Under these circumstances, the Court "ha[d] no difficulty . . . in determining that the . . . reporting [requirements did not] abridge [any] Fourth Amendment right of the banks themselves." *Id.* Ultimately, the reporting requirements were reasonable because the requested information was "reasonably relevant" to the regulatory authority of the agency and "not too indefinite." *Id.* at 67; *Collateral Loanbrokers*, 46 N.Y.S.3d at 604 ("Transactional reporting requirements imposed in a regulated industry that sufficiently describe and limit the information to be provided and are reasonably related to the regulatory authority of the agency to which the information is provided do not trigger constitutional protections against unreasonable searches and seizures." (citing *California Bankers*, 416 U.S. at 67)); *but see California Bankers*, 416 U.S. at 64 ("The District Court went on to pose . . . whether 'these provisions . . . [would] require financial institutions . . . to routinely report . . . the detail of almost every conceivable financial transaction . . . . The District Court was wrong in framing the question . . . . The question is . . . what sort of reporting requirements [that] . . . in fact [were] impose[d].").[15]

### A. Plaintiff has a reasonable expectation of privacy in the pledged items and the physical records

Applying the above principles, Plaintiff has a reasonable expectation of privacy in the

---

[15] Despite the holding in *California Bankers*, the opinion seemingly reflected, in part, a concern over a broad application of its reasoning. *See, e.g., California Bankers*, 416 U.S. at 27 ("At the same time, it was recognized by Congress that such required records would 'not be made automatically available for law enforcement purposes (but could) only be obtained through existing legal process.'" (citation omitted)).

pledged items, and its own physical records. Plaintiff has a possessory and an ownership interest in the pledged items and also the physical records, providing it with the right to exclude others. *See Sanders v. City of San Diego*, 93 F.3d 1423, 1426 (9th Cir. 1996) ("[T]he pawnbroker, as pledgee, has a legitimate possessory interest in the property as against the rest of the world except the person having title to the property." (quoting *G & G Jewelry, Inc. v. City of Oakland*, 989 F.2d 1093, 1098 (9th Cir. 1993)). There is no evidence in the record indicating that Plaintiff ever abandoned its exclusive rights to own and possess these items. *Cf. United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990) (holding that a person forfeits reasonable expectation of privacy in property that he voluntarily abandons).

### B. Plaintiff has no reasonable expectation of privacy in the information in the required records

Plaintiff does not have any reasonable expectation of privacy in the *information* in the records pursuant to the required record doctrine.[16] As discussed below, this finding is also supported by the transactional nature of the information required by the various statutes.

---

[16] The Court notes that the required records doctrine, as suggested by the elements of the standard, is applied more commonly in the context of the Fifth Amendment. *See In re Grand Jury Subpoena*, 741 F.3d at 343 (applying the required records doctrine for Fifth Amendment challenge). Therefore, there is likely a diminished expectation of privacy under the *Katz* inquiry even in cases where *all* the elements of the required records doctrine are not present. *See United States v. Chuang*, 897 F.2d 646, 651 (2d Cir. 1990) ("The fact that [defendant], as an officer of a national bank, knew th[e] documents were subject to periodic examination . . . , coupled with the fact that they were found in areas other than [defendant's] office, lead us to conclude that [defendant's] Fourth Amendment rights were not infringed by . . . [government] examination."); *United States v. Snyder*, 668 F.2d 686, 690 (2d Cir. 1982) ("The records examined . . . were union business records, required to be kept by law . . . and subject to inspection . . . Appellant had no reasonable expectation of privacy in these records."); *We Buy, Inc. v. Town of Clarkstown State of New York*, No. 06-CV-1794, 2006 WL 3016314, at *5 (S.D.N.Y. Oct. 20, 2006) ("It is . . . difficult to see how [plaintiff] could have a reasonable expectation of privacy in those records protected by the Fourth Amendment when they were subject to inspection by the police at any time under the administrative scheme.").

### (1)  The "essentially regulatory" test

The first prong of the required record doctrine "asks whether the record requirement is 'essentially regulatory.'"  *In re Grand Jury Subpoena*, 741 F.3d at 347.  This inquiry looks to the "specific section" of the statute in question.  *Id.* at 348. "[T]he fact [t]hat a statute relates both to criminal law and to civil regulatory matters does not strip the statute of its status as essentially regulatory."  *Id.* at 349 (citation and internal quotation marks omitted).  However, "courts are more likely to hold that the required records exception does not apply" "[w]hen legislation is not 'directed at the public at large' and concerns 'an area permeated with criminal statutes.'"  *Id.* at 347.  Ultimately, "the question is not whether [the government] was subjectively concerned about crime when enacting [a statute's] recordkeeping and reporting provisions, but rather whether these requirements apply exclusively or almost exclusively to people engaged in criminal activity."  *Id.* at 349.  Thus, the required record doctrine applies if "[t]here is nothing inherently illegal about" the information to be collected.  *Id.* at 348.  Based on these principles, courts have refused to apply the required record doctrine to "records regarding marijuana sales, ownership of dangerous firearms," but have done so "in the context of drivers involved in automobile accidents, custodians of state-supervised children, and even various sections of the BSA."  *Id.*

The Court finds that the recordkeeping and reporting requirements of pawnshop transactional information are essentially regulatory.  The statutes and ordinances, including the sections concerning the recording requirements — the portions of the statutes at issue — "target[] those engaged in the lawful activity of [entering into transactions at a pawnshop.]"  *Id.* There is nothing inherently suspect about selling or buying items at pawnshops.  As Plaintiff acknowledges, the parties to the transactions, including its customers, are also not "inherently

suspect." *See id.*; (Pl. Reply in Supp. of Pl Mot. ("Pl. Reply") 9 & 9 n.10, Docket Entry No. 89

("[I]n 2013, the NYPD quantified the percentage of items potentially stolen that pass through

pawnbrokers — and found the rate only to be [0].0001 of 1 percent!").)  Furthermore, Plaintiff's

argument that the recording requirements, along with the rest of the regulatory scheme

overseeing pawnbrokers, were designed for police purposes are irrelevant to the application of

this exception.  (*See generally* Pl. Mem.)  Although portions of the record support Plaintiff's

characterization of the requirements as focused on criminal activity, the subjective intent of the

legislature in enacting the statutes and ordinances is not determinative.  *See In re Grand Jury*

*Subpoena*, 741 F.3d at 349.  Furthermore, the requirements have "considerable regulatory utility

outside of the criminal justice context."  *Id.*  These requirements "serve[] several purposes,

including deterring theft crimes by making it more difficult for stolen property to be monetized

and protecting customers who pledge goods as collateral for short-term loans by ensuring that

they are charged lawful interest rates and that the goods are held for the statutory period."

*Collateral Loanbrokers*, 46 N.Y.S.3d at 605.

### (2)  The "customarily kept" requirement

The second prong "requires that the regulated 'information is to be obtained by requiring

the preservation of records of a kind which the regulated party has customarily kept.'"  *In re*

*Grand Jury Subpoena*, 741 F.3d at 349 (quoting *Grosso*, 390 U.S. at 68) (internal quotation

marks omitted).

The records required to be kept are "very basic" and of the type that Plaintiff has likely

customarily kept.  *Id.* at 350.  By the very nature of their business, pawnshops and other second-

hand dealers need to keep a record of the transactions they enter.  Accordingly, the required

information only concerns basic details about the consumer, including their name, residence, the

nature of the transaction including date, time, location, and descriptions, including a photograph, of the item involved. *Cf. id.* at 350 (holding it to be "common sense" that a bank account's beneficiary would customarily keep "essential information as the bank's name, the maximum amount held in the account each year, and the account number"). Indeed, Plaintiff's own "pawn ticket," provided to customers, requires and records the customer's name, address, the time, date, location of the transaction, and a short description of the pledged item. (*See* Pawn Ticket, annexed to Def. Mot. as Ex. F, Docket Entry No. 86-5.) The pawn ticket also states that "proper id[entification] is required for all transactions." (*Id.*) Because of the unique nature of each item involved in every transaction, Plaintiff would not be able to function without such detailed records. "As a party to the transaction, [much of the information required are of a kind that Plaintiff] already possess or would acquire in its own interest." *California Bankers*, 416 U.S. at 67; (*see also* Dambrot Dep. 150:7–13 ("After [fifteen days], [the pledged items are] sent to the main branch for examination, inventory.").)

### (3) The "public aspects" prong

The third prong asks whether the required records "have assumed public aspects which render them at least analogous to public documents." *In re Grand Jury Subpoena*, 741 F.3d at 351 (quoting *Grosso*, 390 U.S. at 68) (internal quotation marks omitted). "The rule . . . is that records required to be created under an *otherwise valid* regulatory regime necessarily have 'public aspects' for purposes of the required records exception." *Id.* However, "[a] constitutionally infirm statute cannot recharacterize private information as public." *Id.* Nevertheless, "[t]he record need not be 'public' in that anyone can examine or copy it at any time; it need only be lawfully required to be kept." *Id.*

The records at issue are created under a valid regulatory regime and Plaintiff also does

not challenge the aspect of the regulatory scheme requiring that records be kept. Instead, Plaintiff challenges the *manner* in which its premises and records may be inspected and obtained by law enforcement, including the new electronic requirements. (*See generally* Pl. Mem.; Pl. Reply.) Under Second Circuit precedent, the records and the information therein have "public aspects" for purposes of the required records exception. Thus, the information in the records meet all three prongs of the required records doctrine. Accordingly, the information in the records is not protected by the Fourth Amendment.

### C. Consistent with the reasoning in *Burger*

The above reasoning is also consistent with *Burger*. As the Court explained in its March 17, 2014 Decision:

> It is well-accepted that although the owner or operator of a business has a reasonable expectation of privacy in *commercial property*, this expectation is different from, and less than, a similar expectation in an individual's home. "This expectation is particularly attenuated in *commercial property* employed in 'closely regulated' industries."

*Gem I*, 2014 WL 1010408, at *6 (citations omitted and emphasis added). In *Burger*, the Supreme Court recognized that "owner[s] or operator[s] . . . in a 'closely regulated' industry ha[ve] [some, albeit] reduced expectation of privacy" in the "commercial *premises*," including the records and property thereon. *Burger*, 482 U.S. at 700, 702 (emphasis added). However, the Supreme Court did not necessarily find a reasonable expectation of privacy in the information in the records. Reviews of the records and their content were only *indirectly* limited by the constraints in "time, place, and scope" of the physical inspections of the premises.[17] *Id.* at 711;

---

[17] Officers could have also written down the information in the records without giving rise to a seizure within the meaning of the Fourth Amendment. *Arizona v. Hicks*, 480 U.S. 321, 324 (1987) (holding "mere recording of the serial numbers [of stereo in presence of officer] did not constitute a seizure"); Orin S. Kerr, *Fourth Amendment Seizures of Computer Data*, 119 Yale

*see also id.* at 711–12 ("[T]he inspectors may examine the records, as well as 'any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.'"); *id.* at 700 ("Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." (citations omitted)).

Because Plaintiff does not have a reasonable expectation of privacy in the recorded information, there can be no Fourth Amendment violation for review or collection of such information. Accordingly, Plaintiff may challenge the search and seizure of the pledged items, and the physical records maintained on-site but not the information required to be kept by statute.

### 2. Consent and plain view doctrine as to the seized items

Regardless of whether the Plaintiff retained a reasonable expectation of privacy in the pledged items, Defendant argues that all seizures or holds were pursuant to consent or the plain view doctrine because Dambrot, as Plaintiff's representative, consented to all the expressly identified seizures and holds, except one.[18] (Def. Mem. 3.) In addition, Defendant argues that at least a few of the items were also seized under the plain view doctrine after Dambrot consented to bring officers to areas in which the pledges were stored. (*Id.*) Defendant further argues that, because the NYPD had probable cause to believe the expressly identified pledged items seized or held were stolen, the plain view doctrine applies, making the seizures proper. (*Id.* at 3, 7.) Plaintiff contends that Dambrot never voluntarily consented, only acquiescing after officers threatened him with arrest and/or business disruption. (Pl. Mem. 13.) In addition, Plaintiff

---

L.J. 700, 713 (2010) (arguing that copying based on human observation does not constitute a seizure).

[18] Defendant asserts that the lone exception is for a pledge "where no evidence of NYPD involvement was provided." (Def. Mem. 3.)

argues there were many other pledges that were seized or held in addition to those specifically identified in the Amended Complaint. (*Id.*)

### A. Both the "actual" seizures and police holds are seizures within the meaning of the Fourth Amendment

As discussed *supra*, "[a] seizure occurs when the Government interferes in some meaningful way with the individual's possession of property." *Ganias*, 755 F.3d at 133 (citations omitted); *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 62–64 (1992) (explaining a seizure occurs when one's property interests are violated). "The rights and benefits of property ownership . . . include not only the right to actual possession of a thing, but also the right to exclude others from possessing it, . . . and the right to sell, alienate, waste, or even destroy it." *Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009) (citing Hon. James L. Oakes, *"Property Rights" in Constitutional Analysis Today*, 56 Wash. L. Rev. 583, 589 (1981)).

Both the "actual seizures" and the police holds are seizures within the meaning of the Fourth Amendment. Plaintiff has possessory and ownership interests in all the pledged items. (*See supra* pp. 20–21.) By taking pledged items away, the NYPD eliminated actual possession — a complete interference with its "possessory interests." *United States v. Jacobsen*, 466 U.S. 109, 113, (1984); *see also United States v. Haqq*, 278 F.3d 44, 50 (2d Cir. 2002) ("Accordingly, because the Supreme Court in [*Arizona v. Hicks*, 480 U.S. 321, 324 (1987),] held that the search of the stereo equipment was unlawful, it necessarily also found . . . that the defendant had a legitimate expectation of privacy in that equipment, despite its having been stolen."); Restatement (Second) of Torts § 229 (1965) ("'Proprietary interest' is used to denote any right of ownership of an interest in relation to the chattel which would entitle the actor to retain its possession permanently, indefinitely, or *for a period of time*." (emphasis added)). The placement of a hold also meaningfully interfered with Plaintiff's possessory or property interests.

Possessory interests inherently inhere a "right to sell, alienate, . . . or even destroy" the property at issue.[19]  *Almeida*, 588 F.3d at 788.  Despite retaining physical possession of the items placed on hold, Plaintiff could not fully exercise its possessory interests.

## B.  Plaintiff did not voluntarily consent

Officers may effectuate a search and seizure of property "without violating the Fourth Amendment if the owner or lawful custodian voluntarily gives consent."[20]  *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996).  "Whether an individual has voluntarily given consent is essentially a fact-based inquiry that must be determined by the totality of all the circumstances."  *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir. 1993) (quoting *Schneckloth v. v. Bustamonte*, 412 U.S. 218, 227 (1973)) (internal quotation marks omitted), *cert. denied,* 511 U.S. 1025 (1994).  "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority."  *Id.* (citations omitted); *see also Fla. v. Bostick*, 501 U.S. 429, 438 (1991) ("'Consent' that is the product of official intimidation or harassment is not consent at all.  Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse.").

---

[19]  In certain situations, warrantless temporary seizures may be reasonable and not violate the Fourth Amendment.  *See Illinois v. McArthur*, 531 U.S. 326, 330 (2001) ("[T]his Court has upheld temporary restraints where needed to preserve evidence until police could obtain a warrant."); *United States v. Place*, 462 U.S. 696, 707 (1983) (holding temporary seizure of luggage to be constitutional so long as the seizure is not overly intrusive upon the person's privacy interest in the property, and so long as the property is not detained for a long period of time); *United States v. Gori*, 230 F.3d 44, 46 (2d Cir. 2000).  However, Defendant did not argue that the holds were "temporary seizures."  In addition, the Court notes that Dambrot testified that at least a few of the holds were for indefinite periods of time.  (*See* Dambrot Aff. ¶8); *see also Sanders v. City of San Diego*, 93 F.3d 1423, 1431 (9th Cir. 1996) (describing ninety-day temporary holds police may place on pawned items pursuant to statute).  Moreover, the NYPD never obtained any warrants to seize items from Plaintiff.  (*See* Supplemental Demands 2, 4.)

[20]  "The analysis for seizures on consent basically tracks the analysis of the more well-developed area of consent searches."  *We Buy*, 2006 WL 3016314, at *7 n.7 (citations omitted).

"In examining all the surrounding circumstances . . . , account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Corbett v. City of New York*, No. 15-CV-09214, 2017 WL 3207783, at *9 (S.D.N.Y. July 27, 2017) (quoting *Schneckloth*, 412 U.S. at 228). Courts also take into consideration "the age, intelligence and educational background, [and] the length and nature of [a party's] interaction with the police." *United States v. Zaleski*, 559 F. Supp. 2d 178, 185 (D. Conn. 2008) (citations omitted). "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004); *see Florida v. Jimeno,* 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

In section 1983 actions, the Second Circuit has generally imposed "only a burden of production, *i.e.*, 'the duty of producing evidence of consent'" on the defendant. *Tirreno v. Mott*, 375 F. App'x 140, 142 (2d Cir. 2010) ("[T]he law of this Circuit is not clear in assigning the burden of proof regarding consent in a § 1983 action for unlawful search."); *Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991) ("[T]he presumption may cast upon the defendant the duty of producing evidence of consent or search incident to an arrest or other exceptions to the warrant requirement."). "[A]s in all civil cases, 'the ultimate risk of non-persuasion . . . remain[s] squarely on the plaintiff." *Harris v. O'Hare*, 770 F.3d 224, 234 n.3 (2d Cir. 2014) (quoting *Ruggiero,* 928 F.2d at 563) (discussing burden requirements of warrantless searches in the context of the exigent circumstances exception), *as amended* (Nov. 24, 2014).

Under the circumstances of this case, a reasonable juror could conclude that the consent

provided on a number of occasions was involuntary. Dambrot testified that he was threatened with arrest if he did not automatically comply with police officers' seizure or hold requests.[21] In particular, Dambrot testified that officers threatened to arrest him for "possession of stolen property and interference with government administration" when he requested a warrant or further information. Defendant does not necessarily dispute such threats were made. (*See* Def. Mem. 11 n.8 (noting that there were at most three separate threats described in the record).) Instead, Defendant argues that threats of arrest are not coercive as a matter of law where there is probable cause to arrest. (*See* Def. Mem. 5.) In support of this argument, Defendant proffers evidence that most, if not all, of the items were subject to lawful investigations with probable cause to seize the pledges as stolen property. (*See* Def. Mem. 8.)

The evidence that there was probable cause to seize the items does not mitigate the threat of arrests and the involuntariness of the consent. Indeed, Defendant provides no evidence that the officers had *any* probable cause to arrest Dambrot and the other employees for *knowing* possession of stolen property and interference with government administration — the crimes for which they were threatened. *See* N.Y. Penal Law § 165.40 ("A person is guilty of criminal possession of stolen property in the fifth degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof."); N.Y. Penal Law § 195.05 ("A person is guilty of obstructing governmental administration when he intentionally obstructs . . . by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . ."). Instead,

---

[21] Plaintiff's other employees also testified that they were often threatened with arrest for legally refusing to do what officers requested, including a general refusal of the stores to use LeadsOnline. (*See* Somar Dep. 54:1–16; Ragoo Dep. 53:14–22; Lopez Dep. 33:8–15.) One manager testified that officers became specifically upset after being informed that she needed to talk to Dambrot first, prior to acquiescing to their demands. (Lopez Dep. 8–15.)

the only evidence in the record suggests that the officers were impermissibly asserting that Dambrot's requests for warrants or more substantial evidence were themselves the justifications for arrest. *See Dancy v. McGinley*, 843 F.3d 93, 112 (2d Cir. 2016) (holding "noncompliance with [police officer's] orders could not furnish . . . probable cause to arrest" for obstruction of governmental administration); *5 Borough Pawn, LLC. v. Marti*, 753 F. Supp. 2d 186, 196 (S.D.N.Y. 2010) (holding a reasonable juror could conclude that pawnshop employee was "actually arrested for failing to consent to an unlawful search of the pawnshop's safe"); (*see also* Patrol Guide: Inspections of Pawnbrokers and Second-Hand Dealers ("Patrol Guide") 3, annexed to Def. Mem. as Ex. Q, Docket Entry No. 86-7 ("Pawnbrokers . . . are legitimate businesses . . . However, a pawnbroker . . . can sometimes *unknowingly* be serving as a 'fence' for unscrupulous criminals." (emphasis added)).)

In addition to the threats of arrest, Dambrot also testified that officers threatened to "tear [stores] apart," harass customers, and otherwise disrupt business if he did not comply with their requests to seize collateral. (Dambrot Dep. 126:13–20.) While officers are certainly allowed to inform the public of lawful consequences of a refusal to consent, including the obtainment and execution of a search warrant, the manner in which the message is conveyed is relevant to a determination of voluntariness. Under the circumstances, a jury could find that the officers were attempting to coerce Dambrot through thinly veiled-threats. *We Buy, Inc. v. Town of Clarkstown State of New York*, No. 06-CV-1794, 2006 WL 3016314, at *8 (S.D.N.Y. Oct. 20, 2006) ("[A] jury could find that, under the circumstances, the police were not merely providing [workers] information on which to base their decision, but attempting to overcome their resolution not to consent."). Courts have held similar threats that officers would tear houses apart to be sufficiently coercive to overcome a finding of voluntary consent. *See United States v. Turner*, 23

F. Supp. 3d 290, 309 (S.D.N.Y. 2014) ("[C]ourts have found threats to one's home . . . to render involuntary individuals' consent to search their premises."); *United States v. Taft,* 769 F. Supp. 1295, 1306 (D. Vt. 1991) (consent involuntary where, *inter alia,* police threatened that the suspect's "house would be torn up if a search warrant had to be obtained"); *see also United States v. Kampbell*, 574 F.2d 962, 963 (8th Cir. 1978) (consent coerced where defendant was told, after refusing to consent, that a search warrant would give the police "the authority to tear the paneling off the walls"). Although private homes are afforded greater protections than commercial premises, the Court does not find a meaningful distinction in the effect such threats would have on an owner or employee of a business in comparison to a homeowner. Dambrot was effectively left with two impossible choices — exercise Plaintiff's rights and allow that to be the *very basis* for his arrest and destruction of his employer's business, or acquiesce to any and all, even unlawful, demands.

Based on the totality of the circumstances, the Court finds that a reasonable jury could find a lack of consent for many of the seizures and holds at issue. Indeed, as explained *infra*, there is evidence to suggest that a threat of arrest or business disruption preceded every request to seize an item. (*See infra* pp. 34–40.) Plaintiff cannot be said to have consented merely because the police successfully acquired acquiescence by intimidation and harassment. *See Bostick*, 501 U.S. at 438; *Wilson*, 11 F.3d at 351.

### C.  Plain view doctrine does not apply

"'Under the plain-view exception' to the Fourth Amendment's requirement of a warrant for search and seizure, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Delva*, 858 F.3d 135, 149

(2d Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

The record does not support Defendant's contention that all the seizures and holds came within the purview of the plain view exception. Defendant does not dispute that many, if not all, of the collateral items at issue were stored in a vault.[22] (Def. Mem. 9.) Other than the consent argument discussed *supra*, Defendant does not assert that police officers had any lawful right of access to the vault. Defendant, for example, does not argue that the officers were allowed to enter the vault pursuant to an administrative inspection. To the contrary, Defendant admits that the vault and the items within can only be accessed by officers via consent. (*See* Def. Mem. 13 ("However, as collateral jewelry is stored in a vault, [Gem] could have prevented the removal of the collateral jewelry by refusing to remove the item from the vault."); Doephner Dep. 62:20–23 ("If the officer wanted to go into the pawnbroker's safe or vault and remove things without the pawnbroker's consent, he would need a search warrant.").)

To the extent officers did not have lawful access to be in a position to view the seized or held pledges, the plain view doctrine does not apply. By the very definition of the doctrine, the plain view exception cannot apply to items that are not visible to officers. Officers cannot overcome this basic requirement by unlawfully requiring items to be presented before them, even if there was probable cause to believe the collateral were stolen. *See Payton v. New York*, 445 U.S. 573, 587 (1980) ("It is one thing to seize without a warrant property resting in an open area . . . , and it is quite another thing to effect a warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer." (quoting *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 354 (1977)); *see*

---

[22] The vault appears to have been located in Brooklyn, New York. (*See* Ragoo Dep. 55:7–8.) Defendant has not asserted that it ever seized or held items on public display. (*See id.* 55:11–12 ("[P]olice officer[s] never took an item for sale.").)

*also We Buy*, 2006 WL 3016314, at *6 (holding that even property that was within the view of officer was not necessarily subject to the plain view doctrine if the object was placed in front of the officer without consent); *Winters v. Bd. of Cty. Comm'rs*, 4 F.3d 848, 854 (10th Cir. 1993) ("Because the [officer] never saw the ring until it was provided to him by [the pawnshop], justifying the seizure as plain view would be a mischaracterization.").

Under the factual circumstances of this case, a reasonable jury could conclude that the plain view doctrine does not apply to many, if not all, of the collateral items that were seized and held in violation of the Fourth Amendment.

### 3. Plaintiff has provided sufficient evidence of a widespread policy to satisfy *Monell*

In order to sustain a claim for relief pursuant to section 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or custom that caused injury, and a direct causal connection between that policy or custom and the deprivation of a constitutional right. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."); *see Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) ("[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." (alteration in original) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007))). *Monell* does not provide an independent separate cause of action against a municipality; "it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent

constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)

(citing *Monell*, 436 U.S. at 694 and *City of Canton v. Harris*, 489 U.S. 378 (1989)); *see Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality." (citing *Monell,* 436 U.S. at 690–91 and *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012))).

A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates. *See Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification of low-level employee's actions).

Defendant argues that, as a municipality, it cannot be held liable because Plaintiff has failed to identify any official policy, custom, or persistent practice that allows for improper seizures and holds in violation of the Fourth Amendment. (Def. Mem. 14–15.) Defendant also argues that the NYPD has adopted specific lawful procedures governing seizures and holds

pursuant to the Grasso Memo and other guidance.  (*Id.* at 16.)  Defendant further argues that three threats of arrest for seizures and holds are insufficient to support Plaintiff's claim of a practice or pattern of violations of the Fourth Amendment.  (*Id.*)  Plaintiff contends that section 436, and the guidance documents effectuating the policy goals thereof, including the Grasso Memo, are express policies allowing for the violation of its constitutional rights.[23]  (*See* Pl. Mem. 14–15 ("Because [D]efendant argue[s] that it[]s actions are in accordance with their administrative inspection scheme as sanctioned by [section] 436 — then application of that statute is ostensibly the operative policy at issue).)  In addition, Plaintiff disputes Defendant's characterization of the number of problematic interactions between its employees and the NYPD.  (Dambrot Aff. ¶¶ 2–4.)  Further, Plaintiff provides evidence of similar actions by the NYPD at other pawnshops.  (*See* Kaminsky Aff. ¶¶ 4, 6; Buoninfante Aff. ¶ 2.)

As noted above, a plaintiff "need not identify an express rule or regulation," to impose municipal liability, but can show that the practice "of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law."  *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015) (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)).  In other words, a plaintiff can show that there is "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity."  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485–87 (1986)).  "[I]solated acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability."  *Jones*, 691 F.3d at 81 (citations omitted); *Edrei v. City of New*

---

[23]  In its Amended Complaint, Plaintiff also asserted *Monell* claims based on a failure to train.  (*See* Am. Compl. ¶ 168.)  Plaintiff did not, however, rely on this theory in its motion papers.

*York*, 254 F. Supp. 3d 565, 579 (S.D.N.Y. 2017) ("Proof of a single incident of unconstitutional activity is usually insufficient to demonstrate the existence of a policy, . . . . "). Indeed, before the actions of subordinate city employees can give rise to section 1983 liability, the unlawful practice must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Newton v. City of New York*, 779 F.3d 140, 156 n.18 (2d Cir. 2015) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)).

There is no set number of incidents that make a practice "widespread," and courts have found a wide range of instances insufficient to plausibly allege a municipal custom. *See Jones*, 691 F.3d at 85 (finding that the plaintiff showed "two instances, or at the most three" cases of unconstitutional conduct by a "small number of officers" that occurred "over a period of several years," which "fell far short of showing a policy, custom, or usage of officers" or conduct "so persistent that it must have been known to supervisory authorities"); *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (stating that the plaintiff "identifie[d], at most, only four examples where the defendants might have disclosed positive drug test results," and holding that the "evidence [fell] far short of establishing a practice that is so persistent or widespread as to justify the imposition of municipal liability" (citations and internal quotation marks omitted)); *Cruz v. City of New York*, No. 15-CV-2265, 2016 WL 234853, at *5 (S.D.N.Y. Jan. 19, 2016) ("[E]ight cases cited from a municipality (New York) far bigger than Newburgh, makes the number of cited cases particularly inadequate to demonstrate plausibly a municipal custom."); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (finding thirteen instances of similar excessive force allegations over a four year period were insufficient to state a custom where, during that time period "hundreds, if not thousands, of arrests were made").

As to the Fourth Amendment claim for seizure of collateral, a reasonable juror could find that there was a widespread practice of unlawful seizures and holds, constituting the standard operating procedure.[24] Contrary to Defendant's assertions, Dambrot, corroborated by Plaintiff's other employees, testified that officers threatened arrest and disruption of business activities when he requested warrants for seizures or holds of pledged items. Dambrot also explained, by sworn affidavit, that he always protested, even for holds, until he was given "the typical warning [that he could] be arrested for possession of stolen property, or interference with governmental administration." (Dambrot Aff. ¶ 7; *see also* Popilevsky Dep. 20:20–25 ("*Every time* I call [Dambrot] and put him on the phone, it's a fight . . . then [the officer and Dambrot] start arguing

---

[24] Plaintiff requests that the Court find the policy requirement for *Monell* to be satisfied because section 436 is facially unconstitutional. *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125 (2d Cir. 2004) ("*Monell* established that alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself."). Although, as discussed *infra*, the Court finds section 436 to be facially unconstitutional, it is not necessarily clear that the NYPD's actions were pursuant to section 436 rather than other rules, regulations, and policy memoranda. *See Anobile v. Pelligrino*, 303 F.3d 107, 118 (2d Cir. 2002) ("[W]arrantless search exception applies to searches authorized pursuant to valid agency regulations, as well as to statutes."). Plaintiff also concedes that the Grasso Memo is likely constitutional even under the New York State Constitution, with its broader limitations on warrantless inspections. (*See* Pl. Mem. 11 ("[T]he Grasso Memo was built upon [*People v. Keta* (*sub nom. People v. Scott*), 79 N.Y.2d 474, (1992),] and sought to keep the police officers['] actions within the boundaries of what was constitutionally acceptable . . . [H]owever, [Plaintiff] submits that the Grasso Memo . . . [was] never followed . . . .").) Had officers acted pursuant to the Grasso Memo, which presumably is constitutional, section 436 would not appear to serve as the policy at issue for *Monell* purposes. Nevertheless, even if the NYPD acted under valid, constitutional authority, Defendant may be liable for enforcing the statute in an "unconstitutional manner." *Vives v. City of New York*, 524 F.3d 346, 356 (2d Cir. 2008); *Amnesty*, 361 F.3d at 125–26 ("Where a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy, the city may be held liable for its employees' unconstitutional acts."). Indeed, as the Court explained in the March 17, 2014 Decision, the seizures and holds of collateral property, as alleged by Plaintiff, go beyond even the expansive scope authorized by section 436.

and I walk away." (emphasis added)); Taranto Dep. 21:23–24 ("[W]hen it came to a seizure, . . . Dambrot would require a warrant.").) Indeed, Defendant admits that no warrant was ever served on Plaintiff by the NYPD between 2010 and June 21, 2016. (*See* Supplemental Demands 2, 4.) While the lack of such evidence may evince a remarkable history of cooperation with the NYPD, in light of the testimony of Dambrot and Plaintiff's other employees, a reasonable jury could also find that a threat of arrest or disruption of business likely preceded *every* seizure request by an officer. This finding is especially noteworthy in light of the very purpose of holds — "to freeze" the scene temporarily so that officers may obtain a warrant to lawfully seize the collateral. (Timlin Dep. 65:2–7; Esposito Dep. 34:14–21.) The consistency of the testimony across the various stores, located throughout the city, also support the existence of a widespread policy. Furthermore, Dambrot explained that he did not document every police interaction for a variety of reasons, including a lack of time. (Dambrot Aff. ¶ 4.) Dambrot and Plaintiff's other employees have testified that there were many more incidents of threats by the NYPD to seize pledge items beyond that expressly identified in this action. (*See* Dambrot Aff. ¶¶ 2–4; Lopez Dep. 32:13–19; Ragoo Dep. 26:24–27:5; Popilevsky Dep. 30:19–25.) Moreover, as Dambrot explained, Plaintiff was not under any obligation to document every hold, seizure, or police encounter. That Dambrot chose to document some of the incidents does not preclude the inference that there were many others.[25] Finally, managers of other pawnshop chains have sworn

---

[25] Because Defendant limited its challenge to the Fourth Amendment claim for seizure of collateral property, the Court likewise limits its review of the existence of a policy or custom to this basis. Nevertheless, unlawful searches and seizures serve as evidence in support of Plaintiff's claim for as-applied violations of the inspection scheme of commercial premises.

that they experienced similar treatment by the NYPD.[26]  (*See* Kaminsky Aff. ¶¶ 4, 6 (describing "demands" and "orders" to place holds on collateral and warrantless seizure of entire premises); Buoninfante Aff. ¶ 2 (describing "threats and orders to hold jewelry").)

Based on the evidence, the Court denies summary judgment as to the *Monell* claim based on as-applied violations of the Fourth Amendment.

### ii. Facial Challenge under the Fourth Amendment

In its moving papers, Plaintiff requests a declaratory judgment holding section 436[27] and

---

[26]  Plaintiff has provided evidence that would permit a jury to conclude that there was a widespread policy of unlawfully seizing collateral at pawnshops through intimidation and threats of arrest — *causing* the complained of injury of unlawful seizures of collateral in violation of the Fourth Amendment.  *See Cash v. Cty. of Erie*, 654 F.3d 324, 342 (2d Cir. 2011) ("'[P]roximate cause,' although derived from tort law, fairly describes a plaintiff's causation burden with respect to a municipal liability claim under § 1983."); *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."); *see also Szymaszek v. Mahar*, 06-CV-719, 2008 WL 4518613, at *6 (N.D.N.Y. Sept. 29, 2008) ("[C]ausation may also be established by showing that the municipality acquiesced in a 'longstanding practice or custom' constituting the 'standard operating procedure' of the local governmental entity." (quoting *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000)); *Perry v. Metro. Suburban Bus Auth.*, 390 F. Supp. 2d 251, 260 (E.D.N.Y. 2005) (same).  To the extent a jury determines the existence of such a policy, causation would likely be satisfied.  *See Newton v. City of New York*, 779 F.3d 140, 157 n.18 (2d Cir. 2015) ("Where a plaintiff claims that a particular municipal action *itself* violates federal law, . . . resolving [the] issues of fault and causation is straightforward." (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997)).

[27]  The Court finds it necessary to determine the constitutionality of section 436 because Defendant appears to argue in part that inspections that go beyond the scope authorized by other statutes, ordinances, agency rules, regulations, and memoranda are valid pursuant to section 436. (*See* Def. Mem. 3 n.1; Def. Reply 12 n.14.); *see also 5 Borough Pawn, LLC. v. Marti*, 753 F. Supp. 2d 186, 194 (S.D.N.Y. 2010) (finding officers "conduct[ed] biweekly inspections of local pawnshops pursuant to New York City Charter § 436.").  Throughout its submissions, Defendant also appears to argue that the existence of a valid inspection scheme insulates it from any as-applied challenges to the searches and seizures of the commercial premises of pawnshops. However, as-applied challenges of searches and seizures of premises do not violate the Fourth Amendment so long as they are *within* the scope of a valid inspection scheme.  *See Burger*, 482 U.S. 691, 705 n.13 (explaining that the Court "ha[d] no reason to reach the question of the

Local Law 149[28] to be facially constitutional under the Fourth Amendment.[29]

"A facial challenge is an attack on a statute itself as opposed to a particular application."

*Patel*, 576 U.S. at ---, 135 S. Ct. at 2449.  Under the United States Constitution, facial challenges

---

constitutionality of § 436" "because . . . the *inspection at issue* [*was*] *constitutional under § 415-a5*.").  Searches and seizures that go *beyond* the scope a valid inspection scheme constitute as-applied violations of the Fourth Amendment.  The mere existence of a valid inspection scheme does not grant officers unfettered access to commercial premises of closely-regulated businesses.

[28]  Because Plaintiff challenges the reporting requirements of Local Law 149 in their entirety as unlawful searches and seizures under the Fourth Amendment, the Court also considers the constitutionality of this statute.

[29]  Plaintiff also requests that the Court declare the statutes unconstitutional under Article 1, § 12 of the New York State Constitution.  The Second Circuit has held that a declaratory judgment action should be considered "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992).  Here, aside from its state malicious prosecution claim, Plaintiff has brought its claims under section 1983 which by definition require violations of federal law or the United States Constitution.  *See Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014).  In addition, Plaintiff's state malicious prosecution claim does not appear to require a constitutional violation to be viable.  Therefore, Plaintiff's claims do not appear to depend on whether section 436 or Local Law 149 are constitutional under the New York State Constitution.  *See Malek v. Haun*, 26 F.3d 1013, 1016 (10th Cir. 1994) ("[A] violation of state law alone does not give rise to a federal cause of action under § 1983"); *see also We Buy*, 2006 WL 3016314, at *5 (explaining that a citizen of New York may not "expect a higher level of privacy" under the Fourth Amendment because law enforcement is required to follow the more protective limits set by the New York State Constitution).  Under these circumstances, a facial challenge to a state statute under the state constitution appears inappropriate.  *See Sanders v. McNeil*, No. 05-CV-1354, 2008 WL 1909166, at *11 (M.D. Fla. Apr. 30, 2008) (applying same reasoning for facial challenge based on state constitution pursuant to federal habeas review); *see also Wainwright v. Goode*, 464 U.S. 78, 83–84 (1983) ("Section 2254 is explicit that a federal court is to entertain an application for a writ of habeas corpus 'only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States.'").  Therefore, the Court declines to consider Plaintiff's challenge to the constitutionality of section 436 and Local Law 149 under the state constitution.  If Plaintiff is able to provide contrary authority, the Court may reconsider its refusal to consider this challenge.  However, the Court also notes that facial challenges under the United States and New York State Constitutions are reviewed under the same standard.  *See Moran Towing Corp. v. Urbach*, 99 N.Y.2d 443, 448 (2003) ("[T]he challenger must establish that no set of circumstances exists under which the Act would be valid." (quoting *Salerno*, 481 U.S. at 745)).

to legislative acts are "the most difficult challenge[s] to mount successfully [because] the challenger must establish that *no set of circumstances exists under which the Act would be valid.*" *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added). Given this high hurdle, "claims for facial relief under the Fourth Amendment are unlikely to succeed when there is substantial ambiguity as to what conduct a statute authorizes." *Patel*, 576 U.S. at ---, 135 S. Ct. at 2450. Nevertheless, Fourth Amendment facial challenges are neither "categorically barred [n]or especially disfavored" and have been successful on occasion. *Id.* at 2449–50. "Fourth Amendment challenges to statutes authorizing warrantless searches are no exception." *Id.* at 2449.

Courts have "repeatedly held that searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Id.* at 2452 (citations omitted). This rule "applies to commercial premises as well as to homes." *Id.* Accordingly, without an applicable exception, statutes authorizing warrantless searches and seizures of commercial premises are presumptively unconstitutional. *See id.* Indeed, in *City of Los Angeles, Calif. v. Patel*, the Supreme Court clarified that for a "facial challenge to a statute authorizing warrantless searches," applications involving warrants, consents, or exigent circumstances should not be considered. *Id.* at 2451. Otherwise, "facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches" would be "precluded." *Id.* Nevertheless, the Supreme Court acknowledged the continuing viability of various exceptions, including that pertaining to "closely regulated industries." *See id.* at 2456.

Under the closely regulated industries exception, the challenged statute needs to satisfy "three . . . criteria" to be reasonable under the Fourth Amendment:

> (1) [T]here must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further [the] regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.

*Id.* at 2456 (quoting *Burger,* 482 U.S., at 702–03) (internal quotation marks omitted).

Both parties agree that pawnbrokers and second-hand dealers are closely or pervasively regulated in New York. (Pl. 56.1 Statement of Material Facts Pursuant to Local R. 56.1 ("Pl. 56.1") ¶ 1, Docket Entry No. 87-1);[30] *see also Burger*, 482 U.S. at 706 ("In New York, . . . secondhand shops long have been subject to regulation"). Plaintiff thus argues that section 436 and Local Law 149 authorize warrantless administrative inspection schemes that do not meet the requirements set forth in *Burger*. In particular, Plaintiff argues that both statutes fail to provide a "constitutionally adequate substitute for a warrant" by failing to limit the scope of inspections in terms of "certainty, regularity, and in particular frequency."[31] (Pl. Mem. 19–20, 23.) Defendant

---

[30] Under Local Rule 56.1, Plaintiff's statement of "[n]either [a]dmit or [d]eny" is considered an admission. *See Aztar Corp. v. NY Entm't, LLC*, 15 F. Supp. 2d 252, 254 n.1 (E.D.N.Y. 1998) ("Under Local Rule 56.1, [a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." (internal quotation marks and citation omitted)), *aff'd sub nom. Collins v. Aztar Corp.*, 210 F.3d 354 (2d Cir. 2000).

[31] In its reply, Plaintiff also appears to challenge Defendant's argument that there is a substantial government interest in a regulatory scheme over pawnbrokers — the first prong of the *Burger* test. (*See* Pl. Reply ("[Plaintiff] submits the Court should not overlook one very persuasive statistic: in 2013, the NYPD quantified the percentage of items potentially stolen that pass through pawnbrokers — and found the rate only to be [0].0001 of 1 percent!").) As discussed *infra*, the Court does not find it necessary to discuss the first two prongs of the *Burger* test because the inspection scheme authorized by section 436 fails to provide an adequate substitute for a warrant. While section 436 fails to provide an adequate substitute for a warrant, Local Law 149 authorizes a reporting scheme for which the *Burger* test is inapplicable. *Burger* only addresses the limitations of physical, on-site inspection schemes that are not implicated by the electronic reporting requirements of Local Law 149.

contends that the "regulatory scheme" as a whole, including other statutes, ordinances, and NYPD guidance (the Grasso Memo and the Patrol Guide), serve in total as an adequate substitute for a warrant.[32]

### 1. Section 436 fails to provide an adequate substitute for a warrant

"[A] statute's inspection program must . . . , 'in terms of the certainty and regularity of its application,' serve as a 'constitutionally adequate substitute for a warrant.'" *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 285 (6th Cir. 2018) (quoting *Burger*, 482 U.S. at 702). "In other words, the regulatory statute must perform . . . two basic functions . . . : it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Anobile v. Pelligrino*, 303 F.3d 107, 118 (2d Cir. 2002) (quoting *Burger*, 482 U.S. at 703). "To perform th[e] first function, the statute must be 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'" *Id.* (quoting *Burger*, 482 U.S. at 703). As to the second function, in limiting the discretion of inspectors, the statute "must be 'carefully limited in time, place and scope.'" *Id.* (quoting *Burger*, 482 U.S. at 703). Inspections that are "so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that

---

[32] Defendant also argues that Plaintiff's request should be denied because "a declaratory judgment is not a claim but rather a remedy" requiring a "substantive claim of a violation" prior to relief. (Def. Reply 12.) Defendant's argument requires the dismissal of Plaintiff's underlying Fourth Amendment claim regarding warrantless inspections. As discussed *infra*, the Court did not dismiss Plaintiff's Fourth Amendment claim as to warrantless inspections carried out pursuant to section 436.

his property will from time to time be inspected by government officials" will not be permitted.[33]

*Donovan v. Dewey*, 452 U.S. 594, 599 (1981).

Under this standard, section 436 is "plainly unconstitutional." *Burger*, 482 U.S. at 718 n.1 (Brennan, J., dissenting).[34] In particular, section 436 provides no meaningful limitation on the discretion of inspecting officers. The statute effectively authorizes searches of not only the

_____

[33] Courts have been inconsistent in their application of the *Burger* test. Several courts, including the United States Supreme Court, have found statutes unconstitutional for failing to provide a standard to ascertain the frequency of searches. *See City of Los Angeles, Calif. v. Patel*, 576 U.S. ---, ---, 135 S. Ct. 2443, 2456 (June 22, 2015) (explaining that had the *Burger* test applied, Los Angeles Municipal Code § 41.49 would have been unconstitutional for "failing to impose[] [a] comparable standard" as in [*Donovan v. Dewey*, 452 U.S. 594, 599 (1981),] where the Court "upheld inspection schemes of closely regulated industries that called for searches at least four times a year"); *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 291 (6th Cir. 2018) (holding that a statute that allowed "'free access' to . . . information 'at all times,' d[id] not sufficiently constrain the discretion of the inspectors"); *V-1 Oil Co. v. State of Wyo., Dep't of Envtl. Quality*, 902 F.2d 1482, 1487 (10th Cir. 1990) (holding a statute that "leaves inspectors free to inspect any business as often or seldom as he or she pleases" to be unconstitutional). Others, including the *Burger* Court, have disfavored specific requirements. *See Burger*, 482 U.S. at 722 ("There is neither an upper nor a lower limit on the number of searches that may be conducted at any given operator's establishment in any given time period.") (Brennan, J., dissenting); *Spinelli v. City of New York*, 579 F.3d 160, 168 (2d Cir. 2009) (holding warrantless search authority created by section 4–06(a)(3) did not violate the Fourth Amendment because "an effective inspection of a gun dealer's premises requires that searches be unannounced in order to discover potential security infractions"); *see also* Patel, 576 U.S. at ---, 135 S. Ct. at 2463 ("[T]he warrantless police searches of a business '[ten] times a day, every day, for three months' . . . are entirely consistent with the regimes in *Dewey* and *Burger*; [ten] times a day, every day, is 'at least four times a year,' and on a (much too) regular basis." (Scalia, J., dissenting) (internal quotation marks omitted)).

[34] In *Burger*, the United States Supreme Court did not entertain the constitutionality of section 436. *See Burger*, 482 U.S. at 705 n.13 ("Because we find the inspection at issue here constitutional under § 415-a5, we have no reason to reach the question of the constitutionality of § 436 of the New York City Charter."). Because of the Supreme Court's avoidance of the issue, there is some support that the New York Court of Appeals' decision holding section 436 unconstitutional still stands. *See Collateral Loanbrokers Ass'n of New York, Inc. v. City of New York*, 18 N.Y.S.3d 578 (Sup. Ct. 2015) ("*Burger*[,] 67 N.Y.2d 338[,] and its holding that [New York City Charter] § 436 is unconstitutional is arguably still binding on this Court."), *rev'd*, 46 N.Y.S.3d 600 (App. Div. 2017).

entire business premises but also of persons.  *See* N.Y. City Charter § 436 ("[I]n connection with the performance of *any* police duties [the commissioner] shall have power to examine such persons, their clerks and employees and their books, business premises, and *any* articles of merchandise in their possession." (emphasis added)).  Rather than provide "any standards to guide inspectors," the statute is "unlimited [in] scope."  *Dewey*, 452 U.S. at 601; *Liberty Coins*, 880 F.3d at 291.  Pursuant to the plain language of the statute, officers may examine any and all records, whether required to be kept by a valid regulatory scheme or not, access the entirety of the premises, whether open to the public or not, and even conduct searches of persons "in connection with the performance of any [and all undefined] police duties."[35]  N.Y. City Charter § 436; *see also People v. Burger*, 67 N.Y.2d 338, 344 (1986) ("§ 436 . . . do[es] little more than authorize general searches . . ."), *rev'd sub nom. Burger*, 482 U.S. at 691.

Defendant's reliance on the Grasso Memo, Patrol Guide,[36] and other statutes and

---

[35]  Despite the disputed nature of the law, *see supra* p. 44 n.33, section 436 is broader in scope than the statutes that the Supreme Court and other courts have already found to be facially unconstitutional, authorizing unfettered discretion in terms of not only the frequency of searches, but also the areas, objects, and people to be examined.  *Cf. Patel*, 576 U.S. at ---, 135 S. Ct. at 2463 (holding section 41.49 unconstitutional although its inspection scheme only allowed searches of required records and the inspection was to be conducted "in a manner that minimizes any interference with the operation of the business" "whenever possible"); *Liberty Coins*, 880 F.3d at 290 (holding unconstitutional Ohio Administrative Code § 1301:8-6-03(D) which allowed inspection of "[a]ll books, forms, and records, and all other sources of information with regard to the business of the licensee" "at all times"); *see also United States v. Kolokouris*, No. 12-CR-6015, 2015 WL 7176364, at *8 (W.D.N.Y. Nov. 13, 2015) (finding close question as to the constitutionality of Code Rule 56 which "allows for inspectors to enter property 'at any time' during an asbestos project whenever the Department of Labor receives a relevant complaint").

[36]  As discussed *supra*, aspects of the Grasso Memo and the Patrol Guide have been codified in 38 RCNY § 21-11.  In comparison, the Grasso Memo provides more details as to the scope of a permissible inspection than 38 RCNY § 21-11.  In addition, the Grasso Memo also provides officers instructions for how to handle situations that require a search or seizure that go beyond that of an administrative inspection, including the necessity of securing a warrant under

ordinances are unavailing.[37]  While *Burger* and its progeny address "statutory scheme[s]," the

constitutionality of a particular statute, in terms of the warrantless inspections *it* authorizes, is

evaluated on a case-by-case basis.  *See Burger*, 482 U.S. at 703 (analyzing constitutionality of

inspections authorized by section 415-a5 separately from those authorized under section 436);

*see id.* ("[T]he [New York] Court of Appeals concluded that Charter § 436 *also* violated the

Fourth Amendment's prohibition on unreasonable searches and seizures." (emphasis added)); *see*

*also Patel*, 576 U.S. at ---, 135 S. Ct. at 2456 ("Even if we were to find that hotels are

pervasively regulated, § 41.49 would need to satisfy three additional criteria to be reasonable

under the Fourth Amendment.").  Defendant cites no statute that has expressly overruled the

unbridled discretion authorized by section 436.[38]  *See Rush v. Obledo*, 756 F.2d 713, 716 (9th

---

certain circumstances.  Moreover, 38 RCNY § 21-11 does not expressly limit the scope of the
inspections authorized by section 436.

[37]  In contrast to section 436, GBL § 45 and New York City Administrative Code §§ 20-
273, 20-277 authorize inspections of a much more limited nature.  All three limit inspections (in
their current form) to "books and records regularly kept" or "records required by th[e] section."
GBL § 45 further limits inspections to "reasonable" times.  None of these three legislative acts
cross-reference or expressly limit section 436 in any way.  Nor do they regulate physical
inspections of premises or collateral property.  Likewise, the inspection scheme described in 6
RCNY § 1-16 relates back to the requirements in New York City Administrative Code §§ 20-267,
20-273, 20-277, and do not expressly limit the inspections authorized by section 436.  Tellingly,
despite the promulgation of these and other statutes and ordinances regulating pawnbrokers,
Defendant principally relies on the Grasso Memo in asserting that the regulatory scheme
provides sufficient limitations on officer discretion for warrantless inspections.  (*See* Def. Reply.
17–19.)  Defendant's reliance on a *non-binding* "guideline" is self-defeating.  Indeed, the Grasso
Memo is not even binding on the officers themselves, let alone section 436.  (Esposito Dep.
24:2–13 (failing to recollect whether the Grasso Memo was ever even considered the "standard
guideline for inspections of pawnbrokers"); *see also 5 Borough Pawn*, 640 F. Supp. 2d at 286
(S.D.N.Y. 2009) (officer "argue[d] that, pursuant to section 436, he had a right to search the
pawnshop's safe without a warrant").

[38]  In *People v. Pace*, 444 N.Y.S.2d 529 (Sup. Ct. 1981), a pre-*Burger* case, the New York
State Court held that the inspection scheme authorized by section 436 was "limited by 32-
132.0(d) of the Administrative Code of the City of New York," the predecessor to section 20-

Cir. 1985) (holding "current statutes" facially unconstitutional because no other "regulations . . . limit[ed] exercise of inspection authority under [those statutes]").  Nor does section 436 itself limit its reach by reference or incorporation of another, more limited, section or separate statute.  That the NYPD may *voluntarily* limit the scope of its inspections only serves to further highlight the facial unconstitutionality of section 436.  Although adherence to its guidelines may preclude as-applied challenges against the NYPD, the Grasso Memo has no binding effect on section 436 and cannot save the statute from a facial challenge.  *See Anobile*, 303 F.3d at 118 (considering scope of non-binding memo in assessing as-applied challenges under the Fourth Amendment).

For the foregoing reasons, the Court finds unconstitutional the portion of section 436 that authorizes the warrantless inspection scheme.  *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (explaining courts are "not to nullify more of a legislature's work than is necessary").  In particular, the Court determines the following portion of section 436 to be

---

273.  According to the court, the code limited the "unbridled discretion of the Police Commissioner" under section 436 by limiting administrative inspections to "reasonable times." *Id.* at 531.  The *Pace* court did not explain how it reached its conclusion.  Neither the prior nor current version of New York City Administrative Code section 20-273 reference section 436 in any way.  Furthermore, in 2013, Local Law 149 expressly eliminated the "reasonable times" language on which the *Pace* court relied.  Currently, New York City Administrative Code section 20-273 requires that "records required by the section . . . be open to inspection," and fails to serve as a limiting instruction to discretion under section 436.  Notably, section 20-273, in its current and prior forms, does not discuss inspection of premises and property, and could therefore have never served as a limitation of section 436 in those regards.  *See People v. Pace*, 475 N.Y.S.2d 443, 450 n.2 (App. Div. 1984) ("The People argue that subdivision d of section B32–132.0 of the Administrative Code of the City of New York provides that administrative searches are to be conducted during 'all reasonable times' . . .  a review of the language of that section indicates that it speaks only with regard to an inspection of a certain record book . . . and does not speak at all about administrative searches and inspections of merchandise or inventory." (Mangano, J., dissenting)), *aff'd*, 65 N.Y.2d 684 (1985).  With this understanding, the defendants in *Burger* and this action have not argued that any code or statute expressly limits the discretion conferred by section 436 as to physical inspections of the premises, property, and persons.

unconstitutional: "in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession." The Court finds that the legislature would have preferred to retain, at the very least, the Commissioner's "powers of general supervision and inspection" over the listed industries.[39] *See id.* at 330 ("After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?"). Without the unconstitutional portion of section 436, the Commissioner still retains the authority to carry out warrantless inspections of closely regulated industries in a manner consistent with *Burger*, whether by existing statutes, ordinances, agency rules, regulations, or those to be enacted in the future.[40] *See Anobile*, 303 F.3d at 118 ("[W]arrantless search exception applies to searches authorized pursuant to valid agency regulations, as well as to statutes.").

### 2. Local Law 149 authorizes a valid reporting scheme

Local Law 149, and its accompanying amendments to the New York City Administrative Code, do not violate the Fourth Amendment because it authorizes a reporting scheme for information that is required to be kept by statute. As discussed earlier, Plaintiff has no reasonable expectation of privacy in the information contained in the records. Furthermore,

---

[39] "When portions of a New York statute are found unconstitutional, the intent of the state legislature in originally enacting the statute is the touchstone in determining whether the remainder of the statute is severable and may be spared from the unconstitutional taint." *Gen. Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1460 (2d Cir. 1991). The Court has not been able to identify any legislative history regarding section 436, enacted originally in 1936. However, the long history of regulation of pawnbrokers and second-hand dealers strongly suggest that the New York legislature intended the Commissioner to retain some authority over pawnbrokers and the other industries listed in the statue.

[40] The Court does not address whether any of the other existing statutes, ordinances, agency rules, regulations, and policy memoranda are themselves constitutional.

reporting requirements of transactional information "imposed in a regulated industry that sufficiently describe and limit the information to be provided and are reasonably related to the regulatory authority of the agency to which the information is provided do not trigger constitutional protections against unreasonable searches and seizures." *Collateral Loanbrokers*, 46 N.Y.S.3d at 604; *California Bankers,* 416 U.S. at 67 (holding banks did not have a reasonable expectation of privacy in transactional information, including even with regards to consumers' social security numbers); *United States v. Chuang*, 897 F.2d 646, 651 (2d Cir. 1990) ("The fact that [defendant], as an officer of a national bank, knew th[e] documents were subject to periodic examination . . . , coupled with the fact that they were found in areas other than [defendant's] office, lead us to conclude that [defendant's] Fourth Amendment rights were not infringed by . . . [government] examination."); *United States v. Snyder*, 668 F.2d 686, 690 (2d Cir. 1982) ("The records examined . . . were union business records, required to be kept by law . . . and subject to inspection . . . Appellant had no reasonable expectation of privacy in these records.");[41] *S & S Pawn Shop Inc. v. City of Del City*, 947 F.2d 432, 438 (10th Cir. 1991) (holding recording and reporting requirements of pawnshops constitutional despite contention by plaintiff that the statute was "overbroad because it allow[ed] officials to inspect documents not connected to property reported as stolen"). Without a reasonable expectation of privacy in the information, Plaintiff does not even have standing to assert as-applied challenges against Local Law 149.[42] *See Shaul,*

---

[41] *United States v. Snyder*, 668 F.2d 686 (2d Cir. 1982), concerned 29 U.S.C. § 436, a statute that requires "contents of the reports and documents filed" with the United States Department of labor to be "public information," 29 U.S.C. § 435.

[42] Because Plaintiff does not have a reasonable expectation of privacy in the information in the records, the compelled reporting of the information differs from seizures and searches in the computer and internet context. In the latter contexts, the government often seizes information in the first instance so that it may search the information at a later time. *See United*

363 F.3d at 183 (holding lack of an expectation of privacy foreclosed a Fourth Amendment seizure claim); *United States v. Jimenez,* 789 F.2d 167, 170 (2d Cir. 1986) (same).[43]  Accordingly, Local Law 149 is constitutional under the Fourth Amendment.

### c. Equal Protection claim based on selective enforcement

Plaintiff asserts an Equal Protection selective enforcement claim based on retaliatory actions taken by Defendant for failing to register on LeadsOnline.  (Pl. Mem. 16.)  Plaintiff contends that it was subject to unlawful threats of arrest and business disruption in violation of the Fourth Amendment because of its choice not to register.  (*Id.*)  Accordingly, Plaintiff argues that its Fourth Amendment rights were violated and that Defendant acted with malice or bad faith.  (*Id.*)  Defendant asserts that the claim fails as a matter of law because there was no underlying Fourth Amendment violation or evidence of intent to punish.  (Def. Mem. 2.)  Defendant also argues that Plaintiff's decision not to use LeadsOnline provided a legitimate

---

*States v. Vilar*, No. 05-CR-621, 2007 WL 1075041, at *35 (S.D.N.Y. Apr. 4, 2007) ("Instead, it is frequently the case with computers that the normal sequence of search and then selective seizure is turned on its head, as computer hardware is seized from a suspect's premises before its content is known and then searched at a later time." (internal quotation marks and citations omitted)).  Such cases also implicate issues regarding how long the seized information may be stored.  *See United States v. Ganias*, 755 F.3d 125, 142 (2d Cir. 2014); *United States v. Ganias*, 824 F.3d 199, 226 (2d Cir.), *cert. denied*, 137 S. Ct. 569 (2016).

[43]  Defendant's argument for upholding section 436 based on "rational basis review" is inapplicable for facial challenges of statues pursuant to the Fourth Amendment.  (*See* Def. Reply 28–31.)  Rational basis review is the default test for due process or Equal Protection claims under the Fifth or Fourteenth Amendment.  *See Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 288 (2d Cir. 2015) ("[T]here must be at least some perceived public benefit for legislation or administrative rules to survive rational basis review under the Equal Protection and Due Process Clauses." (Droney, J., concurring)).  By comparison, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *Patel*, 576 U.S. at ---, 135 S. Ct. at 2458 (same) (Scalia, J., dissenting); *see also* Tracey Maclin, *The Central Meaning of the Fourth Amendment*, 35 Wm. & Mary L. Rev. 197, 199 (1993) ("Fourth Amendment questions are resolved using a test that *approximates* the rational basis standard, which is the test used to decide equal protection and due process challenges to social and economic legislation." (emphasis added)).

rational basis for differential treatment as compared to those registered for the service. (*Id.*)

To prevail on a claim for selective enforcement of the law in violation of the Equal Protection Clause, a plaintiff must prove that (1) "compared with others similarly situated, [plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [the plaintiff]." *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 554 F. App'x 32, 35 (2d Cir. 2014) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)); *see Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011) (noting that in order to satisfactorily state a selective enforcement claim, the court must determine, based on the allegations in the operative complaint, whether it is plausible that a reasonable jury could ultimately conclude that the plaintiff is similarly situated to an alleged comparator).

In analyzing the second prong, the Second Circuit explained that "the branch of equal protection law that protects individuals from unequal treatment motivated by 'malicious or bad faith intent to injure' provides protection from adverse governmental action that is not motivated by 'legitimate governmental objectives.'"[44] *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005) (quoting *Esmail v. Macrane,* 53 F.3d 176, 180 (7th Cir. 1995)). The Second Circuit reasoned that "if the motivation to punish is to secure compliance with agency objectives, then by definition the motivation is not spite, or malice, or a desire to "'get' [someone] for reasons wholly unrelated to any legitimate state objective." *Id.* Indeed, in *Bizzarro*, the Second Circuit overturned the district court's decision despite the lower court's finding that there was "no

---

[44] In view of the fact that Plaintiff's claim fails to satisfy the second prong, the Court does not consider the first prong.

legitimate *basis* for [an] order" punishing two officers because officials had the legitimate goal of encouraging cooperation with internal investigations. *Bizzarro*, 394 F.3d at 85 (emphasis added); *but see Toussie v. Town Bd. of E. Hampton*, 874 F. Supp. 2d 135, 139–40 (E.D.N.Y. 2012) (explaining potential "problematic results" stemming from a "literal application of the language 'wholly unrelated to any legitimate state objective'" (quoting *Bizzaro*, 394 F.2d at 87)).

Plaintiff's selective enforcement claim fails as a matter of law because the NYPD desired to implement LeadsOnline, as both parties agree, in order promote law enforcement purposes — a legitimate government objective. (*See* Pl. Mem. 2 (describing the NYPD's desire to use LeadsOnline to recover stolen property and identify perpetrators).) As an initial matter, the selective enforcement was not for the purpose of inhibiting the exercise of Fourth Amendment rights. As discussed earlier, Plaintiff has no reasonable expectation of privacy in the information contained in the records it is required to keep. Therefore, Plaintiff has no Fourth Amendment claim for being required to upload its records on LeadsOnline. *See California Bankers,* 416 U.S. at 67; *Chuang*, 897 F.2d at 651; *Snyder*, 668 F.2d at 690. In addition, the other asserted Fourth Amendment violations were not the reason for the alleged selective enforcement. They were instead, at most, a *method* by which Defendant sought to convince Plaintiff to register with LeadsOnline. Thus, Defendant cannot be said to have treated Plaintiff selectively with the intention to inhibit or punish the exercise of Fourth Amendment rights. Furthermore, because both parties agree that the NYPD wanted to encourage the use of LeadsOnline in order to help with policing — a legitimate state objective — Defendant was not motivated by malice or bad faith as a matter of law. *See Bizzarro*, 394 F.3d at 87. While the *methods* employed in achieving such an objective may themselves constitute Fourth Amendment violations, they are not a basis for an Equal Protection selective enforcement claim. Accordingly, the Court grants Defendant's

motion for summary judgment as to the Equal Protection claim.

### d. State law malicious prosecution claim

Plaintiff asserts a malicious prosecution claim under New York law based on a criminal summons issued on September 19, 2012. Defendant argues that Plaintiff fails to satisfy three separate elements of a malicious prosecution claim: (1) the summons was dismissed prior to trial and was not dismissed on the merits; (2) the evidence "does not establish the absence of probable cause"; and (3) there is no evidence that the summons "was issued with 'actual malice.'"[45] (Pl. Mem. 23–24.)

Under New York law, the elements of a malicious prosecution are "(1) commencement of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause, and (4) institution of the proceedings with actual malice." *Swartz,* 704 F.3d at 111–12 (citing *Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir. 2003)); *see also Cameron v. City of New York,* 598 F.3d 50, 63 (2d Cir. 2010) (stating the elements of a malicious prosecution claim under New York law); *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir. 1997) (same); *Adams v. City of New York,* 993 F. Supp. 2d. 306, 325 (E.D.N.Y. 2014) (same).

"[A]ctual malice" for malicious prosecution claims only requires "that the defendant . . .

---

[45] In making this argument, Defendant contends that the summons at issue could have only been dismissed pursuant to NY Criminal Procedural Law ("CPL") §§ 170.30 and 170.35. (Def. Mem. 23.) Defendant argues that under these provisions, dismissals prior to trial could only support a malicious prosecution claim if based on a "failure to comply with speedy trial provision," insufficiency of information with formal abandonment by the prosecutor, or "interest of justice with specific findings supporting innocence." (Def. Mem. 23–24.) However, CPL § 170.30(1)(f) allows dismissal for "legal impediment" to convictions, including presumably innocence, and may serve as a basis for a malicious prosecution claim. *See Adam v. Metro. Transp. Auth.*, No. 07-CV-8807, 2011 WL 891441, at *7 (S.D.N.Y. Mar. 15, 2011).

Defendant also requests that the Court decline to exercise jurisdiction over this state claim based on the assumption that the Court would have dismissed Plaintiff's federal claims. The Court denies this request because Plaintiff has provided sufficient evidence of a claim under the Fourth Amendment for unlawful search and seizure of collateral.

have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994) (citation omitted). "New York courts recognize that actual malice can rarely be established through direct evidence and thus may be proven though circumstantial evidence." *Id.* (citations omitted).

The September 19, 2012 summons was terminated on the merits. This Court has twice addressed this issue after review of the December 21, 2012 proceedings for the September 19, 2012 summons. *See Gem I*, 2014 WL 1010408, at *11; *Gem II*, 2015 WL 1475853, at *5-6. As explained in the March 31, 2015 Decision, "the Court . . . review[ed] the transcript of the December 21, 2012 hearing before Judge Raciti at the Criminal Court of the City of New York, and determined that 'the transcript[ ] from [the] hearing[ ] dated Dec. 21, 2012, reflect[s] that the merits were argued and that the court dismissed the summons . . . because [Plaintiff] had actually complied with the law,' and, therefore, the 'September 19, 2012 summons[ ] . . . did terminate in [Plaintiff's] favor.'" *Gem*, 2015 WL 1475853, at *6.

Plaintiff has also provided sufficient evidence of lack of probable cause and actual malice. As to lack of probable cause, the December 21, 2012 trial transcript again suggests that Judge Raciti reviewed the records submitted by Plaintiff and found them to support its assertions. (*See* December 21, 2012 Hr'g Tr. 5:18–22.) Furthermore, as to actual malice, Plaintiff's employees have testified consistently about the threats of arrest and business disruption they endured because of the refusal to register with LeadsOnline. The Court therefore denies Defendant's motion for summary judgment as to the New York State malicious prosecution claim.

### III. Conclusion

For the reasons discussed, the Court grants Defendant's motion for summary judgment as to the selective enforcement Equal Protection claim but denies the motion as to the Fourth Amendment claim regarding the seizure of collateral and the New York state malicious prosecution claim. The Court grants Plaintiff's request and declares New York City Charter § 436 unconstitutional but only the portion of the statute addressing warrantless inspections. The Court denies Plaintiff's request to declare New York City Local Law No. 149 unconstitutional.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 29, 2018
       Brooklyn, New York