UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
GEM FINANCIAL SERVICE, INC.,
*doing business as* Gem Pawnbrokers,

                Plaintiff,                  **MEMORANDUM AND ORDER**

      v.                             13-CV-1686 (RPK) (RER)

CITY OF NEW YORK,

                Defendant.
--------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

      This case concerns a series of allegedly unlawful inspections that the New York City

Police Department (the "NYPD") performed at pawnshops operated by plaintiff Gem Financial

Service, Inc. ("Gem"). *See* Am. Compl. (Dkt. #25). Three of Gem's claims against the City of

New York (the "City") under 42 U.S.C. § 1983 and state law survived summary judgment. *See*

Order dated Mar. 29, 2018 (Dkt. #93) ("Summ. J. Order"). With a jury trial in this case

scheduled to start on April 11, 2022, the parties have filed several motions *in limine*. For the

reasons stated below, plaintiff's motion to admit Harold Dambrot's affidavit is denied, and

defendant's motions are granted in part and denied in part.

## BACKGROUND

      I assume familiarity with the facts of this case, *see* Summ. J. Order at 2-12, which I

describe here only as needed to address the pending motions.

      Gem is a licensed collateral loan broker and second-hand dealer that operates multiple

retail stores throughout New York City. *Id.* at 2-3. Pawnbrokers like Gem are subject to state

law and the City's supervisory authority. *See id.* at 3; *see, e.g.*, N.Y.C Charter § 436. State law

requires collateral loan brokers to keep records of pawned items, *see* N.Y. Gen. Bus. Law § 43,

1

and the NYPD may require a pawnbroker to submit similar reports, *see* N.Y.C. Admin. Code § 20-277(b).

In 2010, the NYPD started encouraging pawnbrokers to use LeadsOnline, an Internet database for recording pawn transactions. Summ. J. Order at 3. Gem used LeadsOnline in 2010 but stopped in February 2011. *Id.* at 2-3. After Gem stopped using LeadsOnline, the NYPD allegedly visited Gem stores more frequently, threatened Gem and its employees, and issued Gem seven criminal summonses. *Id.* at 4-5.

Gem also alleges that the NYPD improperly seized or required Gem to hold pledged items. *Id.* at 5. The NYPD never secured a warrant to seize any item from Gem between 2010 and June 21, 2016 and has never obtained a warrant to search a Gem store. *Id.* at 6. But the City argues that Harold Dambrot, Gem's former Senior Vice President for Legal Matters, consented to every seizure and hold request. *See id.* at 7.

In 2013, after Gem filed this suit, New York City passed Local Law 149, which amended the City Code to require electronic reporting of pawn transactions. *See id.* at 10.

Gem and Gem's majority shareholder filed this case against the City, the NYPD, and John Doe police officers on March 28, 2013. *See* Compl. (Dkt. #1). The initial complaint alleged that defendants "violated the [plaintiffs'] civil rights and denied [them their] constitutional liberties" and deprived Gem of equal protection by singling Gem out as a "class of one" under 42 U.S.C. § 1983, deprived plaintiffs of their civil rights as guaranteed by the New York Civil Rights Law ("NYCRL"), maliciously prosecuted plaintiffs, and tortiously interfered with plaintiffs' business. *Id.* ¶¶ 82, 91, 95-99, 103-14, 118-22. In addition to damages, plaintiffs sought injunctive relief and a declaratory judgment regarding the constitutionality of certain local laws regulating pawnbrokers. *Id.* ¶¶ 125-33, 134-38. Defendants moved to dismiss

2

the complaint.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss (Dkt. #12).  At oral argument, Judge Margo K. Brodie dismissed the individual plaintiff as well as all claims against the NYPD.  *See* Minute Entry dated Mar. 6, 2014.  On March 17, 2014, Judge Brodie granted the motion to dismiss the equal protection, federal malicious prosecution, NYCRL, and tortious interference claims.  *See* Order dated Mar. 17, 2014 (Dkt. #21).

Plaintiff amended the complaint on May 5, 2014.  *See* Am. Compl.  The complaint added an additional plaintiff, Keith Watts.  *See ibid.*  The complaint brought claims against the City and John Doe officers for deprivation of plaintiffs' federal Fourth Amendment and equal-protection rights, municipal liability, and malicious prosecution.  *Id.* ¶¶ 134-200. Plaintiffs again sought damages, a declaratory judgment, and injunctive relief.  *Id.* ¶¶ 201-18.

Defendants moved to dismiss the equal-protection claim, as well as for reconsideration of the Court's prior decision permitting the Fourth Amendment and state malicious-prosecution claims to proceed.  *See* Defs.' Mem. in Supp. of Mot. for Reconsideration (Dkt. #39).  Judge Brodie denied the motion.  *See* Order dated Mar. 31, 2015 (Dkt. #54).  However, because plaintiffs' attorney withdrew Watts's claims, the Court dismissed all claims as to that plaintiff. *See id.* at 2 n.1.

On March 15, 2017, the parties filed cross-motions for summary judgment.  *See* Defs.' Mot. for Summ. J. (Dkt. #86); Pl.'s Cross-Mot. for Declaratory J. (Dkt. #87).

The Court denied defendant's motion for summary judgment on plaintiff's Fourth Amendment claims.  The Court construed plaintiff's Fourth Amendment claim as consisting of separate claims for unlawful "seizures and holds of collateral property" and "warrantless searches and seizures of the premises."  Summ J. Order at 13 n.10.  The Court did not consider the latter claim concerning the premises because defendant did not attack that claim in its

motion.  *See ibid.*  With respect to plaintiff's unlawful-seizure claim, the Court held that both actual seizures and police holds on collateral are seizures within the meaning of the Fourth Amendment.  *Id.* at 28.  The Court also held plaintiff has a reasonable expectation of privacy in pledged items and its physical records but not in the information in the records.  *Id.* at 21-22.  Accordingly, the Court concluded that plaintiff could challenge searches and seizures of pledged items and physical records but not information required to be kept by statute.  *Id.* at 26.  The Court then found that factual disputes existed regarding whether Dambrot's consents to seizures and holds were voluntary and whether the plain view doctrine applied to certain collateral items that were seized and held.  *Id.* at 30-34.   And the Court decided that a reasonable juror could find a "widespread practice of unlawful seizures and holds" such that the City could be held liable.  *Id.* at 38.

As to the rest of defendant's motion, the Court granted summary judgment on plaintiff's equal-protection claim and denied summary judgment on the malicious-prosecution claim.  *Id.* at 54, 56.

With respect to plaintiff's motion, the Court held that "the portion of [S]ection 436 that authorizes [a] warrantless inspection scheme" is unconstitutional.  *Id.* at 49.  But the Court explained that the City "still retains the authority to carry out warrantless inspections of closely regulated industries in a manner consistent with [*New York v. Burger*, 482 U.S. 691 (1987)], whether by existing statutes, ordinances, agency rules, [or] regulations."  *Id.* at 50.  The Court also found that "Local Law 149[] . . . [does] not violate the Fourth Amendment."  *Ibid.*

On June 25, 2018, defendant requested a pre-motion conference in anticipation of a motion for summary judgment on plaintiff's Fourth Amendment claim regarding premises seizures.  *See* Mot. for Pre-Mot. Conf. (Dkt. #96).  The Court denied defendant's request.  *See*

Order dated June 27, 2018 (Dkt. #97).   The Court clarified that plaintiff's claim was that "the various inspections schemes" were "applied or administered . . . in an unconstitutional manner." *Id.* at 3. Because "the parties appear to agree that [certain documents describing the regulatory scheme] are at the outer bounds of what is constitutional," the Court explained that "[s]earches and seizures that go beyond those . . . bounds, without another legal justification, are . . . unconstitutional." *Ibid.* Accordingly, the Court stated that "[t]o the extent the NYPD exceeded the bounds of its various inspection schemes, the trier of fact will have to consider the circumstances to determine whether the officers had an objectively lawful basis for their actions." *Id.* at 4.   The Court further noted that the jury would not need to consider the "subjective intent or motivations" of officers to conduct those inquiries. *Ibid.* Since "the remaining issues in [the] case . . . are factual in nature," the Court saw no basis for a second summary judgment motion. *Id.* at 5.

This case was reassigned to me on February 6, 2020.   The parties filed an amended proposed joint pretrial order on October 7, 2020. *See* First Am. Proposed Joint Pretrial Order (Dkt. #126).   I scheduled a jury trial to commence on April 11, 2022. *See* Order dated Oct. 21, 2021.

The parties filed motions *in limine*. *See* Pl.'s Mem. in Supp. of Mot. in Limine (Dkt. #139-1) ("Pl.'s Mem."); Def.'s Mem. in Supp. of Mot. in Limine (Dkt. #142-15) ("Def.'s Mem.").   After the parties docketed their motions, they filed a second amended proposed joint pretrial order. *See* Second Am. Proposed Joint Pretrial Order (Dkt. #148).[1]

---

[1] To the extent that the second amended proposed joint pretrial order suggests additional or different grounds for certain motions *in limine* than those actually raised in the parties' moving papers, I do not consider those new arguments in this Order.

Plaintiff moves to (i) preclude the testimony of twenty-seven NYPD officers and (ii) permit the use of an affidavit prepared by Dambrot before his death.  *See* Pl.'s Mem. at 7-10.

Defendant moves to (i) preclude plaintiff's expert testimony on lost profits damages, (ii) preclude plaintiff from introducing a log of contacts with NYPD officers prepared by Dambrot ("NYPD Contact Log"), *see* Decl. of Thomas John Rizzuti Ex. F (Dkt. #142-7) ("NYPD Contact Log") (iii) preclude testimony from plaintiff's witnesses who were not disclosed during discovery, (iv) preclude plaintiff from designating certain depositions in its case-in-chief, and (v) preclude plaintiff from offering evidence at trial concerning issues already decided by the Court. *See* Def.'s Mem. at 3-20.

## DISCUSSION

As explained below, I reserve ruling on plaintiff's motion to preclude NYPD officer testimony and deny plaintiff's motion to admit the Dambrot Affidavit.  I grant defendant's motion to preclude the NYPD Contact Log, grant in part defendant's motion to preclude evidence concerning issues controlled by the law of the case, and deny defendant's motions to preclude expert testimony on lost profits damages, to preclude undisclosed witnesses, and to preclude the admission of certain deposition testimony.

## I.      Plaintiff's Motions

Plaintiff moves to preclude testimony from twenty-seven NYPD officers and to admit the Dambrot Affidavit.  For the reasons stated below, I reserve ruling on plaintiff's motion with respect to NYPD officer testimony and deny plaintiff's motion to admit the affidavit.

### A.      Motion to Preclude NYPD Officer Testimony

Plaintiff moves to preclude the testimony of twenty-seven NYPD officers as cumulative, confusing, and prejudicial under Federal Rule of Evidence 403.  *See* Pl.'s Mem. at 4, 7-8.  I decline to rule on this motion prior to trial.

Plaintiff asserts that the additional twenty-seven officers "would fail to offer any additional probative value to the other twenty . . . officers" that the parties plan to call.  Pl.'s Mem. at 4.  Plaintiff also suggests that the proposed testimony would "unfairly delay the trial" and that preclusion would serve "the interests of justice."  *Id.* at 8.

Defendant responds that "[t]he [twenty-seven] officers . . . were identified by plaintiff as visiting [plaintiff's] stores and interacting with their managers in" the NYPD Contact Log. Def.'s Opp'n at 3 (Dkt. #143).  Defendant notes that those officers were not involved in putting holds on or seizing collateral, and defendant suggests that their testimony is relevant to plaintiff's Fourth Amendment claim regarding searches and seizures of Gem's premises.  *See id.* at 3, 3 n.3; Decl. of Thomas John Rizzuti Ex. B at 15 n.9 (Dkt. #143-3).  Defendant also points out that plaintiff "intends to offer evidence of the interactions between the officers and [plaintiff's] employees through the [NYPD Contact Log]."  Def.'s Opp'n at 3.

The purpose of motions *in limine* is "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (citation omitted).  Courts considering a motion *in limine* "may reserve decision until trial, so that the motion is placed in the appropriate factual context."  *Ali v. Connick*, No. 11-CV-5297 (NGG) (VMS), 2016 WL 3002403, at *2 (E.D.N.Y. May 23, 2016) (citation omitted).

Here, plaintiff argues that the additional officer testimony is inadmissible under Rule 403, which permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

As I explain below, the NYPD Contact Log is not admissible. And defendant appears to concede that in the absence of the log, defendant would "have no cause to call [the NYPD] witnesses." Def.'s Mem. at 2 n.2. But to the extent that plaintiff intends put on other evidence of interactions between the twenty-seven officers and Gem employees, the probative value of the officer testimony does not seem likely to be outweighed by any of the dangers listed in Rule 403. However, plaintiff may not reference interactions involving all twenty-seven officers at trial and defendant may not call all its listed witnesses. Given uncertainty about how the parties will present their cases to the jury, I reserve ruling on plaintiff's motion to preclude the twenty-seven additional NYPD officers. *See, e.g.*, *Connick*, 2016 WL 3002403, at *2.

### B.      Motion to Admit the Dambrot Affidavit

Plaintiff moves to permit the use of a sworn affidavit prepared by Dambrot before his death ("Dambrot Affidavit"). Pl.'s Mem. at 5; *see* Decl. of Paul J. Solda Ex. A (Dkt. #87-4) ("Dambrot Aff."). Plaintiff argues that the affidavit is not inadmissible hearsay because it is former testimony given by an unavailable witness and because it falls within the residual exception to the rule against hearsay. Pl.'s Mem. at 8-10; *see* Fed. R. Evid. 804(b)(1), 807. Neither of those arguments is convincing, and so I deny plaintiff's motion to permit use of the Dambrot Affidavit.

### 1.  Exception for Former Testimony

The Dambrot Affidavit does not fall within hearsay exception for former testimony given by an unavailable witness. Rule 804(b)(1) provides that where "the declarant is unavailable as a witness," "[t]estimony that . . . was given as a witness at a trial, hearing, or lawful deposition . . . and . . . is now offered against a party who had . . . an opportunity . . . to develop [that testimony]

by direct, cross-, or redirect examination" is "not excluded by the rule against hearsay."  Fed. R.

Evid. 804(b)(1).  Although Dambrot is deceased and therefore unavailable, *see id.* 804(a)(4), his

affidavit was not testimony given "at a trial, hearing, or lawful deposition," *see id.* 804(b)(1)(A);

*Sommerfield v. City of Chicago*, No. 08-CV-3025, 2014 WL 12802520, at *1 (N.D. Ill. July 8,

2014) (Rule 804(b)(1) does not apply to affidavits); *Tate v. Zaleski*, No. 19-CV-63 (TBM)

(MTP), 2021 WL 5811965, at *4 (S.D. Miss. Dec. 7, 2021) (same).  Plaintiff has cited no

authority to the contrary.  *See* Pl.'s Mem.  Therefore, the hearsay exception for former testimony

does not apply to the Dambrot Affidavit.

### 2.  Residual Exception

Even when the hearsay exceptions in Rules 803 and 804 do not apply, the residual

exception in Rule 807 provides that a hearsay statement is admissible when "(1) the statement is

supported by sufficient guarantees of trustworthiness" and "(2) it is more probative on the point

for which it is offered than any other evidence that the proponent can obtain through reasonable

efforts."  Fed. R. Evid. 807(a).    In this circuit, hearsay may be admitted under the residual

exception if "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most

probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence

and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse

party." *United States v. Dawkins*, 999 F.3d 767, 791 (2d Cir. 2021) (quoting *United States v.*

*Bryce*, 208 F.3d 346, 350-51 (2d Cir. 1999)); *accord Adamson v. Miller*, 808 F. App'x 14, 17 n.2

(2d Cir. 2020) (summary order).  For the residual exception to apply, all of those requirements

must be satisfied.  *United States v. Hill*, 658 F. App'x 600, 603 (2d Cir. 2016) (summary order).

Here, the residual exception does not apply because the Dambrot Affidavit is not

"particularly trustworthy."  *Dawkins*, 999 F.3d at 791 (quoting *Bryce*, 208 F.3d at 350).  In

determining a statement's trustworthiness, Rule 807 instructs courts to consider "the totality of

circumstances under which [the statement] was made and evidence, if any, corroborating the statement."  Fed. R. Evid. 807(a)(1); *see Gist v. United States*, No. 19-CV-5095 (GHW), 16-CR-656-6 (GHW), 2021 WL 3774289, at *14 (S.D.N.Y. Aug. 24, 2021) (describing 2019 amendments to Rule 807 that focus courts on circumstantial guarantees of trustworthiness and independent corroborating evidence).

The Dambrot Affidavit is not supported by circumstantial guarantees of trustworthiness. The Dambrot Affidavit was originally submitted as one of plaintiff's exhibits during summary judgment practice.  *See* Pl.'s Cross-Mot. for Declaratory J. (Dkt. #87).  In the first paragraph of the affidavit, Dambrot explains that he "submit[ted] [the] affidavit in opposition to [defendant's] motion seeking summary judgment and in support of Gem's [cross-motion]."  Dambrot Aff. ¶ 1. He also says that he could "adequately respond through [the] affidavit" in part because he had "read the [defendant's] papers."  *Ibid.*  The affidavit notes that Dambrot had already been "examined in a deposition" for "three days" at the time he created his affidavit.  *Id.* ¶ 7.  Indeed, the affidavit seeks to correct what Dambrot refers to as "mischaracterizations of [his] deposition testimony or . . . snippets taken out of context" in defendant's summary judgment papers.  *Ibid.* Much of the affidavit concerns Dambrot's creation of the NYPD Contact Log and Dambrot's refusal to consent to searches or seizures of collateral, and the affidavit provides detail about several seizures contested at summary judgment.  *Id.* ¶¶ 3-4, 6, 8-10.  But the affidavit is not styled as a factual narrative.  Instead, the affidavit largely consists of argumentative responses to points made in defendant's summary judgment papers.  *See, e.g.*, *id.* ¶¶ 2-3, 5, 7-10.

Taken as a whole, the affidavit appears to have been created to bolster plaintiff's case following Dambrot's deposition and in part to rebut defendant's use of Dambrot's deposition testimony on summary judgment.  As such, the Dambrot Affidavit was created for the purpose of

advancing plaintiff's interests during this litigation, and the affidavit therefore suffers from a serious risk that Dambrot was insincere.  *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232-33 (2d Cir. 1999) (describing classic risk that hearsay will be unreliable because insincere).  Even "[t]the most truthful of" affidavits prepared in response to summary judgment motions "cannot escape the reality that they are prepared with the incentive to set forth the facts in a light most favorable to itself."  *Broga v. Northeast Utils.*, 315 F. Supp. 2d 212, 218 (D. Conn. 2004) (internal quotation marks and citation omitted).

Plaintiff argues that Dambrot had no ownership interest in Gem or financial interest in this litigation.  *See* Pl.'s Reply at 3 (Dkt. #141).  Regardless, Dambrot's affidavit often uses the third-person "we," indicating a close affiliation between Dambrot and Gem.  *See, e.g.*, Dambrot Aff. ¶ 11.  And the affidavit is so full of editorializing and legal conclusions, *see, e.g.*, *id.* ¶ 8 ("Defendant makes hay of several cases which were not specified in our complaint . . . ."); *id.* ¶ 9 ("I suppose if the NYPD produced a warrant . . . then we would have no case . . . ."); *id.* ¶ 10 ("The [defendant's] argument seems to suggest that my NYPD Log is required to be maintained pursuant to some rule of law and therefore must be content specific without ambiguity."); *id.* ¶ 11 ("I am amused how [defendant] use[s] the word 'request a hold' – but fail to mention that their threats always drove to force us to consent."), that the reliability of the entire affidavit is questionable.

Plaintiff points to no meaningful indicia of reliability.  Plaintiff argues that the affidavit was made under oath and that Dambrot "would be subject to penalties of perjury for lying."  Pl.'s Reply at 2. But just because a statement is made under oath does not mean that it is trustworthy. *See O'Brien v. City of Yonkers*, No. 07-CV-3974 (KMK) (LMS), 2013 WL 1234966, at *8 n.8 (S.D.N.Y. Mar. 22, 2013).  The context in which the oath was taken and the extent to which the

statements under oath were tested by cross-examination are relevant. *See ibid.* Here, Dambrot did not take an oath in open court before a jury and during a public proceeding. *Cf. In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 163 (S.D.N.Y.2009) (admitting testimony of witnesses under residual exception, noting that they had "testified in court, before a jury, under oath and penalty of perjury, in a highly-scrutinized, public proceeding"). Nor was Dambrot subject to cross-examination on the contents of the affidavit after he prepared it. *See O'Brien*, 2013 WL 1234966, at *8 n.8 (finding testimony under oath insufficiently reliable in part because there had been no cross-examination on certain issues). Defendant never even had the chance to depose Dambrot on the specific assertions made in the affidavit because, as I explained, Dambrot prepared the affidavit in part to backtrack from his deposition testimony. Given the affidavit's contents, purpose, and timing, an oath and the penalty of perjury alone are not enough to guarantee trustworthiness.

Plaintiff also argues that the affidavit should be admitted because Dambrot knew that he would be subject to cross-examination about his affidavit in this litigation. *See* Pl.'s Reply at 3. In support, plaintiff cites a Third Circuit case finding that a district court did not abuse its discretion in admitting an affidavit from a deceased affiant under Rule 807. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 113 (3d Cir. 2001). The district court had relied in part on the declarant's knowledge about the pending litigation and the possibility that he would be cross-examined in admitting the exhibit. *See ibid.* Yet the affidavit in *Bohler-Uddeholm* bore greater indicia of trustworthiness than the affidavit here. That affidavit does not appear to have been created as a response to an opposing party's summary judgment papers and did not try to counter the opposing party's use of the affiant's prior deposition testimony. Rather, it does not appear from the Third Circuit's opinion that the affiant had been deposed about the relevant

facts, and the district court decided that the affidavit provided "the only way" that a particular claim could be rebutted.  *See ibid.*

Decisions in which courts in this circuit have admitted affidavits from deceased persons have similarly involved indicia of trustworthiness that are absent here.  *See Lopez v. Miller*, 915 F. Supp. 2d 373, 423-26 (E.D.N.Y. 2013); *Disabled in Action v. City of New York*, 437 F. Supp. 3d 298, 308 n.11 (S.D.N.Y. 2020); *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 288 n.1 (S.D.N.Y. 2020).  They involved multiple affidavits that were "detailed, internally consistent, and substantially consistent with each other," *Lopez*, 915 F. Supp. 2d at 425, declarations from deceased declarants that "[were] as trustworthy as . . . other declarations . . . that [the opposing party] [did] not challenge," *Disabled in Action*, 437 F. Supp. 3d at 308 n.11, or a scenario where the opposing party had "expressly declined to depose" the declarant, *Brehm*, 432 F. Supp. 3d at 288 n.1.  As I explained, the Dambrot Affidavit consists in large part of arguments against positions taken in defendant's summary judgment papers, and one of its purposes is to rehabilitate Dambrot's deposition.  Indeed, plaintiff argues that the affidavit is necessary because "the deposition testimony of Dambrot lacks clarity in many regards and requires support from his affidavit, in order to align (what [would have] been) his testimony and the evidence."  Pl.'s Mem. at 5 n.8.  Dambrot's awareness that he would be subject to cross-examination on the affidavit suggests that he would have fallen back on the affidavit if impeached through his deposition testimony.  Under those circumstances, I find inapposite the decisions that have admitted affidavits made by deceased affiants who anticipated future cross-examination.

The other cases upon which plaintiff relies are also inapposite.  *See* Pl.'s Mem. at 10. Two of those cases did not decide that similar affidavits were actually admissible under the

residual exception.  In *Sellers v. Nationwide Mutual Fire Insurance Co.*, No. 15-CV-957 (KOB), 2018 WL 1174482, at *3 (N.D. Ala. Mar. 6, 2018), the district court denied a motion to strike an affidavit from a deceased affiant on summary judgment, noting that a district court "may consider out-of-court statements within affidavits . . . so long as they may be reduced to evidence in an admissible form at trial."  Similarly, in *Landreaux v. Huntington Ingalls Inc.*, No. 20-1208, 2021 WL 533717, at *2 (E.D. La. Feb. 12, 2021), the district court denied a motion to strike affidavits submitted on a motion to remand in part because the Rule 804 exceptions for unavailable declarants could apply.

Moreover, plaintiff has not identified any specific correlations between the Dambrot Affidavit and other evidence that provide independent corroboration for the affidavit's contents. Plaintiff's memorandum asserts that the affidavit "can be corroborated by other evidence."  Pl.'s Mem. at 6.  But beyond arguing that the affidavit's contents are corroborated by "the attendant Gem contract/pledge records and computer reports," generally, citing to thirty-seven of Gem's trial exhibits, Pl.'s Reply at 3, and referencing "statements from Dambrot's depositions and . . . testimony by . . . eight Gem employees," *id.* at 2 n.5, plaintiff does not actually point to such evidence.  Those conclusory statements accompanied by citations to vast portions of the record do not establish that corroborating evidence exists for specific factual assertions made in the affidavit.

Even if the Dambrot Affidavit were partially corroborated by other evidence, as I have explained, the affidavit is not sufficiently trustworthy to be admitted under Rule 807.  The residual hearsay exception applies "very rarely, and only in exceptional circumstances."  *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (citation omitted); *Schering Corp.*, 189 F.3d at 232 (same).  Sometimes, an affidavit from a deceased witness may be admissible under this

exception.  *Cf. Lopez*, 915 F. Supp. 2d at 423-26; *Disabled in Action*, 437 F. Supp. 3d at 308 n.11; *Brehm*, 432 F. Supp. 3d at 288 n.1.  But here, the Dambrot Affidavit appears to be a litigation document manufactured to argue against an opposing party's dispositive motion and to shore up potential weaknesses in extensive deposition testimony.  Accordingly, plaintiff's motion to use the Dambrot Affidavit pursuant to the residual exception is denied.

**II.     Defendant's Motions**

For the reasons stated below, defendant's motion to preclude the NYPD Contact Log is granted, and defendant's motion to preclude certain evidence under the law-of-the-case doctrine is granted in part. Defendant's motions to preclude expert testimony on lost profits damages, to preclude undisclosed witnesses, and to preclude designation of deposition testimony are denied.

**A.     Motion to Preclude Expert Testimony on Lost Profits**

Defendant moves to preclude expert testimony from plaintiff's witnesses Barry Koch and Alan Schachter on lost profits damages under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See* Def.'s Mem. at 11-20.  Since plaintiff no longer intends to call Koch as an expert witness, I address defendant's arguments only as they relate to Schachter.  *See* Pl.'s Opp'n at 18 n.28.  Defendant argues that Schachter's report is "premised upon [an] unsupported assumption of a connection between police presence and customer behavior" and contains analysis that "[does] not comport with . . . professional standards" set by the American Institute of Certified Public Accountants ("AICPA").  Def.'s Mem. at 15.  Both arguments go to the weight of Schachter's testimony, not its admissibility, and so defendant's motion is denied.

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if four conditions are met: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. A party seeking to admit expert testimony under Rule 702 "must establish admissibility by a preponderance of the evidence." *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 397 (S.D.N.Y. 2019) (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)). The Rule 702 standard for the admissibility of expert testimony is "liberal." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).

Under Rule 702, the court must ensure that the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *accord United States v. Willis*, 14 F.4th 170, 185 (2d Cir. 2021). That "gatekeeping role" requires the court to "consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks and citation omitted) (quoting Fed. R. Evid. 702); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (holding that courts have the same "gatekeeping" role with respect to "technical" and "other specialized" knowledge). Factors that bear on reliability include whether a theory or technique "can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the technique's "known or potential rate of error" and the existence of standards controlling the technique's operation, and "general acceptance" of the technique or theory in the relevant scientific community. *Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-94).

In short, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267. The court's analysis "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266. However, "only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303 F.3d at 267). For example, expert testimony should be excluded as unreliable if the testimony "is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or [is] in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks and citation omitted). Other deficiencies in the expert's assumptions go to the testimony's "weight, not . . . admissibility." *Ibid.* (citation omitted).

Plaintiff retained Schachter, who is a licensed accountant and an accredited Certified Valuation Analyst, to calculate the lost profits damages suffered by plaintiff due to defendant's allegedly wrongful conduct. Decl. of Thomas John Rizzuti Ex. I at 2-3 (Dkt. #142-10) ("Schachter Report"). In calculating plaintiff's damages, Schachter assumed defendant's liability, that plaintiff suffered damages from 2011 through 2014, that defendant's actions affected all plaintiff's stores in New York City, and that the dispute between the parties generated bad press for plaintiff. *See id.* at 4, 10-11. To calculate the damages, Schachter gathered financial information from plaintiff and data for the pawn industry, determined "industry-wide and company specific variable costs," and "[c]reated an economic damage model . . . to determine the extent to which . . . [d]efendant's actions resulted in lost profits." *See*

*id.* at 11-12.  Schachter's model was based on "the Yardstick Method," "which compares the actual performance of [a company] to industry metrics to estimate the profits the [c]ompany would have earned 'but for' [defendant's] alleged wrongful acts." *Id.* at 12.

More specifically, Schacter "compute[d] 'lost revenue' by comparing [plaintiff's] 'actual revenue' to its 'expected revenue' in each year of the [period in which plaintiff allegedly suffered damages]. [Schacter] then deduct[ed] 'variable costs' from the lost revenue to compute 'lost profits.'" *Id.* at 13.  Plaintiff's expected revenue was determined by calculating a projected growth rate specific to plaintiff but based on industry growth rates. *See id.* at 14.  Schachter then applied that growth rate to plaintiff's actual revenue earned in a particular year. *See ibid.* Plaintiff's growth rate was adjusted for inflation and drops in gold prices. *See ibid.*

Defendant argues that Schachter's expert testimony is inadmissible because Schachter improperly assumed in his calculations that plaintiff "suffered lost profits as a result of alleged excessive police presence" and failed to "address all relevant factors" needed to perform a "Yardstick Method" analysis.  Def.'s Mem. at 15; Def.'s Reply at 9 (Dkt. #142-29).  But those alleged deficiencies do not render Schachter's testimony so unreliable that it must be excluded.

Schachter may testify regarding the calculations that he made using the Yardstick Method.  Specifically, Schachter may testify regarding the amount of profits plaintiff lost due to some plaintiff-specific cause between 2011 and 2014 based on a comparison of plaintiff's actual revenues with expected revenues pegged to industry-based growth rate. *See* Schachter Report at 12-16.  Doing so is not prohibited on the ground that Schachter operated from the assumption that "'but-for' . . . [d]efendant's actions, . . . [p]laintiff would have experienced . . . higher . . . profits," rather than drawing independent conclusions about the causal chain leading to those lost profits. *Id.* at 12.  Instead, Schacter took as a given a theory of causation communicated to him

by plaintiffs. *See* Decl. of Thomas John Rizzuti Ex. M. at 54-59 (Dkt. #142-14) ("Schachter Dep.") (discussing plaintiff's instructions regarding causation). Indeed, preclusion under these circumstances would prevent plaintiff from calling any expert on lost profits damages who could not also serve as an expert on causation issues. But the jury can assess the reliability of Schacter's assumptions regarding causation, and defendant "may inquire into those theories on cross-examination." *Playtex Prods., Inc. v. Procter & Gamble Co.*, No. 02-CV-8046 (WHP), 2003 WL 21242769, at *5 (S.D.N.Y. May 28, 2003). Ultimately, plaintiff will need to establish its theory of causation at trial, and "[i]f . . . plaintiff . . . fails to prove causation[,] . . . its expert testimony [on damages] will suffer the same fate." *Sleepy's, LLC v. Select Comfort Wholesale Corp.*, No. 07-CV-4018 (TCP) (ARL), 2012 WL 441190, at *2 (E.D.N.Y. Feb. 10, 2012).

That said, Schachter may not go beyond testifying that some cause specific to plaintiff's business caused the lost profits Schachter identified. For example, he may not testify that defendant's conduct caused the lost profits. Such testimony would be improper because, as noted above, Schachter assumed that defendant's conduct caused plaintiff damages. *See* Schachter Report at 10-11 (stating that Schachter was "asked to assume that all of the New York City stores of Gem Financial were affected by the aforementioned wrongful acts, and the negative publicity generated by the dispute between the parties"); Schachter Dep. at 54-59. Moreover, Schachter's projections using industrywide data do not address whether defendant's conduct—as opposed to some alternative cause specific to plaintiff's business—led to plaintiff's underperformance over the relevant period. *Cf.* Def.'s Mem. at 19 (proffering plaintiff's decision to sell collateral at below cost as alternative explanation). Schachter adjusted his model to take account of one specific feature of plaintiff's business—plaintiff's greater-than-usual reliance on gold items as collateral. *See* Schachter Report at 14-15. But he did not purport to

conduct an analysis that would exclude other factors specific to plaintiff's business, such as plaintiff's business decisions during the period in question.

Provided that Schachter's testimony is limited in this way, none of the other purported deficiencies in Schachter's use of the Yardstick Method that defendant identifies go to the admissibility of the testimony, rather than its weight.  Defendant criticizes the appropriateness of the "Yardstick Method" in this case and Schachter's assumptions that "police presence affected customer behavior[,] . . . . that [plaintiff] incurred damages during the period of 2011 to 2014[,] . . . . [that] all of plaintiff's stores were affected[,] . . . and the . . . negative press generated by the dispute."  Def.'s Mem. at 17, 18-19.  Defendant points to other evidence that Schachter's assumptions about causation were incorrect, including "the lack of correlation between the number of pawn . . . and sales tickets and [plaintiff's] decrease in revenue" and "the historic decline of the value of gold in 2013 and 2014."  *Id.* at 19.  In addition, defendant argues that Schachter failed to address plaintiff's growth in 2011 and 2012, "the delay of the impact of the . . . NYPD presence until 2013," why plaintiff's decline in revenue in 2013 was largely limited to one store, plaintiff's sales practices in 2013 and 2014, and the effect of competition on plaintiff's revenue.  *Id.* at 19-20.

But while defendant may properly challenge the assumptions underlying Schachter's analysis, and posit alternative causes for the decline in plaintiff's revenue, the issues that defendant identifies are "gaps or inconsistencies in [Schachter's] reasoning" that "go to the weight of the evidence."  *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (citation omitted).  Those alleged missteps in Schachter's report, as well as his justifications for selecting the Yardstick Method as a framework for his analysis, are "the proper subject of cross-examination or competing expert testimony," *BPP Wealth, Inc. v. Weiser Cap. Mgmt., LLC*, 623

F. App'x 7, 10 (2d Cir. 2015) (summary order), and do not warrant preclusion.  Accordingly, defendant's motion is denied.

### B.    Motion to Preclude Plaintiff's NYPD Contact Log

Defendant moves to preclude plaintiff from introducing the NYPD Contact Log[2] on the ground that the document is inadmissible hearsay.  *See* Def.'s Mem. at 6-9. The NYPD Contact Log appears to consist of dated entries beginning on March 10, 2006, and ending on November 5, 2013, detailing instances when NYPD officers interacted with plaintiff's employees.  *See* NYPD Contact Log.  Plaintiff argues that the NYPD Contact Log is admissible under the business records exception and the residual exception to the hearsay rule.  Because neither exception applies and there does not appear to be any other basis to admit the document, defendant's motion is granted.

### 1. Business Records Exception

Plaintiff is incorrect that the NYPD Contact Log is admissible as a business record.  *See* Pl.'s Opp'n at 13.  Under Rule 803(6), a business record is not excluded by the rule against hearsay if "the record was made at or near the time by—or from information transmitted by— someone with knowledge," "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit," "making the record was a regular practice of that activity," "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification," and "the opponent does not show that the source

---

[2] Although plaintiff designated the NYPD Contact Log as Exhibit 14, defendant's opening brief misidentifies the document as plaintiff's Exhibit 45. *See, e.g.*, Second Am. Proposed Joint Pretrial Order at 24 n.14. To the extent that defendant may have consented to the NYPD Contact Log in error, *see* Pl.'s Opp'n at 10-11, plaintiff offers no persuasive reason why defendant now should be estopped from moving to preclude the document.

of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(A)-(E).

"The purpose of the [business records exception] is to ensure that documents were not created for 'personal purpose[s] . . . or in anticipation of any litigation' so that the creator of the document 'had no motive to falsify the record in question.'" *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (quoting *United States v. Freidin*, 849 F.2d 716, 719 (2d Cir. 1988)). "[R]ecords created in anticipation of litigation do not fall within" the exception. *United States v. Feliz*, 467 F.3d 227, 234 (2d Cir. 2006). Rule 803(6) otherwise "favors the admission of evidence rather than its exclusion if it has any probative value at all." *Kaiser*, 609 F.3d at 574 (quoting *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000)). Accordingly, the "principal precondition to admissibility is that the record has sufficient indicia of trustworthiness to be considered reliable." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995) (internal quotation marks, alterations, and citation omitted). "The determination of whether, in all the circumstances, the records are sufficiently reliable to warrant their admission . . . is left to the sound discretion of the trial court." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 633 (2d Cir. 1994).

The NYPD Contact Log appears to be a document prepared in anticipation of litigation, not a business record admissible under Rule 803(6). *See Feliz*, 467 F.3d at 234. But even assuming that the NYPD Contact Log qualifies as a business record, the record lacks "sufficient indicia of trustworthiness" to be admissible because Dambrot edited the final document after plaintiff filed this action, Dambrot could not explain his method for creating the document, and Dambrot admitted that certain entries may be inaccurate. *Stone*, 60 F.3d at 101; *see* Fed. R. Evid. 803(6)(E).

The NYPD Contact Log appears to have been created in anticipation of the litigation. Dambrot testified in his deposition that he made the document that plaintiff seeks to offer as evidence "[a]fter the lawsuit started."  Decl. of Thomas John Rizzuti Ex. E at 51:10-12 (Dkt. #142-6) ("Dambrot Dep.").  Dambrot explained that he "had notes here, notes there. [He] put [them] together so they made sense. [He] copied the dates off the notes off the computer screen. . . . This . . . document [the NYPD Contact Log] . . . is an edited document of the originals that were prepared as they occurred."  *Id.* at 51:10-12, 16-17.  In light of Dambrot's testimony, the NYPD Contact Log appears to have been made to "serve the purposes of this litigation," *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 299 (S.D.N.Y. 2001), and not in "the course of a regularly conducted activity of a business," Fed. R. Evid. 803(6)(B).

Plaintiff's reliance on Dambrot's Affidavit to show that "[k]eeping a log of . . . police intrusions became a regular practice for [plaintiff]" is misplaced.  Pl.'s Opp'n at 12.  Dambrot stated in his affidavit that he kept a "running document in [his] computer" and "[i]n November[] 2013 . . . closed it, made a PDF document[,] and sent it to [his] attorney." *See* Pl.'s Opp'n at 12 (quoting Dambrot Aff.).  But because the Dambrot Affidavit is inadmissible, *see* pp. 8-15, *supra*, Dambrot's deposition appears to be the only source of testimony to establish a foundation for the NYPD Contact Log as required by Rule 803(6).  And Dambrot's deposition testimony indicates that Dambrot did far more than "close[] . . . a PDF document."  Pl.'s Opp'n at 12 (quoting Dambrot Aff.).  Dambrot testified that he compiled and edited materials to create the NYPD Contact Log.  *See* Dambrot Dep. at 51:10-12, 16-17.  Accordingly, the NYPD Contact Log is not a business record covered by Rule 803(6).

Even if the NYPD Contact Log is a business record, it is not sufficiently trustworthy to be admitted under Rule 803(6).  The fact that Dambrot modified entries in the document raises

doubts about the document's reliability, especially since at least some of those modifications occurred after plaintiff filed suit.  *See* Dambrot Dep. at 51:10-12, 16-17.  Multiple entries in the document reflect Dambrot's tinkering.  For example, an entry dated September 16, 2012, referencing a particular pledge includes a final line describing how the item was "[s]old at auction 04/15/2013."  NYPD Contact Log at 18.  Entries dated September 6 and 8, 2012, include similar annotations.  *See id.* at 17.  Moreover, Dambrot testified that "[t]here are no originals" of the information compiled into the document against which the entries could be checked for accuracy.  Dambrot. Dep. at 51:20.  "[M]inor incompleteness of . . . files" may go "to the weight rather than to the admissibility of . . . evidence," *United States v. Panza*, 750 F.2d 1141, 1151 (2d Cir. 1984), but all the sources for the NYPD Contact Log are missing.  Without those materials, it is impossible to assess the extent to which the information in the log has been manipulated.  Those "circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6)(E).

Dambrot's inability to explain how he created the NYPD Contact Log further undermines the document's reliability.  When Dambrot was asked about the method by which the information had been inputted into the computer, Dambrot responded, "I don't know. All I know is that it is accurate."  Dambrot Dep. at 52:6.  But Dambrot's testimony calls into question the reliability of certain entries.  With respect to an entry dated January 14, 2011, Dambrot testified that he either received the information "on the phone or [he] picked it up from a report and it was back-dated to the 14th."  *Id.* at 50:18-20.  Dambrot elaborated that the information "could have been handed to [him] on the 15th or the 16th *but for the most part it is accurate.*"  *Id.* at 50:20-21 (emphasis added).  That admission does not inspire confidence in the document's trustworthiness.

Finally, "[m]any of the log entries are incomplete, disjointed[,] and fail to fully identify who made or recorded the statements." *Trouble*, 179 F. Supp. 2d at 300.  Dambrot testified that the information in the document was "relayed to [him] by store managers" or came from "conversations with . . . different police officers[,] or it was face-to-face."  Dambrot Dep. at 50:9-11.  Later, Dambrot explained that "the vast majority of [the entries] are face-to-face events."  *Id.* at 55:3-4.  But most of the log entries are sentence fragments that do not identify which of plaintiff's employees had an encounter with an NYPD officer.  *See, e.g.*, NYPD Contact Log at 17 (Sept. 7, 2012 entry) ("PO Cabral . . . [e]xamined the Buy Book . . . noted 'investigation' on the log sheet. [C]opied pawn ledger.")

Plaintiff is therefore wrong that that "[t]here is . . . no indication that there may be a lack of trustworthiness to the document" because it was plaintiff's "regular practice . . . to maintain such a record and [the record] was [maintained] by a person having first-hand knowledge or transmitted by another person with knowledge."  Pl.'s Opp'n at 14.  Dambrot's edits, the uncertain means by which the document was created, Dambrot's concession that entries may be imprecise, and the muddled content of the entries make the NYPD Contact Log untrustworthy.  *See* Fed. R. Evid. 803(6)(E).  Accordingly, the business records exception does not render the NYPD Contact Log admissible.

### 2.  Residual Exception

For substantially similar reasons, the residual exception to the hearsay rule does not cover the NYPD Contact Log.  Hearsay may only be admitted under the residual exception if "it is particularly trustworthy."  *Dawkins*, 999 F.3d at 791 (quoting *Bryce*, 208 F.3d at 350).  As explained above, Dambrot created the NYPD Contact Log during this litigation, altered entries, could not recall his method for compiling entries, and suggested that some entries are inaccurate.  Plaintiff has cited no specific corroborating evidence, and the totality of the circumstances

indicate that the document is unreliable.  *See* Fed. R. Evid. 807(a)(1).  The NYPD Contact Log is not admissible under Rule 807, and defendant's motion is granted.

### C.    Motion to Preclude Late-Disclosed Witnesses

Defendant moves to preclude plaintiff from offering testimony from Jeffrey Kuhl and Michael Marino as a sanction for failing to disclose those witnesses during discovery.  Def.'s Mem. at 9-10; *see* Def.'s Reply at 6 (clarifying that defendant seeks preclusion only as to those two witnesses).  Because plaintiff's failure to disclose Kuhl and Marino was harmless, defendant's motion is denied.

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Rule 26(a) requires a party to make an initial disclosure "of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses."  Fed. R. Civ. P. 26(a).  And Rule 26(e) requires a party to supplement its Rule 26(a) disclosures "if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e).

Plaintiff failed to disclose Kuhl and Marino as required by Rule 26.  At most, the record reflects that Kuhl and Marino were brought to defendant's attention through joint pretrial orders rather than an initial Rule 26(a) disclosure or a supplemental Rules 26(e) disclosure.  Courts in this circuit generally do not view the disclosure of a witness in a joint pretrial order as a proper Rule 26(e) disclosure.  *See Merlite Inds., Inc. v. Valassis Inserts, Inc.*, 12 F.3d 373, 377 (2d Cir. 1993); *Wei Yan Yan v. 520 Asian Rest. Corp.*, No. 13-CV-2417 (KNF), 2014 WL 1877078, at *3 (S.D.N.Y. May 7, 2014); *see also Demirovic v. Ortega*, No. 15-CV-327 (CLP), 2017 WL

4621089, at *9-10 (E.D.N.Y. Oct. 13, 2017), *aff'd*, 771 F. App'x 111 (2d Cir. 2019) (summary order).  Therefore, neither Kuhl nor Marino were disclosed initially pursuant to Rule 26(a) or (e).

However, plaintiff has shown that its failure to disclose Kuhl and Marino was harmless. *See* Fed. R. Civ. P. 37(c)(1); *Ritchie Risk-Linked Strats. Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) (party that fails to comply with Rule 26 bears the burden of proving substantial justification and harmlessness).  Non-disclosure is harmless "when there is no prejudice to the party entitled to the disclosure."  *Redd v. N.Y. State Div. of Parole*, 923 F. Supp. 2d 393, 407 (E.D.N.Y. 2013) (citation omitted).  And, more specifically, "a failure to disclose witness information is 'harmless' if the other party was well aware of the identity of the undisclosed witness[es] and the scope of [their] knowledge well before trial."  *Evans v. United States*, 978 F. Supp. 2d 148, 154 (E.D.N.Y. 2013); *see Barcroft Media, Ltd. v. Coed Media Grp., LLC*, No. 16-CV-7634 (JMF), 2017 WL 4334138, at *2 (S.D.N.Y. Sept. 28, 2017) (denying preclusion where plaintiffs knew about undisclosed witness "for months").

 Here, defendant had notice of Kuhl and Marino and the topics of their testimony at least fifteen months ago when the parties filed a first amended pretrial order including their names. And defendant's motion *in limine* to preclude those witnesses was filed almost sixth months before the trial date.  Given the unusual length of time that this case has been delayed on its way to trial, plaintiff's failure to disclose Kuhl and Marino was harmless.

Accordingly, defendant's motion to preclude undisclosed witness is denied.

### D.     Motion to Preclude Use of Depositions in Plaintiff's Case-in-Chief

Defendant moves to preclude plaintiff from using deposition testimony of two NYPD Chiefs, Phil Pulaski and Joseph Esposito, and Thomas Doephner, an Assistant Deputy Commissioner in the NYPD Legal Bureau.  *See* Def.'s Mem. at 10-11; Second Am. Proposed Joint Pretrial Order at 16-17.

No ruling is necessary on defendant's motion concerning Pulaski and Esposito because plaintiff has agreed to withdraw its designation of those witnesses' depositions so long as the witnesses appear at trial.  Pl.'s Opp'n at 4 n.7.

Defendant's motion to preclude plaintiff from using Doephner's deposition is denied. Defendant maintains that the designated portions of Doephner's deposition "address the underlying administrative scheme and the NYPD's use of [LeadsOnline], which the Court previously found to be . . . lawful."  Def.'s Mem. at 11. But many of the designated parts of Doephner's deposition pertain to live issues in this case—such as municipal liability and the Fourth Amendment claims against the City.  For example, Doephner discusses the NYPD's general approach to ensuring that officers comply with new rules of law, the NYPD's compliance with certain internal guidance, the application of the plain view doctrine to administrative inspections, and the actions of NYPD officers during administrative inspections. *See* Decl. of Paul J. Solda Ex. K at 25:21-26:12, 32:16-33:2, 37:16-40:6, 53:17-54:24 (Dkt. #87-14).  Although it is more difficult to discern how other designated parts of the deposition are relevant, *see, e.g.*, *id.* Ex. K at 17:4-18 (Doephner's understanding of New York State decisional law), 66:25-68:13 (discriminatory nature of NYPD investigations of recidivists and parolees), defendant moves to preclude the "entirety of [the] deposition" and does not identify any specific objectionable testimony, Def.'s Mem. at 11.  Defendant's motion is therefore denied.

### E.   Motion to Preclude Evidence Concerning Issues Controlled by the Law of the Case

Defendant's motion to preclude evidence on issues that were purportedly decided during motions practice is granted in part.  *See* Def.'s Mem. at 3.

Defendant argues that plaintiff should not be permitted to introduce evidence concerning (1) "the legality of the administrative scheme, including" (2) "the legality of [LeadsOnline]," (3)

28

"[the] legitimate law enforcement purpose and use [of LeadsOnline]," (4) "the lack of constitutional privacy in the records required to be maintained under the administrative scheme," (5) "the validity of the summonses unrelated to the lone summons at issue in [plaintiff's] surviving state malicious prosecution cause of action," (6) "wrongdoing on the NYPD's or officers' part by the use of information obtained from inspections in investigating crimes," and (7) coercion of plaintiff "through threats in order to acquiesce to various demands[,] . . . especially demands to use [LeadsOnline]." *Id.* at 3-5.   Defendant suggests that evidence regarding those issues would be "irrelevant," "unduly prejudicial," and confusing to the jury because the Court already resolved those issues. *See id.* at 3; Fed. R. Evid. 403.

Under the law-of-the-case doctrine, "a decision on an issue made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re Nassau Cnty. Strip Search Cases*, 958 F. Supp. 2d 339, 343 (E.D.N.Y. 2013) (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)).   Even so, a district court may exercise its discretion to "reconsider its own decisions prior to final judgment" given "cogent or compelling reasons" like "an intervening change of controlling law." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d Cir. 1996) (internal quotation marks and citations omitted).

Here, plaintiff does not clearly argue that this Court should depart from the earlier decisions in this case or present "cogent or compelling reasons" for doing so. *Ibid.* At most, plaintiff argues that the Court's analysis of the "required records doctrine" is "somewhat misplaced" because the Court relied on caselaw relating to the Fifth Amendment.  Pl.'s Letter dated Dec. 23, 2021 at 5 n.6 (Dkt. #154).  Yet the Court addressed plaintiff's concerns in its order.  *See* Summ. J. Order at 22 n.17.   Because plaintiff has not shown that circumstances

justify departure from the Court's earlier rulings, those prior decisions remain binding under the law-of-the-case doctrine.

Applying that doctrine, defendant's motion is granted in part and denied in part. Defendant's motion to exclude evidence of criminal summonses other than the one at issue in plaintiff's state-law malicious prosecution claim is denied.  Contrary to defendant's arguments, such evidence is not "irrelevant."  Def.'s Mem. at 3.  To be sure, such summonses are not relevant to plaintiff's state-law malicious prosecution claim—which is based on a particular summons issued on September 19, 2012.  *See* Am. Compl. ¶ 189; *see* Summ. J. Order at 54-55. But plaintiff seeks to offer evidence of other summonses to show an "illegal municipal policy . . . to conduct impermissible searches and seizures and levy the force of law upon [plaintiff]."  Pl.'s Opp'n at 10, 10 n.17; *see* Pl.'s Letter dated Dec. 23, 2021 at 5.  And the Court already recognized in its summary judgment order that a reasonable jury could find a "widespread policy" supporting municipal liability under Section 1983 in this case based upon evidence "that a threat of arrest or disruption of business likely preceded *every* seizure request by an officer." Summ. J. Order at 39-40.  Evidence of past summonses that officers issued would be relevant to assessing whether officers coerced consent through threats of criminal process.  Moreover, defendant has not shown this evidence presents a risk of confusion or of misleading the jury that "substantially outweighs" the probative value of those summonses for plaintiff's municipal liability theory.  Fed. R. Evid. 403.  If defendant wishes, it may seek a limiting instruction to address those risks.  *See e.g., Adams v. City of New York*, 993 F. Supp. 2d 306, 320 (E.D.N.Y. 2014).  Therefore, defendant's motion to preclude evidence of additional summonses is denied.

Defendant's motion to preclude evidence relating to coercion and threats is denied, because it rests on a misunderstanding of the Court's decisions.  Defendant argues that the Court

previously decided that "the use and encouragement of [LeadsOnline] [was] lawful" and "mere threats without actual injury are not actionable under [Section] 1983." Def.'s Mem. at 5.  But the Court also decided that "a reasonable jury could find a lack of consent for many of the seizures and holds at issue" on the basis of "evidence . . . that a threat of arrest or business disruption preceded every request to seize an item."  Summ. J. Order at 33.  Threats that may have vitiated plaintiff's consent to seizures thus remain probative as to plaintiff's Section 1983 claim.  Threats intended to persuade plaintiff to use LeadsOnline are less obviously relevant. But the Court reserves judgment on evidence of threats relating to LeadsOnline until trial, when the relevance of that evidence can be assessed with additional evidentiary context.

Defendant's motion to preclude evidence regarding "the legality of [LeadsOnline]" and that program's "legitimate law enforcement purpose and use" is granted with respect to plaintiff's proposed evidence about data mining.  Def.'s Mem. at 3  Plaintiff indicates that it intends to put on evidence that "shows that the NYPD . . . data mined the records" in a manner outside the scope of a "legitimate administrative inspection program."  Pl.'s Letter dated Dec. 23, 2021 at 4; *see* Pl.'s Opp'n at 5-6.  Plaintiff's data mining evidence seems to rest on a legal theory already rejected by this Court—plaintiff's reasonable expectation of privacy in information uploaded to LeadsOnline.  *See* Summ. J. Order at 22 (concluding that plaintiff had no "reasonable expectation of privacy in the *information* in the records" (emphasis in original)).  And plaintiff offers no alternative explanation for the relevance of that evidence.  Accordingly, any minimal probative value of that evidence is substantially outweighed by undue prejudice to defendant and the danger of misleading the jury.  *See* Fed. R. Evid. 403.

Defendant's motion to preclude evidence about "wrongdoing on the NYPD's or officers' part by the use of information obtained from inspections in investigating crimes" is granted.

Def.'s Mem. at 5. Plaintiff appears to argue that the officers' use of the information obtained from their inspections to investigate crimes is evidence that the searches and seizures plaintiff challenges were "pretextual."   Pl.'s Opp'n at 7.   However, as the Court noted in its order resolving defendant's motion to dismiss, "an officer's subjective motive is irrelevant if any actual search that took place otherwise comports with the Fourth Amendment."   Order dated Mar. 17, 2014 at 13.  Accordingly, plaintiff has not explained why evidence of officers' motives for a seizure would be relevant to its Fourth Amendment claim.  Nor has plaintiff explained how officers' subsequent use of material seized pursuant to a valid administrative scheme would be evidence that the seizure exceeded the scope of the scheme.    At minimum, evidence about officer motives poses a substantial danger of unfair prejudice or confusion that substantially outweighs its probative value.  *See* Fed. R. Evid.  403.  Accordingly, such evidence is precluded.

Finally, I decline to rule at this time on defendant's request to preclude certain argument or evidence that plaintiffs do not appear to be offering.  No ruling is needed concerning evidence or argument on plaintiff's expectation of "privacy in the records required to be maintained under [New York's] administrative scheme," Def.'s Mem. at 3, because plaintiff indicates that it does not intend to offer such argument or evidence, *see* Pl.'s Letter dated Dec. 23, 2021 at 1.  Nor will I rule at this stage on defendant's motion to preclude evidence about the legality of NYPD's administrative scheme governing searches and seizures of collateral loan brokers. Up until the briefing of motions *in limine*, "[p]laintiff ha[d] not argued that the Grasso Memo or its later manifestations as new memoranda or regulations violate the Fourth Amendment in and of themselves," but had instead "challenge[d] the manner in which the various . . . regulations[] and agency memoranda are applied or administered in practice."  Order dated June 27, 2018 at 2-3. Plaintiff now opines in response to defendant's preclusion motion that it is "unlikely" that the

32

NYPD's administrative scheme was lawful.  Pl.'s Letter dated Dec. 23, 2021 at 3.  But plaintiff continues to represent that its theory at trial will be that "the NYPD's practice grossly *contravened* [NYPD's administrative] guidelines as well as underlying state and federal law." *Ibid.* (emphasis added).  Given plaintiff's articulation of its trial theory, a ruling on defendant's motion to preclude evidence or argument regarding a hypothetical challenge to New York's administrative scheme does not appear warranted at this time.

## CONCLUSION

Plaintiff's motion to admit the Dambrot Affidavit is denied, and I reserve ruling on plaintiff's motion to preclude NYPD officer testimony.  Defendant's motion to preclude the NYPD Contact Log is granted, and defendant's motion to preclude certain evidence under the law-of-the-case doctrine is granted in part. Defendant's motions to preclude expert testimony on lost profits damages, to preclude undisclosed witnesses, and to preclude designation of deposition testimony are denied.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: February 10, 2022
　　　　Brooklyn, New York