UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
GEM FINANCIAL SERVICE, INC.,
*d/b/a* GEM PAWNBROKERS,

                    Plaintiff,

      v.

CITY OF NEW YORK,

                    Defendant.
--------------------------------------------------------x

**MEMORANDUM AND ORDER**
13-CV-1686 (RPK) (RER)

RACHEL P. KOVNER, United States District Judge:

After a two-week trial, a jury found defendant City of New York liable for Fourth Amendment violations under 42 U.S.C. § 1983 and for malicious prosecution under New York law. The jury awarded plaintiff Gem Financial Service, Inc., *d/b/a/* Gem Pawnbrokers, $1,003,250.00 in compensatory damages. Defendant has moved for judgment as a matter of law under Federal Rule of Civil Procedure 50 and for a new trial under Federal Rule of Civil Procedure 59. For the reasons discussed below, defendant's motions are denied.

## BACKGROUND

The Court assumes familiarity with the background and procedural history of this case, which is recounted here only as necessary to decide defendant's motions.

### I.    Facts Adduced at Trial

#### A.  Plaintiff's Case-In-Chief

Plaintiff offered the testimony of nine principal witnesses.

##### *1.  Gilbert Delarosa*

Gilbert Delarosa, a vice president at Gem, testified about his experience managing Gem's business from 2011 through 2014. Trial Tr. 86–94. Gem has 20 branches across New York City.

1

*Id*. at 135.  It offers loans to customers; in exchange, customers leave collateral with Gem and pay interest on the loan.  *Id*. at 87–91.  If the customers repay the loan within the contractual timeframe, Gem will return the customer's collateral.  *Ibid*.  If they do not, title to the collateral passes to Gem, which sells it.  *Id*. at 91–94.

Pawnbrokers and secondhand dealers are regulated by New York State and New York City. *Id*. at 103–05.  Among other things, these regulations require pawnbrokers to maintain a physical "buy book" recording customer, loan, and merchandise and collateral details for each pawnbroker transaction.  *Id*. at 103, 105.

Sometime in or before 2009, the NYPD deployed the LeadsOnline program.  *Id*. at 27. Participating pawnbrokers uploaded their buy-book information into this online system, allowing NYPD officers to review the records about each pawnbroker transaction.  *Id*. at 121.  LeadsOnline not only afforded NYPD officers much easier access to buy-book information, but it allowed them to place "holds" on items—requiring the store to keep the held item on location—without going to the store.  *Id*. at 124–25.

Gem participated in the LeadsOnline system in 2009 but stopped doing so in late 2010.  *Id*. at 128.  Afterward, police officers started coming into Gem stores "more often," *id*. at 131–32, "once or twice a day" at "many different locations," *id*. at 130, without a warrant, *id*. at 133.  During these visits, officers would force Gem employees to show them proprietary records, certain merchandise and collateral and to search for specific customer names in Gem's databases under the threat of arrest.  *Id.* at 137, 142–45.

### 2.  *Joseph Taranto*

Joseph Taranto, a security officer at Gem's main branch during the relevant period, *id*. at 335, testified that NYPD officers visited Gem once every three months when Gem participated in LeadsOnline, i*d.* at 338.  After Gem stopped participating in LeadsOnline, NYPD officers began

visiting four to eight times per week. *Id.* at 341. No officer that Mr. Taranto observed had a warrant or subpoena. *Id.* at 348.

### 3. Khariton Popilevsky

Khariton Popilevsky, a manager at Gem's 608 8th Avenue location, also testified. *Id.* at 384–85. Mr. Popilevsky stated that after Gem stopped using LeadsOnline, NYPD officers came to the store weekly or biweekly—"more often" than when Gem participated in LeadsOnline, *id.* at 391—"hounding [Gem] to get back on LeadsOnline," *id.* at 414. The officers would take the buy book, look through it, and ask Mr. Popilevsky to run specific customer names through Gem's database. *Id.* at 394. If he didn't comply, the officers would threaten to arrest him. *Id.* at 395. Mr. Popilevsky further testified about an April 2011 incident in which NYPD detectives gave him "no other choice" than to obtain certain jewelry from Gem's safe and then confiscated the jewelry without a warrant in front of customers. *Id.* at 396, 399–402. Mr. Popilevsky did not recall ever seeing a warrant during NYPD visits to Gem. *Id.* at 395.

### 4. Andre Santiago

Andre Santiago, a supervisor of multiple Gem locations, *id.* at 447, 449, testified that, before Gem participated in the LeadsOnline program, NYPD officers would visit his locations every three or four months, *id.* at 459–60. After Gem left LeadsOnline, officers would visit his store locations three to four times per week. Beginning in 2012, the frequency increased further and the officers began aggressively demanding Gem rejoin LeadsOnline. *Id.* at 467–68. During these visits, the officers would force Gem employees to run specific names in its database, place holds on various merchandise and collateral, and demand to see certain merchandise and collateral. *Id.* at 464, 471. In one instance, an NYPD officer forced Mr. Santiago to retrieve pledged jewelry from the safe and then confiscated it, saying it was stolen property. *Id.* at 576–77.

### 5. John Somar

John Somar, a retired Gem employee who had processed loans for the company from 1990 until 2017, *id*. at 777–80, testified that, in March 2012, two "very angry" officers—one of whom was Officer Glenn Olsen—entered a Gem store and asked Mr. Somar to "run names." *Id*. at 786–88. When he refused, Officer Olsen wrote Mr. Somar a summons, issued to Gem, "for not complying with them." *Id*. at 790. This recurred more than four times in 2012. *Id*. at 803–04, 816, 819, 824. On each occasion, Mr. Somar appeared in court and the case was dismissed. *Id*. at 792, 800, 819, 823. In one such incident in August 2012 incident, Officer Olsen specifically told Mr. Somar that he "wanted Gem to go to LeadsOnline" and then issued him the summons. *Id*. at 813, 816–17. Mr. Somar further testified that Officer Olsen made the same comment prior to issuing a summons in September 2012, and that the summons appeared to have been written before Officer Olsen entered the store. *Id*. at 819–20.

### 6. David Kaminsky

David Kaminsky, the owner of EZ Pawn Corp., a competitor of Gem, *id.* at 610–11, testified there was an "increase [in police presence] after [EZ Pawn] went off of LeadsOnline." *Id*. at 645. During these visits, NYPD officers "came in to examine books and records and they wanted to take the records out of the store," *id*. at 648, run names, *id*. at 649, and sometimes attempt to take EZ Pawn's merchandise, *id*. at 647. When asked why EZ Pawn eventually rejoined LeadsOnline, Mr. Kaminsky testified:

> We were getting threats from the police. We were being bombarded that we should go on Leads and it would be better for us. They kind of pushed us into it. And I didn't want to. My managers -- we had discussions with our managers and our managers didn't like that they were being harassed by the police and people were coming in . . . We were having meetings with them. We knew what was going on. A lot of them wanted us to bring Leads back so that they didn't have to deal with the police coming into the stores.

*Id*. at 654–55.  After EZ Pawn rejoined LeadsOnline, "it was like we flipped a switch. The police stopped coming into the store."  *Id*. at 656.

### 7.  *Joseph Buoninfante*

Joseph Buoninfante, the managing member of another competitor, Quick Cash USA, also testified about his company's experience with government agents.  *Id*. at 1844–46.   Mr. Buoninfante testified that during administrative inspections conducted by the Department of Consumer Affairs, agents would "come in with a badge and they would do their inspection of the postings, that everything was properly posted, the right size was posted, the license was posted, the pawn ticket was enlarged and visible to the public, certain wording."  *Id*. at 1856.

Mr. Buoninfante further testified that "around 2010, 2011," NYPD officers started to visit Quick Cash USA frequently and became "aggressive, . . . demanding that" Quick Cash USA join LeadsOnline.  *Id*. at 1859.  The officers warned that if it did not "join LeadsOnline, . . . there's gonna be problems," and the NYPD would close it down.  *Id*. at 1864.  These officers visited Quick Cash USA stores "[t]wenty, twenty five times" in 2010 and on multiple occasions "basically said you have to be on LeadsOnline or we're going to close you down."  *Id*. at 1894–95.  Mr. Buoninfante also testified that a Quick Cash USA store manager was arrested on one occasion when the store did not "cooperate and giv[e] up the merchandise" that NYPD officers had requested.  *Id*. at 1872–73.  Another time, Mr. Buoninfante saw via video five officers visiting the store, "going through the safes, looking at merchandise, confiscating merchandise."  *Id*. at 1882–83.

### 8.  *Rachel Wilen*

Rachel Wilen, who was president of Gem during the times relevant to this case, also testified.  *Id*. at 709, 887.  Ms. Wilen testified that, in 2011, she witnessed her colleague Harold Dambrot get into an argument with NYPD Officer Brian Erbis and his colleagues after refusing to

turn over certain pledged items. *Id.* at 888. In response, the officers threatened to arrest Mr. Dambrot, shut the store down, and bring other officers over to "scour through" Gem's records and vault. *Id.* at 888–89. When Mr. Dambrot asked for a warrant, the officers replied that they did not need one. *Id.* at 891. Ms. Wilen further testified she witnessed Mr. Dambrot get into another heated argument with NYPD officers in 2012 after refusing to turn over certain pledged items. *Id.* at 892–93. The officers again threatened to arrest him and to shut down Gem for failing to comply. *Id.* at 894. Ms. Wilen testified that Gem storefronts had heavy physical customer traffic, with around fifteen customers at any given time, so these instances of police presence were very disruptive. *Id.* at 893.

Ms. Wilen testified about a specific encounter in which officers wanted to see a certain pawn contract. *Id.* at 896. Ms. Wilen and Mr. Dambrot fetched it from a secure area at the back of a Gem store and showed it to Officer Erbis. *Id.* at 898–99. Officer Erbis then demanded to see the collateral and, according to Ms. Wilen's understanding, took both the pledged item and the contract. *Id.* at 899–901. In 2013, another officer walked into the store, took a $500 guitar off the wall, and left with it. *Id.* at 902–04.

Ms. Wilen testified that Gem experienced dramatic year-over-year decreases in sales and in loan and payment transactions between 2011 and 2014. *Id.* at 923. In her approximation, the number of sale transactions decreased from about 14,000 in 2011 to about 12,000 in 2012; 11,000 in 2013; and 9,000 in 2014. *Id.* at 931. She testified that the total number of pawn transactions decreased from 180,000 in 2011 to 170,000 in 2012; 150,000 in 2013 and 126,000 in 2014. *Id.* at 934–35.

### 9. *Alan Schachter*

Alan Schachter testified as an expert witness.

During Mr. Schachter's testimony, the Court admitted into evidence certain summaries of voluminous financial records. *Id*. at 1152, 1201, 1210, 1220, 1223. As relevant here, Gem introduced a summary chart showing that Gem's gross profit was $24,114,954 for fiscal year 2010; $27,060,589 for fiscal year 2011; $24,092,924 for fiscal year 2012; $16,753,426 for fiscal year 2013; and $15,766,030 for fiscal year 2014. *Id*. at 1202–09. Gem also introduced a summary of its store-by-store financial statements showing that Gem's gross profit at the individual store level similarly decreased from 2010 through 2014. *Id*. at 1209–18. Gem then introduced a summary of its pawn and sales tickets showing that from fiscal year 2010 through 2014, pawn ticket volume decreased year-over-year from 181,846 to 172,264 to 159,936 to 143,310 to 126,705. *Id*. at 1222. Sales-ticket volume decreased from 14,062 to 9,909 over the same period. *Ibid*. Lastly, Gem introduced a summary of its store-by-store pawn and sale ticket numbers, which generally trended downward over the relevant period. *Id*. at 1223–26.

Mr. Schachter testified that he had reviewed Gem's 2011–14 financial and pawn ticket records; a survey of 9,300 U.S. pawnshops conducted by IBISWorld, a research company; and public filings of First Cash, a public pawnshop business with a similar product mix to Gem. *Id*. at 1180–91. Mr. Schachter used the yardstick methodology to determine Gem's lost profits, "compar[ing] Gem's] . . . operations to a group of other similarly-situated providers of the same services." *Id*. at 1191.

Mr. Schachter then compared the 2011–14 real growth rates of pawnshops in the IBISWorld survey—slightly adjusted for Gem's New York locale—to Gem's 2011–14 actual growth rates. *Id.* at 1192–93. He testified that applying these rates to Gem's financial statements with certain adjustments, Gem had a positive gross-profit differential compared to those

7

comparators of $2,538,000 in fiscal year 2011; a negative differential of $2,968,404 in fiscal year 2012; a negative differential of $3,544,000 in fiscal year 2013; and a negative differential of $1,000,507 in fiscal year 2014.  *Id*. at 1230–43.  After making an additional downward adjustment in defendant's favor, Mr. Schachter testified that Gem had total lost profits—reflecting what Gem's profit should have been if its performance correlated with that of the comparators versus what its profit actually was—of $5,481,000.  *Id*. at 1242–43 ("[T]he actual lost profits were over 8 million; but because I felt it was appropriate and reasonable to subtract . . . 2,538,000 from that loss because in one year . . . I didn't see the loss occurring.").

On cross-examination, defendant's counsel questioned Mr. Schachter on whether and how his models accounted for the effect of factors unrelated to the NYPD's conduct, such as competition and the economy, on Gem's financial performance.  Defense counsel also questioned Mr. Schachter about the appropriateness of using Fast Cash and the IBISWorld survey as comparators.  *Id*. at 1302–32.  Mr. Schachter testified that his New York adjustment to IBISWorld's 2011–14 real growth rates was a matter of "professional judgment after many years of practice" and that he didn't think Gem's business had a high correlation with the national economy's health based on his one day of in-store observations.  *Id*. at 1310–18.  Defendant's counsel questioned Mr. Schachter about the fact that not every store had decreases in pawn and sales tickets from 2011–14.  Mr. Schachter responded, there was nevertheless a "trend" of "a negative roll on a number of them."  *Id*. at 1318–24.  Mr. Schachter also explained that the number of pawn tickets and sales tickets do not have a direct correlation because a pawn ticket is issued every time interest is paid on a loan, in addition to the initial pawning of the item.  *Id.* at 1325–27.

## B. Defendant's Case-in-Chief

Defendant called three principal witnesses.

### 1. Detective David Bonacarti

Detective David Bonacarti discussed his involvement in the June 2013 incident Mr. Santiago had previously testified about. According to Detective Bonacarti, in that incident, a woman reported to the police that her "grandson had stolen her jewelry, and . . . gave [it] to another person who pawned that jewelry at Gem." *Id.* at 2143–44. After allegedly obtaining Gem's consent from Mr. Santiago, Detective Bonacarti obtained the jewelry from Gem, issued Gem a receipt, and returned it to the victim. *Id.* at 2147–48, 2152. On cross-examination, Detective Bonacarti stated that he did not advise Mr. Santiago that the employee had a right to withhold consent or to demand a warrant. *Id.* at 2159.

### 2. Detective Kevin Cannon

Detective Kevin Cannon testified how, during a homicide investigation, he put a criminal hold on a pledged item in Gem's possession while he obtained a subpoena. *Id.* at 2188–92. Detective Cannon obtained the subpoena, returned to Gem, and examined the pledged item. *Id.* at 2195–96. Detective Cannon testified that he never encouraged Gem to join LeadsOnline. *Id.* at 2198.

### 3. Alan Blass

Defendant's final witness was forensic accountant Alan Blass. Mr. Blass reviewed documents utilized by plaintiff's expert Mr. Schachter, *id.* at 2275, and conducted his own "Gross Profit Trending Analysis," *id.* at 2279. Mr. Blass testified that the "yardstick method" employed by plaintiff's expert—which compares Gem to other similar companies in the same business and location—was not an appropriate methodology to show that the NYPD's presence at Gem

damaged its business. *Id.* at 2254–55. In his view, Gem should have instead relied on its own historical data and done comparisons among Gem store locations. *Ibid.*

Mr. Blass testified that Gem's sales increased in 2012 and did not begin to decline until 2013. And, when the decline began, according to Mr. Blass, the decline was largely concentrated at Gem's Schermerhorn Street location. *Id.* at 2282–83. Mr. Blass testified that plaintiff's expert should have considered why the decrease in sales did not begin in 2011 and why the decrease was predominately concentrated at Gem's Schermerhorn Street location. *Ibid.*

Mr. Blass testified that a central reason for Gem's profit decline was not NYPD presence but a "historic decrease in the value of gold" in 2013. *Id.* at 2289. While plaintiff's expert "considered the amount of the gold decline in '13 and '14," Mr. Blass testified that plaintiff's expert "made an assumption that half of the merchandise . . . that was sold at these pawn shops was gold." *Id.* at 2290. Mr. Blass testified that Mr. Schachter "didn't even have a basis" for this assumption and the adjustment he made in his analysis was therefore "rather random." *Id.* at 2290–91. Mr. Blass likewise testified that Mr. Schachter did not sufficiently consider "increased competition" and the "economic climate" in coming to his conclusions. *Id.* at 2292–93.

### C.  Jury's Verdict

At the close of trial, the jury returned a verdict for plaintiff. Verdict (Dkt. #179). The jury found that searches of Gem's proprietary records by NYPD officers had violated plaintiff's Fourth Amendment rights, and that this violation was caused by an official policy or custom of the City of New York. *Id.* at 2. It similarly found that NYPD officers had seized merchandise and collateral in violation of plaintiff's Fourth Amendment rights, and that this violation was caused by an official policy or custom of the City of New York. *Ibid.* The jury further found that defendant had maliciously prosecuted plaintiff in violation of New York State law. *Ibid.*

The jury awarded plaintiff $1 million in compensatory damages for the searches of plaintiff's proprietary records; $1,500 for the seizures of plaintiff's merchandise and collateral; and $1,750 for malicious prosecution. *Id.* at 3.

Defendant then made this instant motion for relief under Federal Rules of Civil Procedure 50 and 59.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 50 "enables the district court to enter judgment as a matter of law against a party on an issue only if there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, and permits the district court to do so after a jury verdict, provided a pre-verdict motion is properly renewed." *Piroscafo v. Metro-N. Commuter R. Co.*, 552 F. App'x 6, 8 (2d Cir. 2013) (quoting *Nadel v. Isaksson*, 321 F.3d 266, 271–72 (2d Cir. 2003)). "When considering the evidence associated with a Rule 50(b) motion, the trial court may not 'weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury,' . . . and may grant the motion only when there is 'either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guess-work, or the evidence [is] so overwhelming that reasonable and fair-minded persons could only have reached the opposite result.'" *Ibid.* (alterations in original) (quoting *Vt. Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 277 (2d Cir. 1996) and *Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 112 (2d Cir. 1996)).

Under Federal Rule of Civil Procedure 59(a), a district court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), in the discretion of the trial judge, *Crockett v. City of New York*, 720 F. App'x 85, 86 (2d Cir. 2018). In this Circuit, such a motion may be granted only "when the jury's verdict is 'egregious,'" *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124,

134 (2d Cir. 1998) (quoting *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir. 1992)), or "if the verdict is against the weight of the evidence," *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012), such as when "the jury has reached a seriously erroneous result, or [its] verdict is a miscarriage of justice," *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005) (alteration in original) (internal quotation marks and citations omitted).

Rule 59(a) motions are evaluated under a "less stringent standard" than those under Rule 50(b). *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (internal quotation marks and citation omitted). "Unlike on a Rule 50 motion, . . . on a Rule 59 motion the court 'may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner' . . . [but when] 'a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice.'" *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (quoting *Raedle*, 670 F.3d at 418–19).

## DISCUSSION

For the reasons discussed below, defendant's motions for judgment as a matter of law and a new trial are denied.

**II.    Defendant Is Not Entitled to Judgment as a Matter of Law or a New Trial on Plaintiff's Fourth Amendment Claims.**

Defendant is not entitled to judgment as a matter of law or a new trial on plaintiff's Fourth Amendment claims.

### A. Claim For Unlawful Searches

The jury's determinations on plaintiff's unlawful-search claim were not against the weight of the evidence.  Defendant's motions for judgment as a matter of law and a new trial on this ground are accordingly denied.

#### 1. Fourth Amendment Interest

Defendant first contends that NYPD officers' searches of plaintiff's proprietary records could not have violated the Fourth Amendment because plaintiff lacked any privacy interest in "records and information required to be maintained and made available to governmental authorities pursuant to a valid administrative scheme."  Mem. in Supp. 2 (Dkt. #187–10).  Judge Brodie rejected this argument at the summary-judgment stage, reasoning that plaintiff had "a reasonable expectation of privacy in [its] pledged items, and its own physical records" that permitted plaintiff to bring a Fourth Amendment challenge to searches of its records and property. *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 482 (E.D.N.Y. 2018) ("*Gem II*"); *see id.* at 485 ("Plaintiff may challenge the search and seizure of the pledged items, and the physical records maintained on-site.").  That determination is the law of the case.  *See United States v. Daniels*, No. 20-3186-CR, 2022 WL 2203832, at *2 n.2 (2d Cir. June 21, 2022) (citing *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999)).

In any event, police searches of a business's required records are not—as defendant suggests—entirely immune from Fourth Amendment scrutiny.  As a general matter, business records are "papers" protected by the Fourth Amendment.  *See Hale v. Henkel*, 201 U.S. 43, 76–77 (1906).  When the government "obtains information by physically intruding on" a business's "papers," its actions constitute a search.  *United States v. McKenzie*, 13 F.4th 223, 232 (2d Cir. 2021) (citing *Florida v. Jardines*, 569 U.S. 1, 5 (2013)).  A search also occurs when government action "violate[s] a person's reasonable expectation of privacy," *ibid.* (citing *Katz v. United States*,

389 U.S. 347, 361, (1967) (Harlan, J., concurring)), and "one who owns or lawfully possesses or controls property"—as a business does with its papers—"will in all likelihood have a legitimate expectation of privacy by virtue of [its] right to exclude," *Rakas v. Illinois,* 439 U.S. 128, 143 n.12 (1978) (citation omitted).

Accordingly, the en banc Ninth Circuit has expressly rejected defendant's theory that the Fourth Amendment imposes no constraints on searches of records that a business is required to maintain. *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061–63 (9th Cir. 2013) (en banc), *aff'd*, 579 U.S. 409 (2015). The Court of Appeals reasoned that a hotel could raise a Fourth Amendment challenge to a statute that authorized searches of records that it was statutorily required to keep, because the searches "involve[d] both a physical intrusion upon a hotel's papers and an invasion of the hotel's protected privacy interest in those papers . . . notwithstanding the fact that the records [in question] are required to be kept by law." *Id.* at 1061–62; *see also McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 995 (6th Cir. 1988) (holding that "the concept of 'required records' is not synonymous with the absence of a privacy interest. . . . [E]mployers have a recognizable privacy interest in the records in question, even though the employer is required by law to keep them") (citing *Brock v. Emerson Electric Co.*, 834 F.2d 994 (11th Cir. 1987)).

This principle is also embedded in decisions of the Supreme Court. Its decisions hold, for example, that the Fourth Amendment limits the government's ability to obtain, through subpoenas, records that a company is required to maintain. *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (noting, in the context of a subpoena for statutorily required records under the Fair Labor Standards Act, that the subpoenaed employer must be able "to question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it"); *see ibid.* (citing *See v. City of Seattle*, 387 U.S. 541, 544 (1967), as establishing that "when an administrative agency

subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome"). And in affirming the Ninth Circuit's decision in *Patel*, the Supreme Court treated it as obvious that a hotel had a Fourth Amendment interest in the register it was statutorily required to maintain—with Justices disagreeing only as to whether the register-inspection scheme satisfied the Fourth Amendment's requirement of reasonableness. *Compare Patel*, 576 U.S. at 419–22 (opinion of the Court) (concluding that registry inspections without opportunity to bring pre-inspection challenge before neutral decisionmaker violated Fourth Amendment), *with id.* at 441 (Scalia, J., dissenting) (concluding that registry inspections comported with the Fourth Amendment because "the limited warrantless searches authorized . . . are reasonable under the circumstances").

Donovan v. Mehlenbacher*, 652 F.2d 228 (2d Cir. 1981), on which defendant relies, is not best read to establish a different rule. The plaintiff in that case challenged an order enforcing a subpoena for payroll records under statutes including the Fair Labor Standards Act. He argued that the subpoena was "lacking in reasonableness and relevancy, and violat[ed] his constitutional rights and those of his employees." *Id*. at 229. The Court of Appeals disagreed. It acknowledged that while the Department of Labor "clearly has the power to issue subpoenas in the course of an investigation conducted under statutory authority," its "subpoena power is limited . . . by requirements of reasonableness and relevancy." *Id.* at 230 (citing *Sec. & Exch. Comm'n v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1053 (2d Cir. 1973)). *Brigadoon Scotch Distribution Company*, on which the Second Circuit relied, had compiled Supreme Court decisions that "stand for the proposition that for purposes of the fourth amendment's probable cause requirement it is sufficient if an agency shows that an investigation is within its authority and the

15

materials requested are reasonably relevant." 480 F.2d at 1055. Analyzing the subpoena in *Mehlenbacher* under the framework described in *Brigadoon Scotch Distribution Company*, the Second Circuit "f[ound] no merit to the objections as to relevance or reasonableness" because of the subpoena's limited scope and the clear relevance of the records sought to Department of Labor investigations. *Mehlenbacher*, 652 F.2d at 230. The court then moved on to a further argument "that production of the documents in question will violate [plaintiff's] rights against unreasonable searches and seizures under the fourth amendment and against self-incrimination under the fifth amendment," and "disagree[d]," stating that "[p]roduction of the documents requested would not violate Mehlenbacher's fourth or fifth amendment rights because the subpoenas seek only those documents required to be maintained by federal law and therefore come within the 'required records' doctrine." *Id.* at 231.

*Mehlenbacher* is best read to foreclose act-of-production-based challenges to the production of documents that a business is required to maintain. Defendant's reading of the case as foreclosing *all* Fourth Amendment challenges to searches of statutorily required records cannot be reconciled with the parts of *Mehlenbacher* that analyze the challenged subpoena using a Fourth Amendment-based reasonableness rubric. *See id*. at 230. Moreover, defendant's broad reading would conflict with the Supreme Court decisions noted above establishing that the Fourth Amendment does constrain governmental searches and seizures of required records. Accordingly, to the extent that *Mehlenbacher* has language that suggests the broad rule defendant advocates, it has been superseded by later cases.

In sum, plaintiff's proprietary records are papers covered by the Fourth Amendment's protections against unreasonable searches.

2.  *Permissible Administrative Inspection*

Defendant next contends that the trial evidence does not support the jury's conclusion that defendant's searches violated the Fourth Amendment, because the searches were permissible administrative inspections.

Warrantless searches of commercial property are permitted under the Fourth Amendment when (1) the property is used in a closely regulated industry, (2) "a 'substantial' government interest [] informs the regulatory scheme pursuant to which the inspection is made," (3) "warrantless inspections [are] 'necessary to further the regulatory scheme,'" and (4) the regulations provide an adequate substitute for a warrant by "advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and [by] limit[ing] the discretion of the inspecting officers." *Anobile v. Pelligrino*, 303 F.3d 107, 117–18 (2d Cir. 2002) (quoting *New York v. Burger*, 482 U.S. 691, 702–03 (1987)).

But when a search is made for purposes other than "inventory or administrative regulation," the administrative-search exception to the warrant requirement does not apply. *Id.* at 122 (citing *Whren v. United States*, 517 U.S. 806, 811–12 (1996)). Thus, for example, an administrative inspection is not lawful if it is "a 'pretext' for obtaining evidence of general criminal activity," because such searches are not for the purpose of inventory or administrative regulation. *Ibid.* (citing *Burger*, 482 U.S. at 716–17 n.27); *see EZ Pawn Corp. v. City of New York*, 390 F. Supp. 3d 403, 409 n.3 (E.D.N.Y. 2019) ("An administrative search is a search made for the purpose of inventory or administrative regulation, . . . and is distinguishable from a search for evidence of a crime.") (internal quotation marks, alteration, and citations omitted); *see also Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 197–99 (5th Cir. 2009); *United States v. Orozco*, 858 F.3d 1204, 1206 (9th Cir. 2017). In this way, "while subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis . . . the purposes . . . of the search are indeed relevant" to whether a

17

search is a permissible administrative inspection.  *Anobile*, 303 F.3d at 122 (internal quotation marks omitted) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 45, 47 (2000)).

Here, a reasonable jury could have found that defendant's searches of Gem's proprietary records were for purposes other than inventory or administrative regulation:  namely, to induce plaintiff to rejoin the LeadsOnline program.  Multiple Gem employees testified that after Gem discontinued its LeadsOnline participation, NYPD officers dramatically increased the frequency of their searches at Gem stores.  Mr. Taranto testified that NYPD officers would only come to Gem once every three months when Gem was using LeadsOnline.  Trial Tr. 338.  After Gem stopped participating, the NYPD's visits increased to four to eight per week.  *Id.* at 341.  Mr. Popilevsky similarly testified that after Gem discontinued LeadsOnline, NYPD officers appeared weekly or biweekly, "more often" than these officers visited while Gem participated in LeadsOnline, *id.* at 391–92, "hounding [Gem] to get back on LeadsOnline," *id.* at 414.  Gem supervisor Mr. Santiago likewise testified that NYPD officers visited the stores every three to four months while Gem participated in LeadsOnline, but that the officers visited three or four times per week after Gem's participation stopped, and that visiting officers told Gem employees that Gem should return to LeadsOnline.  *Id.* at 459–60, 467–68.  Representatives of competing pawnbrokers recounted similar patterns.  *See id.* at 645–56 (Kaminsky testimony); *id.* at 1894–95 (Buoninfante testimony).

Because a reasonable juror could have concluded on this evidence that the searches of Gem's records were not valid administrative searches, *Zellner v. Summerlin*, 494 F.3d 344, 370–71 (2d Cir. 2007) (citing *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)), defendant's Rule 50 motion as to the searches of Gem's records is denied.  And although Rule 59(a) is subject to "more relaxed requirements" in that the Court may "consider credibility and the weight of the evidence

18

and [is not required] to view the evidence in the light most favorable to plaintiff," *Giles v. Rhodes*, 171 F. Supp. 2d 220, 229 n.5 (S.D.N.Y. 2001), the same conclusion follows under that standard. Defendants are not entitled to a new trial on plaintiff's Fourth Amendment claim pertaining to searches because the jury's verdict is not against the weight of the evidence. *See, e.g.*, *Exodus Partners, LLC v. Cooke*, No. 04-CV-10239 (GEL), 2007 WL 120053, at *13 (S.D.N.Y. Jan. 17, 2007).

### B. Claim For Unlawful Seizures

Defendant's motions for judgment as a matter of law and a new trial on plaintiff's Fourth Amendment claim for unlawful seizures are also denied.

The jury's verdict on that claim was not against the weight of the evidence. Officers may seize an item without a warrant when the owner consents. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). When assessing consent, the "ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (internal quotation marks and citation omitted).

Sufficient evidence supported the jury's conclusion that officers did not have a reasonable basis for believing they had acquired consent to seize merchandise and collateral from Gem. *See* pp. 2–6, *supra*. For example, Ms. Wilen testified that officers seized a guitar, Trial Tr. 902–04, as well as an item from Gem's safe, *id*. at 899–901, without a warrant, despite her refusal to consent, *id*. at 903–04. Mr. Popilevsky and Mr. Santiago both testified that NYPD detectives seized pledged jewelry items without warrants, *id*. at 396, 399–402, 576–77, despite their refusal to consent, *id*. at 400, 577. The jury also heard evidence that the NYPD would place holds on Gem's merchandise and collateral without warrants or consent. *See, e.g.*, *id*. at 464. A reasonable jury could find from this testimony that NYPD officers seized property from plaintiff without warrants, and without a reasonable basis to conclude that plaintiff had consented to the seizures.

19

Defendant's argument that it cannot be held liable because plaintiff did not offer evidence of "a sufficient number of holds or removals or sufficient information of the circumstances in which they occurred to support a policy or custom" is unavailing. Mem. in Supp. 9. To be sure, a municipality can only be held liable for Fourth Amendment violations under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), if "an official policy or custom" caused "the plaintiff to be subjected to a denial of a constitutional right," *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). But a plaintiff can establish an official policy or custom through evidence of "practices so persistent and widespread as to practically have the force of law," *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted)—as distinct from isolated acts "by non-policymaking municipal employees," *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012). Here, a reasonable jury could find a persistent NYPD practice of unlawfully seizing items from pawnshops based on the evidence of multiple unconstitutional seizures by NYPD officers at Gem stores, *see* pp. 2–6, *supra*, along with the evidence of similar seizures at competitors Quick Cash USA, *id.* at 1844–1943, and EZ Pawn Corporation, *id.* at 610–91. Defendant's motions for judgment as a matter of law and for a new trial on plaintiff's unlawful-seizure claim are accordingly denied. *Compare Davis v. City of New York*, 959 F. Supp. 2d 324, 349 (S.D.N.Y. 2013) (reasonable for jury to find *Monell* liability for false arrest when there was evidence of eight similar arrests without probable cause), *with Carmody v. Vill. of Rockville Ctr.*, 661 F. Supp. 2d 299, 331 (E.D.N.Y. 2009) (finding plaintiff could not establish a municipal policy or custom because plaintiff had not offered "evidence of the complained-of activity by defendants in similar circumstances outside of the present case").

### C. Damages

Invoking decisions under New York common law, defendant contends that the jury's damages award must be set aside, either because the evidence did not support a finding that

defendant caused plaintiff lost profits or, in the alternative, because plaintiff failed to prove the amount of those lost profits with reasonable certainty.  Neither argument is persuasive.

Plaintiff was obligated to establish lost profits with reasonable certainty.  "[W]hen [Section] 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986).  At common law in New York and elsewhere, lost profits in both tort and contract cases must be established with "reasonable certainty." *See, e.g.*, *Wolf Street Supermarkets, Inc. v. McPartland*, 108 A.D.2d 25, 25–26 (N.Y. App. Div. 1985); *Levine v. Am. Fed. Grp., Ltd.*, 180 A.D.2d 575, 577 (N.Y. App. Div. 1992); *see* Restatement (2d) of Torts § 912(a) (1979).  Accordingly, courts have required lost-profit damages to be established with reasonable certainty in the context of Section 1983 claims.  *See Frank Sloup & Crabs Unlimited, LLC v. Loeffler*, 745 F. Supp. 2d 115, 137 (E.D.N.Y. 2010); *New York Youth Club v. Town of Harrison*, 12-CV-7534 (CS), 2016 WL 3676690, at *8 (S.D.N.Y. July 6, 2016); *cf. Wallace v. Suffolk Cnty. Police Dep't*, 809 F. Supp. 2d 73, 81 (E.D.N.Y. 2011) (lost income damages).  Nevertheless, this reasonable-certainty standard does not require absolute certainty.  Measurements of damages "are often an approximation," and "[t]he law does not require that they be determined with mathematical precision." *Myheal Techs., Inc. v. Fonar Corp.*, 100 F.3d 944 (2d Cir. 1996) (citation omitted); *see* Restatement (2d) of Torts § 912(a) (1979) ("[A]n injured person [should] not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered," particularly "where the harm is of such a nature as necessarily to prevent anything approximating accuracy of proof, as when anticipated profits of a business have been prevented").

Here, affording due deference to the jury's role, defendant is not entitled to have the jury's award of damages set aside on the theory that plaintiff did not adequately prove lost profits.  A jury could infer that unconstitutional searches caused plaintiff to lose profits based on evidence that (1) after Gem left LeadsOnline in 2010, NYPD officers began to go to Gem's stores as frequently as once or twice a day, where they compelled Gem employees to show them merchandise or collateral or to search for names in Gem's databases, *see, e.g.*, Trial Tr. 130, 137, 142–45; (2) police officers' conducting these frequent searches in Gem's stores deterred customers from visiting Gem's stores, *see, e.g.*, *id*. at 936–37, 967–68; (3) plaintiff experienced significant reductions in sales volume and diminished profits over the period in which these intrusions occurred, *see id.* at 1202–43; and (4) plaintiff's expert, Mr. Schacter, opined that Gem had $5,481,000 less in profits during this period than he would have predicted, using the "yardstick method," based on Gem's past performance and comparator data from 2011 to 2014 taken from a survey of 9,300 U.S. pawnshops conducted by IBISWorld, a research company; and the public filings of First Cash, a public pawnshop business,  *see id*. at 1180–91, 1242–43.  And while the question is somewhat closer, a jury was entitled to find $1 million to be a fair assessment of lost-profit damages from unlawful searches, given the historical data showing diminished pawn ticket volume, sales volume, and profits, along with Mr. Schachter's estimates.

Defendant argues, first, that the damages award must be set aside because plaintiff failed to offer its financial records into evidence and jurors were not permitted to rely on summaries of those records prepared by experts.  Mem. in Supp. 14–16.  Under Federal Rule of Evidence 1006, however, a court may admit a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court" so long as the underlying records are made available to the adverse party, Fed. R. Evid. 1006; *see United States*

*v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020); *United States v. Mohamed*, No. 18-CR-603 (ARR), 2022 WL 15493545, at *9 (E.D.N.Y. Oct. 26, 2022), and "[t]he offering party. . . la[id] a proper foundation for admissibility of the underlying materials and show[ed] that the summary is accurate," *Thompson v. Spota*, No. 14-CV-02473 (NGG) (AYS), 2022 WL 17253464, at *12 (E.D.N.Y. Nov. 28, 2022) (citing 6 Weinstein's Federal Evidence § 1006.05); *see, e.g.*, *Mohamed*, 2022 WL 15493545, at *10. The jury may rely on charts admitted under Rule 1006 as substantive evidence, *Miller*, 954 F.3d at 565; *see, e.g.*, *United States v. Runner*, No. 18-CR-578 (JS), 2023 WL 3727532, at *8 (E.D.N.Y. May 30, 2023), and the court need not admit the underlying data upon which the charts are based, *see, e.g.*, *Mohamed*, 2022 WL 15493545, at *9.

Under these principles, the Court did not err by admitting plaintiff's summary charts. The data underlying the summary charts spanned hundreds of pages of documentary evidence. Am. Joint Pretrial Order 27 (Dkt. #148). It would have been impractical for the jury to review the reams of financial documents. *See, e.g.*, *Spota*, 2022 WL 17253464, at *12. Defendant has not suggested that plaintiff failed to make the underlying data available to it. And at trial, plaintiff laid the foundation for the data's admission and established the summary charts were accurate representations of that data. Trial Tr. 1201, 1210, 1220, 1223. The summary charts were therefore properly admitted under Rule 1006, even though the data underlying the charts was not also admitted into evidence.

Defendant also argues that the damages award must be set aside because Mr. Schachter's methodology for calculating the lost-profit damages was "legally invalid" on the ground that the businesses that Mr. Schacter used as comparators were not sufficiently similar to plaintiff's shops. Mem. in Supp. 13–15.

As an initial matter, before trial, the Court ruled that Mr. Schachter could testify about plaintiff's lost profits during the period of the NYPD intrusions at issue in this case based on his analysis using the yardstick method, *see* Mem. & Order 18–19 (Dkt. #155), which "compares the actual performance of [a company] to industry metrics to estimate the profits the [c]ompany would have earned 'but for' [defendant's] alleged wrongful acts," Decl. of Thomas John Rizzuti, Ex. I at 13 (Dkt. #142–10).  The Court ruled, however, that he could not testify that defendant's intrusions were the cause of those diminished profits.  Mem. & Order 19–20.  At trial, Mr. Schachter testified in line with these constraints.  He also explained why, in his view, the businesses being compared were "similar in material respects," *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 316 (S.D.N.Y. 2015) (ellipses omitted), and how he made adjustments to account for the fact that plaintiff was operating in New York City.  *See* Trial Tr. 1187–94.  Under these circumstances, disputes about the comparability of the yardsticks Mr. Schachter used go to weight, not admissibility, *Kellwood Co.*, 105 F. Supp. 3d at 318; *see Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006) ("The selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone").

Moreover, a jury was entitled to conclude that plaintiff suffered $1 million in damages from unlawful searches, after considering all of the trial evidence—including Mr. Schachter's testimony.  Courts closely scrutinize attempts by new ventures to establish lost profits using data from other companies.  *See, e.g.*, *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1579 (2d Cir. 1994) ("Courts distinguish between established businesses and new or 'fledgling' enterprises in fixing the level of proof needed to achieve reasonable certainty as to the amount of damages").  A new venture seeking lost profits faces "greater scrutiny because there is no track record upon which to base an estimate" of the damages.  *Schonfeld v. Hillard*, 218 F.3d 164, 172

(2d Cir. 2000). Accordingly, courts sometimes turn aside those businesses' bids for lost profits on the ground that they rely on comparisons to existing enterprises that are too dissimilar—as illustrated by several cases that defendant highlights. *See, e.g.*, *Washington v. Kellwood Co.*, No. 05-CV-10034 (SN), 2016 WL 3920348, at *7–8 (S.D.N.Y. July 15, 2016); *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 105, 121 N.E. 756 (1919). But plaintiff is not a new venture, and its lost-profits case relied not simply on data from other pawnshops but also on evidence of its own significantly diminished profits and sales volume during the period of unlawful police intrusions.

Giving due deference to the jury's role as factfinder, defendant is not entitled to have set aside the jury's determination that plaintiff established, with reasonable certainty, $1 million in damages from unlawful police searches.

### D. Malicious-Prosecution Verdict

Defendant's motions for judgment as a matter of law and a new trial are denied with respect to plaintiff's state-law claim of malicious prosecution. Under New York law, malicious prosecution requires: "(1) that [d]efendant[] either commenced or continued a criminal proceeding against him, (2) that the proceeding terminated in his favor, (3) that there was no probable cause for the criminal proceeding, and (4) that the criminal proceeding was instituted with actual malice." *Bermudez v. City of New York*, 790 F.3d 368, 376–77 (2d Cir. 2015) (citation omitted). A city can be held liable for malicious prosecution based on *respondeat superior*. *Rodick v. City of Schenectady*, 1 F.3d 1341, 1348 (2d Cir. 1993) (applying New York law). At trial, plaintiff contended that defendant was liable, under *respondeat superior*, for a malicious prosecution by NYPD Officer Glenn Olsen, who issued a summons to Gem on September 19, 2012. In issuing the summons, Officer Olsen asserted that plaintiff had violated a New York City rule regarding

customer identification because plaintiff did not retain a copy of a customer's identification documents. *Id.* at 1810–11.

Defendant asserts it is entitled to a judgment as a matter of law, or a new trial, because there was insufficient evidence that Officer Olsen's issuance of the summons reflected actual malice. Mem. in Supp. 16–17. "Under New York law, actual malice does not require a plaintiff to prove that the defendant was motivated by spite or hatred, but that he initiated the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Davis v. City of New York*, No. 04-CV-3299 (JFB) (RLM), 2007 WL 755190, at *10 (E.D.N.Y. Feb. 15, 2007) (internal quotation marks and citation omitted). Actual malice typically is shown by circumstantial evidence, including a lack of probable cause. *Ibid.* (citation omitted).

Defendant's motions are denied because a reasonable jury could find that Officer Olsen initiated the prosecution of Gem for the improper purpose of pressuring Gem to rejoin LeadsOnline. At trial, a Gem employee, Mr. Somar, testified that Officer Olsen issued him citations for Gem's failure to retain copies of customers' identification at least five times in 2012. Trial Tr. at 795, 804, 816, 819, 824. On at least two of these occasions, Officer Olsen told Mr. Somar that Gem needed to return to using LeadsOnline right before he issued him the summons. *Id.* at 813, 816–17, 819–20. On at least one of these occasions, Officer Olsen appeared to have written the summons before even entering the store. *Id.* at 820. This evidence supports the inference that Officer Olsen harbored an improper motive for citing plaintiff and its employees.

Moreover, contrary to defendant's contentions, a reasonable jury could find that Officer Olsen also lacked probable cause to issue a summons to Gem for violating New York City's customer-identification rule. The rule in question provides that "'it shall be the duty of every

secondhand dealer to verify the identity of every person from whom [the dealer] purchase[s] an article, and to make and keep a written record of the nature of the evidence submitted by such person to prove his identity.'"  Rules of the City of N.Y. § 2-201 (2016).  In issuing the citation underlying plaintiff's malicious-prosecution claim, Officer Olsen alleged that plaintiff had violated this identification rule because plaintiff had "fail[ed] to copy the identification for a customer ticket" for a particular customer, David Williams.  *Id*. at 1811.  But Officer Olsen's citation did not suggest that the store had failed to make a written record of the nature of the evidence submitted by Mr. Williams to prove his identity—only that the store had failed to retain a copy of the identification document itself.  *Id*. at 1813.  And the customer-identification rule does not require a secondhand dealer to keep a *copy* of the identification a customer provided.  The jury was accordingly entitled to conclude that Officer Olsen lacked probable cause to believe that plaintiff had violated New York City's customer-identification rule for pawnshops.

Taken together, this trial evidence was sufficient to support an inference that Officer Olsen "harbored [an] illegitimate reason for pursuing the case" against plaintiff for violating customer-identification rules, *Zwick v. Town of Cheektowaga*, No. 17-CV-727 (FPG), 2021 WL 4895106, at *6 (W.D.N.Y. Oct. 20, 2021)—namely pushing plaintiff to rejoin LeadsOnline.  Defendant's motion for judgment as a matter of law on the jury's malicious-prosecution claim is therefore denied.  And defendant's motion for a new trial on that claim is similarly denied, because for the reasons set forth above, the jury's malicious-prosecution verdict is not otherwise against the weight of the evidence.

## III.     Defendant Is Not Otherwise Entitled to a New Trial.

Defendant's remaining arguments for a new trial on the theory that the jury's verdict was seriously erroneous or a miscarriage of justice are without merit.

First, the asserted unreliability or inconsistency of the accounts from plaintiff's witnesses does not warrant a new trial.  *See* Mem. in Supp. 18.  In this Circuit, a "high degree of deference is accorded to the jury's evaluation of witness credibility, and [] jury verdicts should be disturbed with great infrequency."  *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014).  Here, while there were discrepancies between plaintiff's witnesses' testimonies and depositions,  defendant's counsel had the opportunity to cross-examine each witness, flag these inconsistencies for the jury, and empower the jury to weigh the witnesses' credibility themselves.  Because defendant "was entitled to argue to the jury that [the witnesses'] inconsistencies made [them] unreliable," *United States v. Kirk Tang Yuk*, 885 F.3d 57, 77 n.8 (2d Cir. 2018), "the jury's trusting of the accounts of the [plaintiff's witnesses] over that of the [defendant's witnesses] does not meet the high threshold required for overturning a credibility determination," *Flores v. Cnty. of Suffolk*, No. 16-CV-2502 (ADS) (ARL), 2020 WL 1323075, at *5 (E.D.N.Y. Mar. 18, 2020); *see Koch v. Greenberg*, 14 F. Supp. 3d 247, 262–63 (S.D.N.Y. 2014).

Second, while plaintiff's counsel engaged in unprofessional conduct throughout the trial, counsel's misconduct did not rise to the high threshold for overturning a jury's verdict.  Prejudicial misconduct by counsel can be a ground for a district court to grant a new trial pursuant to Rule 59.  *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992).  But "[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Crockett v. City of New York*, 720 F. App'x 85, 86–87 (2d Cir. 2018) (citation omitted).  "[O]nly if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted."  *Matthews v. CTI Container Transp. Int'l, Inc.*, 871 F.2d 270, 278 (2d Cir.

1989).  And "where the jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de minimis* in the context of the entire trial."  *Marcic v. Reinauer Transp. Companies*, 397 F.3d 120, 124 (2d Cir. 2005) (citing *Pappas*, 963 F.2d at 540).

As defendant observes, plaintiff's counsel improperly asked a litany of leading questions to plaintiff's own witnesses, *see* Mem. in Supp. 19 (noting "over fifty examples where the Court either sustained the [defendant's] leading objection, directed plaintiff's counsel to rephrase the question, or where plaintiff's counsel himself rephrased"), and made several improper references to "irrelevant police conduct" during trial and in closing argument—flouting the Court's *in limine* rulings, *id*. at 20, 22.  But defendant does not identify a leading question or improper statement that was not objected to and addressed by the Court.  And as explained above, substantial evidence supported the jury's verdict.  Considering the record as a whole, a new trial based on this improper conduct is not warranted.  *See, e.g.*, *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006); *Crockett*, 720 F. App'x at 87.

### A.  Jury Instructions

Finally, Defendant contends there were "two substantive issues" with the Court's jury instructions that warranted a new trial: that (1) the inclusion of the jury instruction regarding Section 436 was erroneous, and (2) the instruction on searches was erroneous.  Mem. in Supp. 23. Both claims lack merit.

#### 1.  The Section 436 Instruction

One theory of *Monell* liability plaintiff advanced was that the police officers conducted their searches pursuant to Section 436 of the New York City Charter.  Section 436 provides that "in connection with the performance of any police duties", the NYPD Commissioner "shall have power to examine [pawnbrokers and dealers in second-hand merchandise], their clerks and employees and their books, business premises, and any articles of merchandise in their

29

possession." N.Y. City Charter § 436.  At the summary-judgment stage, Judge Brodie found facially unconstitutional this portion of Section 436 because it "provides no meaningful limitation on the discretion of inspecting officers," as required under *New York v. Burger*, 482 U.S. 691 (1987).  *Gem II*, 298 F. Supp. 3d at 497.  At trial, the Court, making no mention of Section 436's unconstitutionality, instructed the jury as follows:

> You have heard that there existed a statute called Section 436 of the New York City Charter, which states that the NYPD Commissioner has the power to examine pawnbrokers and secondhand dealers, their clerks and employees and their books, business premises, and any articles of merchandise in their possession.  If you find that officers were relying on this particular part of Section 436 when they conducted the searches and seizures at issue in this case, or that this particular part of Section 436 in some way caused plaintiff to be deprived of its rights, then plaintiff has established that the deprivation of its federal rights was caused by an official policy of the municipality.

Trial Tr. 2419–20.

Defendant argues that the inclusion of this jury instruction was erroneous because there was no evidence in the record that officers relied on Section 436 in conducting the searches and seizures.  "A litigant is entitled to an instruction on a claim where that claim is supported by evidence of probative value."  *Harris v. O'Hare*, 770 F.3d 224, 238 n.9 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  "All that a party needs to show is that there is some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury."  *Ibid*. (quoting *Branen*, 17 F.3d at 557).  But "[a] party is not entitled to have the court give the jury an instruction for which there is no factual predicate in the trial record."  *McCardle v. Haddad*, 131 F.3d 43, 52 (2d Cir. 1997).

There was sufficient evidence in the record for the Court to give the Section 436 jury instruction.  At trial, plaintiff offered evidence to support its theory that officers relied on Section 436 as a basis for searches.  Plaintiff read into evidence Mr. Dambrot's deposition testimony stating that officers told Mr. Dambrot he "would be placed under arrest for interference with

governmental administration and Section 436" if he failed to comply with a hold request.  Trial Tr. 1103.  Mr. Bouninfante testified that his employee was arrested for refusing a police inspection pursuant to Section 436.  *Id*. at 1875–76.  And the trial record also contained an interrogatory answer in which defendant cited Section 436 as a basis for running criminal searches on pawnbroker customers.  *Id*. at 1691.  While the record also contained evidence from which jurors could infer that officers had not relied on Section 436 in conducting seizures, *see id*. at 1579–80 (testimony of Officer Daniel Albano); *id*. at 1762–63 (testimony of Chief Joseph Esposito), it was well within the jury's purview to weigh this evidence regarding Section 436.

### 2.  The Fourth Amendment Instructions

Second, defendant argues that the Court's "instruction on administrative inspections was erroneous and prejudiced" defendant because (1) it did not include that plaintiff's records were required to be kept by law and do not receive Fourth Amendment protection and because it (2) discussed the officer's intent.  Mem. in Supp. 24.

Defendant, however, failed to object to the jury instructions on either ground.  In particular, defendant made no objections to these instructions during the charge conference held on April 19, 2022.  *See* Trial Tr. 1260–88.  And while defendant invokes two letter submissions—Exhibits I (Dkt. #203–1) and J (Dkt. #203–2)—it claims were "written objections" to the Fourth Amendment jury instructions, Reply Br. 9 (Dkt. #202), neither letter qualifies.  Exhibit I is an April 17, 2022 letter in response to an order directing parties to explain what provisions of the administrative scheme permitted the searches in this case, and whether the purposes of officers in conducting searches and seizures are relevant.  The letter does not discuss any proposed jury instructions.  Exhibit J is an April 19, 2022 letter objecting to a proposed jury instruction regarding inferences from the absence of subpoenaed witnesses.  The letter does not pertain to the jury instructions the defendant now challenges.

Because "the challenging party failed to object to the [jury] charge at trial," the instructions are reviewed for plain error.  *Rasanen v. Doe*, 723 F.3d 325, 331–32 (2d Cir. 2013).  The plain error doctrine "should only be invoked with extreme caution in the civil context." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996).  "To constitute plain error, a court's action must contravene an established rule of law" and the substantial right affected must "go[] to the very essence of the case." *Rasanen*, 723 F.3d at 333 (quoting *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 483 (2d Cir. 2001) and *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)).

Defendant "fail[s] to show how . . . the jury [instructions] on this point resulted in a miscarriage of justice so as to constitute plain error." *Simms v. Vill. of Albion*, 115 F.3d 1098, 1109 (2d Cir. 1997).  As discussed above, even records that businesses are statutorily required to keep receive some Fourth Amendment protections, *see* pp. 13–16, *supra*, and an officer's intentions can be relevant to determining whether searches were conducted pursuant to a valid administrative scheme, *see* pp. 17–19, *supra*.  Accordingly, it was not plain error to instruct the jury on both points.

## CONCLUSION

Defendant's motions for judgment as a matter of law and for a new trial are denied.

SO ORDERED.

/s/ Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated: July 28, 2023
        Brooklyn, New York